**NO DATE FOR ORAL ARGUMENT HAS BEEN SET**

**Nos. 22-5036, 22-5037 (Consolidated)**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

FRIENDS OF THE EARTH; HEALTHY GULF; SIERRA CLUB; CENTER FOR BIOLOGICAL DIVERSITY,

*Plaintiffs-Appellees,*

v.

DEBRA A. HAALAND, in her official capacity as Secretary of the Interior, LAURA DANIEL-DAVIS, in her official capacity as Assistant Secretary of the Interior for Land and Minerals Management; UNITED STATES DEPARTMENT OF THE INTERIOR; BUREAU OF OCEAN ENERGY MANAGEMENT,

*Defendants-Appellees,*

STATE OF LOUISIANA,

*Intervenor for Defendant-Appellant,*

AMERICAN PETROLEUM INSTITUTE,

*Intervenor for Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Columbia, No. 1:21-cv-02317-RC

## BRIEF OF CHEVRON U.S.A. INC. AS AMICUS CURIAE IN SUPPORT OF INTERVENOR-APPELLANT AND REVERSAL

Jennifer J. Clark
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
jennifer.clark@sidley.com

Ashley C. Parrish
Charles J. ("Tim") Engel
Nikesh Jindal
Amy R. Upshaw
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
aparrish@kslaw.com

Initial Brief: June 13, 2022     *Counsel for Amicus Curiae*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties and *Amici Curiae*.** All parties and intervenors appearing in this Court are listed in the Opening Brief for Appellants, except for the Chamber of Commerce of the United States of America, EnerGeo Alliance, National Ocean Industries Association, and Shell Offshore, Inc.., which have appeared as amici curiae in support of Appellants.

***Ruling Under Review.*** Reference to the ruling at issue appears in the Opening Brief for Appellants.

***Related Cases.*** This case has not previously come before this Court.

*Louisiana v. Biden*, No. 2:21-cv-00778-TAD-KK (W.D. La. Mar. 24, 2021), involves the same lease sale at issue in this appeal. *American Petroleum Institute v. United States Department of Interior*, No. 2:21-cv-02506-TAD-KKK (W.D. La. Aug. 16, 2021), involves a challenge to a *de facto* moratorium on offshore leasing.

Dated: June 13, 2022

## CERTIFICATE PURSUANT TO CIRCUIT RULE 29(d)

In accordance with Circuit Rule 29(d), undersigned counsel for Chevron U.S.A. Inc. represent that this brief is being filed in accordance with the Court's April 9, 2022 briefing order, which specifically provides for a separate amicus curiae brief to be filed by Chevron.

Chevron previously filed a notice of appeal challenging the district court's order denying without prejudice its motion to participate as an intervenor. *See Friends of the Earth v. Halland*, No. 22-5067, Notice of Appeal (March 21, 2022). In deciding to voluntarily dismiss that appeal, Chevron reached agreement with all parties that it would be permitted to file a separate brief as amicus curiae. *See* Unopposed Mot. to Dismiss Appeal and Notice of Intent to Participate as Amicus Curiae (April 8, 2022). Chevron actively participated as an amicus in the district court proceedings, and its submissions were considered by the district court.

This brief presents Chevron U.S.A. Inc.'s unique perspective on the issues on appeal, including explaining in detail the likely harm caused to Chevron as a result of the district court's decision to vacate the agency's lease sale. No other amicus is expected to describe these harms.

# CORPORATE DISCLOSURE

Chevron U.S.A. Inc. discloses that the following are parent companies, subsidiaries, affiliates, or companies that own at least 10% of the stock of Chevron U.S.A. Inc. which have any outstanding securities in the hands of the public: Chevron Corporation, which is publicly traded.

No publicly held corporation owns 10% or more of Chevron Corporation's stock.

These representations are made in order that judges of this Court may determine the need for recusal.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ...................................................................i

CERTIFICATE PURSUANT TO CIRCUIT RULE 29(d) .......................ii

CORPORATE DISCLOSURE .................................................................iii

TABLE OF AUTHORITIES.....................................................................vi

GLOSSARY .................................................................................................x

STATEMENT OF IDENTIFICATION OF
AMICUS CURIAE, ITS INTEREST IN THIS CASE,
AND ITS AUTHORITY TO FILE....................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .................3

JURISDICTION ..........................................................................................6

ARGUMENT ................................................................................................8

I.    The District Court Improperly Ruled On Plaintiffs' Unripe
NEPA Challenge And Imposed Unlawful Procedural
Requirements On The Agency's NEPA Review.............................9

A.    Plaintiffs' NEPA claim is not ripe because it depends
on contingent future events .................................................9

B.    The district court improperly imposed additional
procedural requirements that exceed NEPA's mandate......13

C.    The district court's decision conflicts with precedent ..........15

II.   The District Court Abused Its Discretion By Vacating Lease
Sale 257, Which Will Cause Irreparable Harm To Chevron
And Other Bidders .........................................................................19

A.    The disruptive consequences of vacatur are enormous
for Chevron...........................................................................21

B. The disruptive consequences for the public further support remand without vacatur ........................................... 26

C. The district court's reasons for ordering vacatur are incorrect and demonstrate an abuse of discretion ............... 27

CONCLUSION ................................................................................. 34

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Allied Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
988 F.2d 146 (D.C. Cir. 1993) .......................................................20

*Am. Great Lakes Ports Ass'n v. Schultz,*
962 F.3d 510 (D.C. Cir. 2020) ....................................................22, 31

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy,*
22 F.4th 1018 (D.C. Cir. 2022) ......................................................20

*Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff,*
23 F.4th 1028 (D.C. Cir. 2022 ........................................................10

*Belize Soc. Dev. Ltd. v. Gov't of Belize,*
668 F.3d 724 (D.C. Cir. 2012) ..........................................................8

*Black Oak Energy, LLC v. FERC,*
725 F.3d 230 (D.C. Cir. 2013) ..............................................5, 20, 24

*Cal. Communities Against Toxics v. EPA,*
688 F.3d 989 (9th Cir. 2012) ..........................................................29

*California v Block,*
690 F.2d 753 (9th Cir. 1982) ..........................................................14

*California v. Watt,*
712 F.2d 584 (D.C. Cir. 1983) ..........................................................3

*Carson v. Am. Brands, Inc.,*
450 U.S. 79 (1981) ..........................................................................7

*Ctr. for Biological Diversity v. U.S. Dep't of Interior,*
563 F.3d 466 (D.C. Cir. 2009) ............................... 4, 9, 10, 14, 17

*DaimlerChrysler Corp. v. Cuno,*
547 U.S. 332 (2006) ........................................................................12

*Fisheries Survival Fund v. Haaland,*
858 F. App'x 371 (D.C. Cir. 2021) ...............................................5, 11

*Gulf Restoration Network, Inc. v. Salazar*,
683 F.3d 158 (5th Cir. 2012) ...................................................... 10

*Kickapoo Tribe of Indians of
Kickapoo Rsrv. in Kansas v. Babbitt*,
43 F.3d 1491 (D.C. Cir. 1995) .............................................. 28, 33

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976) ............................................................ 4, 13

*N. Slope Borough v. Andrus*,
642 F.2d 589 (D.C. Cir. 1980) ..................................................... 12

*Nevada v. Dep't of Energy*,
457 F.3d 78 (D.C. Cir. 2006) ....................................................... 9

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
896 F.3d 520 (D.C. Cir. 2018). .............................................. 32, 33

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ................................................................ 13

*Sec'y of the Interior v. California*,
464 U.S. 312 (1984) ............................................................... 15

*Sierra Club v. FERC*,
827 F.3d 59 (D.C. Cir. 2016) ...................................................... 20

*Sierra Club v. Peterson*,
717 F.2d 1409 (D.C. Cir. 1983) ................................... 5, 11, 14, 15

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021) ........................................ 27, 28, 33

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002). .................................................... 31

*Texas v. United States*,
523 U.S. 296 (1998) ................................................................. 9

*United States v. Microsoft Corp.*,
56 F.3d 1448 (D.C. Cir. 1995) ..................................................... 7

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
6 F.4th 1321 (D.C. Cir. 2021) .........................................................5, 19

*Vt. Yankee Nuclear Power Corp. v.
Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978).............................................................................13

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
165 F.3d 43 (D.C. Cir. 1999).................................................5, 9, 14, 17

**Statutes**

28 U.S.C. § 1292(a)(1)..........................................................................7

43 U.S.C. § 1334(a)(2)..........................................................................17

43 U.S.C. § 1337(a)(1)..........................................................................21

43 U.S.C. § 1351(h)(1) .........................................................................11

43 U.S.C. § 1802(1)...............................................................................26

**Regulations**

30 C.F.R. § 550.181 .......................................................................11, 16

30 C.F.R. § 550.184 ..............................................................................16

30 C.F.R. § 550.202 ..............................................................................18

30 C.F.R. § 550.207 ..............................................................................17

30 C.F.R. § 550.208 ..............................................................................17

30 C.F.R. § 550.209 ..............................................................................18

30 C.F.R. § 585.437 ..............................................................................16

**Other Authorities**

API Amicus Br.,
*Louisiana v. Biden*,
No 2:21-cv-00778 (W.D. La. May 6, 2022), Dkt. 203....................23, 24

API, Comment Letter
on DOI Comprehensive Review of
Federal Oil and Gas Program (Apr. 15, 2021) ..............................23, 24

BOEM Budget Justifications
and Performance Information Fiscal Year 2022 (2021)......................30

BOEM,
Oil and Gas Leasing on the Outer Continental Shelf (2011) .............29

CRS, No. IF1-1909,
Offshore Oil and Gas:
Leasing "Pause," Federal Leasing Review, and Current
Issues(Apr. 29, 2022) ...................................................................... 29, 30

Exec. Order No. 14,008,
Tackling the Climate Crisis at Home and Abroad,
95 Fed. Reg. 7,619 (Jan. 27, 2021) .....................................................30

Statement of Tommy P. Beaudreau,
Bureau of Ocean Energy Mgmt.,
*Evaluating President Obama's Offshore*
*Drilling Plan and Impacts on Our Future:*
*Hearing Before the H. Comm. on Nat. Res.*,
112th Cong. (2012)................................................................................27

U.S. Dep't of Interior,
BOEM-2005,
Oil and Gas Lease of Submerged Lands Under the OCS
Lands Act § 1 (2017) ...........................................................................12

# GLOSSARY

| | |
|---|---|
| API | Appellant American Petroleum Institute |
| BOEM | Bureau of Ocean Energy Management |
| Interior | U.S. Department of the Interior |
| OCSLA | Outer Continental Shelf Lands Act |
| NEPA | National Environmental Policy Act |

## STATEMENT OF IDENTIFICATION OF AMICUS CURIAE, ITS INTEREST IN THIS CASE, AND ITS AUTHORITY TO FILE

Chevron U.S.A. Inc. is an energy company that has, for many decades, engaged in oil and gas exploration and production activities on the outer continental shelf in the Gulf of Mexico. Chevron is one of the largest leaseholders and one of the largest producers in the Gulf, with interests in hundreds of leases.

Chevron has a particular interest in this case because it participated in the individual lease sale (Lease Sale 257) that is the focus of plaintiffs' challenge. In the preliminary results for Lease Sale 257, Chevron was the high bidder on 34 tracts. After those results were announced, Chevron moved to intervene in the proceedings before the district court. The district court denied the motion but accepted Chevron's brief as an amicus curiae brief.

In earlier Gulf of Mexico lease sales, the Department of the Interior ultimately awarded Chevron leases on the vast majority of parcels for which it was high bidder. As required by the terms of Lease Sale 257, Chevron has already paid the United States government one-fifth of the bonus bids for the 34 tracts on which it was the high bidder, amounting to $9,425,602.20.

By vacating the lease sale, the district court deprived Chevron of the use of leases for which it was the high bidder. In addition, the bids that Chevron submitted are now in the public domain. If those leases are offered in a new lease sale, Chevron's competitors would have the unfair advantage of knowing Chevron's bid amounts for and interests in specific parcels. The resolution of this case is therefore important to Chevron's core business and decision-making.

Counsel for all parties to this appeal have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no one other than amicus contributed money that was intended to fund the preparation or submission of this brief.

## INTRODUCTION AND
## SUMMARY OF THE ARGUMENT

The Outer Continental Shelf Lands Act ("OCSLA") reflects a strong congressional policy in favor of promoting the "swift, orderly, and efficient exploration" of oil and gas resources on the outer continental shelf. *California v. Watt*, 712 F.2d 584, 588 (D.C. Cir. 1983). While activities subject to OCSLA are also subject to the requirements of the National Environmental Policy Act ("NEPA"), NEPA imposes what courts have characterized as procedural obligations that give way to conflicting provisions of organic statutes. NEPA ensures that agencies make well-informed decisions about the environmental consequences of a proposed action, but it is not supposed to impose substantive obligations or to be outcome determinative.

The district court lost sight of these essential principles. It concluded that the Department of the Interior ("Interior") violated NEPA by failing to include in its calculations, at the lease sale stage, foreign greenhouse gas emissions that could only arise from eventual consumption of any oil and gas that might be produced if exploration is successful. As set forth in the brief filed by the American Petroleum Institute ("API"), there are serious problems with the merits of the

district court's ruling, in addition to other errors.  Chevron submits this amicus brief to address two of the district court's errors in further detail.

*First*, the district court was wrong to vacate Lease Sale 257 because plaintiffs' NEPA claims based on greenhouse gas emissions were not ripe. OCSLA ensures the orderly and expeditious development of untapped resources through a four-step process.  At the lease sale stage, none of the greenhouse gas emissions that concerned the district court could occur; they could occur only at the fourth stage if and when post-exploration lease production activities are allowed following additional required government approvals.

An agency has authority to decide when, during a regulatory process, it will review particular environmental impacts so long as the agency has not yet "irretrievabl[y] commit[ted]" resources to a particular action. *Kleppe v. Sierra Club*, 427 U.S. 390, 405, 414 (1976).  An agency's NEPA obligations thus "mature only once it reaches a 'critical stage of a decision which will result in irreversible and irretrievable commitments of resources to an action that will affect the environment.'"  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009) (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49

(D.C. Cir. 1999)). Where, as here, an agency "reserves both the authority to preclude all activities pending submission of site-specific proposals and the authority to prevent proposed activities if the environmental consequences are unacceptable," the obligations have not matured and no NEPA claim involving not-yet-proposed activities is ripe for litigation. *Fisheries Survival Fund v. Haaland*, 858 F. App'x 371, 372 (D.C. Cir. 2021) (per curiam) (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983)).

*Second*, the district court abused its discretion in vacating Lease Sale 257 rather than remanding without vacatur to afford the agency an opportunity to complete the analysis the court deemed necessary. Whether to vacate agency action "depends on two factors: the likelihood that deficiencies in an order can be redressed on remand, even if the agency reaches the same result, and the disruptive consequences of vacatur." *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331–32 (D.C. Cir. 2021) (quoting *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013)). These factors here weigh overwhelmingly in favor of remand *without* vacatur.

Any deficiencies in the actions taken by Interior's Bureau of Ocean Energy Management ("BOEM") are readily redressed on remand because Interior has already performed elsewhere the analysis that the district court deemed necessary. Moreover, the consequences of vacatur are highly disruptive for bidders, the statutory scheme, and the public interest. By vacating the already held lease sale, the district court gave NEPA substantive force that Congress never intended, undermining the competitive bidding process and causing irreparable harm to Chevron and other bidders who invested millions in preparing confidential bids that have now been publicly disclosed.

This Court should reverse.

## JURISDICTION

This Court has appellate jurisdiction because the district court vacated Lease Sale 257 based on a legal determination about Interior's NEPA obligations. Concrete harms flow from that judgment; this Court will never have another opportunity to review the environmental impact statement and the record for Lease Sale 257; and no future review of a different environmental impact statement on a different record could remedy those harms.

The most straightforward basis for exercising jurisdiction, as API explains, is to recognize that the district court's order is final. *See* API Br. 15–19. Moreover, both API and the United States agree that the Court may alternatively exercise jurisdiction under the collateral order doctrine. *See* API Br. 19; Federal Defendant-Appellees' Resp. to Plaintiffs-Appellees Mot. to Dismiss 7–10 (filed Feb. 28, 2022). Two additional grounds confirm the common-sense conclusion that this Court has jurisdiction to correct the district court's judgment and prevent irreparable harm.

*First*, the Court may construe the district court's order as an appealable injunction under 28 U.S.C. § 1292(a)(1). The judgment below has the "practical effect" of an injunction, *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 83 (1981), prohibiting Interior from proceeding with Lease Sale 257 — or any substitute sale of these parcels — unless and until it completes a revised environmental impact statement that addresses foreign emissions. That judgment has "a 'serious, perhaps irreparable, consequence,' and could only be 'effectively challenged' by immediate appeal." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1456 (D.C. Cir. 1995) (quoting *Carson*, 450 U.S. at 84). As described below, significant

7

irreparable harms flow from the judgment below that cannot be effectively challenged other than through this appeal.

*Second*, the Court may construe API's notice of appeal as a petition for mandamus. *See Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 729–31 (D.C. Cir. 2012). Where a would-be appellant has a clear entitlement to relief, but the Court's appellate jurisdiction is uncertain, this Court has elected to construe the appeal as a petition for mandamus and to grant effective relief on that basis. *See id.* at 730–31. Accordingly, if the Court harbors any residual doubt about other grounds for jurisdiction, mandamus provides an appropriate vehicle to grant relief.

**ARGUMENT**

Chevron agrees with API, Louisiana, and the Department of the Interior that (1) this Court has jurisdiction, and with API and Louisiana that (2) plaintiffs' NEPA claims are unripe, (3) Interior did not violate NEPA, and (4) vacatur of Lease Sale 257 was improper. Chevron submits this amicus curiae brief to provide the Court with its particular insights as the high bidder on 34 of the tracts in Lease Sale 257, and as a frequent participant in the confidential bidding process established by OCSLA.

**I.   The District Court Improperly Ruled On Plaintiffs' Unripe NEPA Challenge And Imposed Unlawful Procedural Requirements On The Agency's NEPA Review.**

Plaintiffs have not carried their burden to show that their NEPA claim is ripe. Nor have plaintiffs shown that Interior is barred from addressing foreign greenhouse gas emissions at a later stage of the OCSLA regulatory process. Because Interior has not made any irreversible or irretrievable commitments to any action that will affect the environment, plaintiffs' NEPA challenge is premature.

**A.   Plaintiffs' NEPA claim is not ripe because it depends on contingent future events.**

As this Court has explained, "an agency's NEPA obligations mature only once it reaches a 'critical stage of a decision which will result in irreversible and irretrievable commitments of resources to an action that will affect the environment.'" *Ctr. for Biological Diversity*, 563 F.3d at 480 (quoting *Wyo. Outdoor Council*, 165 F.3d at 49). Plaintiffs bear the burden of demonstrating that their claim does not "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Nevada v. Dep't of Energy*, 457 F.3d 78, 85 (D.C. Cir. 2006) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). Plaintiffs must establish a "concrete" injury, not one that is "conjectural or

9

hypothetical." *Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028, 1032 (D.C. Cir. 2022).

OCSLA establishes a four-stage process, which ensures that disputes over adverse environmental effects are resolved at the appropriate stage. *Ctr for Biological Diversity*, 563 F.3d at 473. *First*, in the preparation stage, Interior prepares a five-year schedule of proposed lease sales. *Gulf Restoration Network, In.c v. Salazar*, 683 F.3d 158, 165 (5th Cir. 2012). *Second*, in the lease-sale stage, Interior solicits bids and issues leases for specific areas. *Id.* *Third*, in the exploration stage, Interior determines whether to approve a lessee's exploration plans. *Id.* And *fourth*, in the development stage, Interior (and other governmental entities) review the lessee's detailed plan for development and production on its leased tracts. *Id.*

Plaintiffs challenged Lease Sale 257 and, in response, the district court found only one purported deficiency: the government's failure to include foreign greenhouse gas emissions in its quantitative calculation in the No Action Alternative. JA__ (Dkt. 78 at 22). That calculation quantifies the difference between estimated greenhouse gas emissions due to lease production and emissions if no lease production took place

and foreign production or other sources of energy were substituted instead to meet domestic demand. JA__ (Dkt. 78 at 23–24). But none of these emissions can result from activity allowed at the lease-sale stage. They could occur only at the fourth stage — if and when lease production activities are allowed.

This Court recently clarified that a lease sale under OCSLA does not necessarily render all NEPA claims ripe. *See Fisheries Survival Fund v. Haaland*, 858 F. App'x 371 (D.C. Cir. 2021) (per curiam). The Court explained that the relevant question is whether the lease in question "reserves both the authority to preclude all activities pending submission of site-specific proposals and the authority to prevent proposed activities if the environmental consequences are unacceptable." *Id.* at 372 (quoting *Sierra Club*, 717 F.2d at 1415).

The leases here — like those in *Fisheries* — reserve authority for Interior to preclude any production activities pending submission of plans for exploration and development, and also reserve authority for Interior to cancel the leases in certain circumstances if the environmental consequences are unacceptable. *See* 30 C.F.R. § 550.181(a)–(c); *see also* 43 U.S.C. § 1351(h)(1)(D)(i). Confirming these

restrictions, the form lease — which sets out the terms that apply to all leases awarded under Lease Sale 257 — provides that it "is subject to the [OCSLA], regulations promulgated pursuant thereto, and other statutes and regulations in existence upon the Effective Date of the lease." U.S. Dep't of Interior, BOEM-2005, Oil and Gas Lease of Submerged Lands Under the OCS Lands Act § 1 (2017), https://www.boem.gov/sites/default/files/about-boem/Procurement-Business-Opportunities/BOEM-OCS-Operation-Forms/BOEM-2005.pdf (Interior's model lease); *see also* JA__ (Dkt. 78 at 21–22).

In short, at the lease sale stage, NEPA review needed only to extend to "those hazards associated with the limited preliminary activities permitted to the lessees during the lease sale phase." *N. Slope Borough v. Andrus*, 642 F.2d 589, 606 (D.C. Cir. 1980); *cf. DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006) ("a plaintiff must demonstrate standing for each claim he seeks to press"). Plaintiffs' NEPA claim relating to greenhouse gas emissions from oil and gas consumption are premised on emissions that cannot exist — and hypothetical calculations that will remain too speculative — until further approvals are granted at the

exploration or production stage. That claim is therefore not ripe for judicial review.

**B.      The district court improperly imposed additional procedural requirements that exceed NEPA's mandate.**

The district court's decision also contradicts the principle that an agency has discretion to decide when to evaluate particular environmental impacts. In requiring the agency to undertake a NEPA analysis for activities that will not have the complained of environmental effects until a later stage of the OCSLA process, the district court unlawfully imposed procedural requirements that exceed NEPA's mandate. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978) (courts may not "stray beyond the judicial province ... to impose … its own notion of which procedures are 'best'"); *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015).

NEPA "does not require that [the government] prepare one comprehensive impact statement covering all before proceeding" to the next step of its process. *Kleppe*, 427 U.S. at 414. Instead, an agency is permitted to "defer detailed analysis until a concrete development proposal crystallizes the dimensions of a project's probable environmental consequences." *California v Block*, 690 F.2d 753, 761 (9th

Cir. 1982). If, as here, "the Department retains the authority to preclude *all* surface disturbing activities pending submission of a lessee's site-specific proposal as well as the authority to refuse to approve proposed activities which it determines will have unacceptable environmental impacts, then the Department can defer its environmental evaluation [under NEPA] until such site-specific proposals are submitted." *Sierra Club*, 717 F.2d at 1415. It follows that the agency is free to supplement its analysis at a later stage when environmental impacts are less speculative and better understood. *See id.*

In the litigation below, the government explained that Interior "typically prepares a programmatic NEPA analysis for the five-year program and then prepares *additional NEPA analyses* at each OCSLA stage requiring federal action." Dkt. 45 at 4 (emphasis added). That is consistent with authority recognizing that NEPA requires analysis only when a decision will result in an irreversible and irretrievable commitments of resources "to an action that will affect the environment." *Ctr. for Biological Diversity*, 563 F.3d at 480 (quoting *Wyo. Outdoor Council*, 165 F.3d at 49). It is also consistent with OCSLA's purposes. Congress designed OCSLA "to forestall premature litigation regarding

14

adverse environmental effects that all agree will flow, if at all, only from the latter stages of OCS exploration and production." *Sec'y of the Interior v. California*, 464 U.S. 312, 341 (1984).

Accordingly, because the greenhouse gas calculation was not *yet* required (if required at all), the government was entitled to "defer its environmental evaluation" until later. *Sierra Club*, 717 F.2d at 1415.

## C. The district court's decision conflicts with precedent.

The district court decided plaintiffs' claims on the merits for primarily three reasons. None is availing.

*First*, the district court concluded that plaintiffs' NEPA claim was ripe because "the lease sale stage is the last point at which the Bureau is definitively required to conduct an EIS for leases in the Gulf of Mexico." JA__ (Dkt. 78 at 18). But OCSLA does not limit NEPA review to the lease-sale stage. The agency is required to conduct an appropriate NEPA review at every stage, and Interior may, in the exercise of its discretion, address environmental impacts in subsequent NEPA reviews.

*Second*, the court concluded that plaintiffs' NEPA claims were ripe because Interior would need to impose a five-year suspension on lessees and pay compensation if it cancelled the leases. The district court

15

recognized that *both* the regulations at issue in *Fisheries* and those at issue here allow the agency to cancel a lease after "notice and opportunity for a hearing" if continued activity would cause "harm or damage" to the environment." JA__ (Dkt. 78 at 21) (comparing 30 C.F.R. § 585.437(b)(4) (cancellation of wind lease) *with* 30 C.F.R. § 550.181(a)–(c) (cancellation of oil-and-gas leases)). Nonetheless, the district court contended that the lease in *Fisheries* is distinguishable from the leases here because "oil and gas lease cancellations carry the additional requirements that '[a] suspension has been in effect for at least 5 years or' the lessee requests cancellation," and that "the lessee is entitled to compensation." JA__ (Dkt. 78 at 21) (quoting 30 C.F.R. § 550.181(d) and citing 30 C.F.R. § 550.184). According to the court, "these additional limitations … represent an irretrievable commitment of resources" because "once a lease is issued, [Interior] cannot unilaterally undo that decision for at least five years and the government must pay a penalty if it does so." *Id.*

But the relevant inquiry is not whether there is an irretrievable commitment of resources in the abstract; it is whether there are "irreversible and irretrievable commitments of resources *to an action that will affect the environment.*" *Ctr. for Biological Diversity*, 563 F.3d at 480

16

(emphasis added) (quoting *Wyo. Outdoor Council*, 165 F.3d at 29). Here, the penalty and five-year delay — even if "irretrievable" — will not affect the environment. Just the opposite. These measures allow the government to prevent a lessee from taking any action that could affect the environment. The mere payment of government funds or the imposition of a suspension does not trigger the NEPA concerns identified by the district court. And, in any event, the same delay-and-compensation provision governed the lease in *Fisheries* because it applies to "any lease or permit" issued under OCSLA. 43 U.S.C. § 1334(a)(2).

*Third*, the district court indicated that certain ancillary activities triggered NEPA review of potential greenhouse gas emissions from future production. Issuance of a lease allows a lessee to perform certain "ancillary" activities including conducting seismic geological and geophysical surveys and other survey activities. 30 C.F.R. § 550.207.

But Interior retains authority to approve (or reject) such ancillary activities before a lessee can perform them. Before engaging in these activities, lessees must provide notice and "[d]escribe the potential adverse environmental effects of the proposed activity." 30 C.F.R. § 550.208(a)(4). Interior then reviews the notice to "ensure [it] complies

17

with" performance standards, 30 C.F.R. § 550.209, which include (1) compliance with OCSLA and other federal law; (2) "safe[ty]"; (3) conformity "to sound conservation practices"; and (4) ensuring that the activity "[d]oes not cause undue or serious harm or damage to the human, marine, or coastal environment," 30 C.F.R. § 550.202(a), (b), (c), (e). If Interior determines that a notice does not comply with those standards, the lessee "may not start [its ancillary activity]" until Interior approves a full exploration or development plan. 30 C.F.R. § 550.209.

In any event, the alleged environmental effects of ancillary activities are irrelevant to the calculation of greenhouse gas emissions. The district court identified three potential environmental impacts from ancillary activities: (1) fishermen may be precluded from a small area for several days during surveying; (2) underwater noises; and (3) a potential for various marine life to "become entangled in some types of lines associated with" these activities. JA__ (Dkt. 78 at 17) (quotation marks omitted). None of these ancillary activities provide any basis for considering greenhouse gas calculations that result from a decision to produce or not produce oil and gas at later stages of the OCSLA process. JA__ (Dkt. 78 at 23). Indeed, the district court rejected every other NPEA

18

claim raised by plaintiffs beyond foreign consumption impacts on greenhouse gas emissions.

The district court's departures from precedent thus confirm the need for this Court to reverse the judgment below. Because the only NEPA claim accepted by the district court relates to foreign greenhouse gas emissions that may never occur, and because Interior has discretion to decide when to evaluate particular environmental impacts, the plaintiffs' emissions-related claim is not ripe.

## II. The District Court Abused Its Discretion By Vacating Lease Sale 257, Which Will Cause Irreparable Harm To Chevron And Other Bidders.

The Court should also reverse because the district court abused its discretion in vacating Lease Sale 257 instead of remanding without vacatur. Whether to vacate agency action "depends on two factors: the likelihood that deficiencies in an order can be redressed on remand, even if the agency reaches the same result, and the disruptive consequences of vacatur." *Vecinos*, 6 F.4th at 1331–32 (cleaned up). Both factors require remand *without* vacatur here.

As API has explained, any deficiencies in Interior's action can be redressed on remand. *See* API Br. 40–44; *see also Black Oak*, 725 F.3d at

244 (declining to vacate where it is "plausible" that agency can redress its error on remand); *Allied Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993) (declining to vacate where it is "conceivable" that agency can develop a reasoned explanation for its decision). Because NEPA requires only that the agency adequately consider relevant environmental issues, *Sierra Club v. FERC*, 827 F.3d 59, 68 (D.C. Cir. 2016), there is no *legal* reason that Interior could not complete the analysis demanded by the district court and reaffirm the lease sale.

Chevron writes separately to elaborate on the second factor. In these circumstances, vacatur is improper if it would be outcome determinative, cause irreparable harm, and prevent Interior from reaffirming the lease sale after completing the required analysis. *See Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 22 F.4th 1018, 1030 (D.C. Cir. 2022) (recognizing that a "remand without vacatur is a useful arrow in a court's remedial quiver"). Vacatur has precisely those disruptive consequences here, and the district court's reasons for nonetheless

ordering vacatur demonstrates that it abused its discretion. This Court should reverse.

### A. The disruptive consequences of vacatur are enormous for Chevron.

Vacating Lease Sale 257 would cause Chevron significant, irreparable economic and competitive harms. Chevron is one of the largest Gulf of Mexico leaseholders and producers and has operated there pursuant to leases for many decades. *See* JA__ (Dkt. 73-1 ¶ 3 (Second Decl. of Kyle L. Gallman) ("2d Gallman Decl.")). Chevron was the high bidder for 34 tracts in Lease Sale 257. *Id.* ¶ 10. If the sale is vacated *there will be no Lease Sale 257.* And any new lease sale, even if new competitive bidding were possible, is months if not years away. In these circumstances, vacating the lease sale would cause multiple irreparable harms.

*First*, because the government has publicly disclosed Chevron's confidential, proprietary information, its competitors would have an unfair advantage in any new lease sale covering some or all of the same leases. Vacatur would deprive Chevron of the congressionally mandated competitive, confidential bidding process for the tracts covered by Lease Sale 257. *See* 43 U.S.C. § 1337(a)(1) ("The bidding shall be by sealed bid"

to ensure "competitive bidding."); *see also Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020) ("[R]emand without vacatur … is appropriate when vacatur would disrupt settled transactions.").

*Second*, vacatur would deprive Chevron of the opportunity to benefit from its previously confidential, proprietary information in bidding on tracts in the Gulf. Chevron goes to great lengths to protect its commercially valuable valuation assessment of unleased tracts, including shielding the information even from people within the company. *See* JA__ (2d Gallman Decl. ¶ 8). The bids Chevron submitted have been publicly disclosed, meaning that even if Interior were to put the same tracts back up for sale in the future, Chevron could not achieve the same benefit from what was previously confidential and proprietary information. The marketplace, including Chevron's competitors, are now aware of which tracts Chevron has targeted for potential development as well as the valuation that Chevron has placed on leasing those parcels in its previously sealed bids. *See* JA__ (Dkt. 71-1 ¶ 9 (Decl. of Kyle L. Gallman) ("1st Gallman Decl.")). And they know the geographic areas of interest to Chevron based upon Chevron's bidding activity. Chevron's competitors, in other words, have an anticompetitive advantage.

*Third*, if the sale is vacated, Chevron would lose the significant money, time, and effort it invested in preparing to participate in Lease Sale 257. "It takes several years of due diligence, and a sizable investment … to analyze the underlying geology, perform the necessary technology and engineering assessments, finalize commercial arrangements, and coordinate the logistics of exploration and development projects" before a company "can determine if a lease contains commercial quantities of oil and natural gas."[1] These activities "occur across the time periods leading up to a lease sale (and inform decisions on lease bidding)." API Amicus Br. 10, *Louisiana v. Biden*, No 2:21-cv-00778 (W.D. La. May 6, 2022), Dkt. 203. Chevron's bids are "based on information developed over years of analysis." JA__ (2d Gallman Decl. ¶ 7). In preparation for a lease sale, Chevron forms a special "team of interdisciplinary personnel" including scientists, engineers, and finance professionals to create a plan for bidding. *Id.* And it assigns valuations to tracts based on proprietary knowledge on which

[1] API, Comment Letter on DOI Comprehensive Review of Federal Oil and Gas Program at 10 (Apr. 15, 2021), https://www.api.org/-/media/Files/News/Letters-Comments/2020/API-Comments-for-DOI-Comprehensive-Review-of-Federal-Oil-and-Gas-Program.pdf.

it has spent millions of dollars.  *Id.*  The "years of due diligence" and "sizable investment" cannot be rolled back.[2]  *See Black Oak*, 725 F.3d at 244 (refusing to vacate when doing so would harm "uninvolved market participants").[3]

*Fourth*, vacatur would deprive Chevron of the present concrete interest that it obtained through Lease Sale 257 in the leases for which it was high bidder.  Those lease interests would give Chevron the opportunity to evaluate the leases and seek approval of exploration plans. If exploration is successful on some of these tracts, Chevron  reasonably expects millions of dollars in production activities would result from its high bids on at least some of those tracts.  In earlier lease sales, Interior has awarded Chevron leases on the vast majority of parcels for which it was the highest bidder.  JA__ (1st Gallman Decl. ¶ 6).  As the district court recognized, Chevron has a legally protected expected property

---

[2] API, Comment Letter, *supra* note 1, at 10; *see also* API Amicus Br. 10, *Louisiana*, No. 2:21-cv-00778.

[3] Vacatur would also deprive Chevron of the use of the more than $9.4 million it paid to the United States in initial bonus bids and that the government has been holding since November 17, 2021.  *See* JA__ (2d Gallman Decl. ¶ 10).  Even if the government returns these payments, that will not compensate Chevron for loss of access to millions of dollars for more than six months.

interest in the leases for which it was high bidder.  JA__ (Dkt. 70 at 4–5 (Order Denying Chevron Mot. to Intervene)).  "The fact that Chevron prevailed in a competitive bidding process makes its interest concrete."  JA__ (Dkt. 70 at 5).

Vacating Lease Sale 257 deprives Chevron of this concrete, present interest, putting Chevron in the position of having to submit new bids to a new lease sale with no guarantee of remaining the high bidder.  Chevron also risks losing its interests in the substantial profits it anticipated from potential operations on some of the leased tracts.  *See* JA__ (1st Gallman Decl. ¶ 9) (explaining that if it is able to operate in the leased tracts, Chevron expects to earn millions of dollars in production opportunities).  Moreover, Chevron participated in earlier lease sales in the Gulf—and invested billions of dollars in leased tracts—with the understanding that it would have the opportunity to participate in a competitive bidding process for unleased tracts.  *See* JA__ (2d Gallman Decl. ¶¶ 4–6).  Chevron's inability to do so hamstrings its ability to more fully develop previously discovered oil and gas reservoirs in which it has invested and to explore for new reservoirs.  *Id.* ¶ 6.

**B.** **The disruptive consequences for the public further support remand without vacatur.**

The disruptive consequences to Chevron alone demonstrate that vacatur was improper. But Chevron's harms form only part of the disruptive consequences wrought by vacatur. The indefinite delay in allowing any production — or even exploration — on 1.7 million acres caused by the vacatur of Lease Sale 257 combined with the absence of any subsequent plan for lease sales has significant disruptive implications for the American public.

Congress commanded that Interior hold lease sales and to do so expeditiously. Failing to make leases available undermines Congress's goals of "achiev[ing] national economic and energy policy goals, assur[ing] national security, reduc[ing] dependence on foreign sources, and maintain[ing] a favorable balance of payments in world trade." 43 U.S.C. § 1802(1). Moreover, delaying or cancelling a lease sale imposes a heavy cost on the United States Treasury. During the Obama Administration, for example, Interior's offshore leasing program "generat[ed] more than $2 billion in bonus payments." *Evaluating President Obama's Offshore Drilling Plan and Impacts on Our Future:*

*Hearing Before the H. Comm. on Nat. Res.*, 112th Cong. (2012) (statement of Tommy P. Beaudreau, Director, Bureau of Ocean Energy Mgmt.).

As part of Lease Sale 257, companies submitted over $198 million in high bids on lease tracts. Chevron alone will pay the United States an additional nearly $38 million if the Department of the Interior approves Chevron's bids. JA__ (2d Gallman Decl. ¶ 10). The economic impact of vacating Lease Sale 257 weighs heavily against vacatur.

### C. The district court's reasons for ordering vacatur are incorrect and demonstrate an abuse of discretion.

The district court's reasons for refusing to remand without vacatur demonstrate that it abused its discretion. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1053 (D.C. Cir. 2021) (in reviewing for abuse of discretion, the court considers "whether the decision maker failed to consider a relevant factor, whether he [or she] relied on an improper factor, and whether the reasons given reasonably support the conclusion").

The district court first abused its discretion by basing vacatur on the erroneous and irrelevant belief that it "may not be impossible" for Interior to reconduct Lease Sale 257 before the expiration of the current Five-Year Program at the end of June 2022. JA__ (Dkt. 78 at 62).

Interior told the district court that "it is unlikely that [Lease Sale 257] could be held again" before that date. JA__ (Dkt. 74 at 4 (Defendants' Resp. to the Court's Jan. 19, 2022 Minute Order)). And, absent court intervention or other steps to extend the deadline, it is clear that the Lease Sale cannot be conducted before the expiration of the Five-Year Program.

Moreover, the district court's reasoning was flawed even if Lease Sale 257 could have been reconducted with a new bidding process before the end of June because a new bidding process would result in the same disruptive harms identified above. The confidential bids have been made public; reconducting the sale with a new bidding process before or after June 30, 2022 would not restore that confidentiality. The district court's reasoning does not "reasonably support the conclusion" that vacatur is warranted and thus is an abuse of discretion. *Standing Rock*, 985 F.3d at 1053 (quoting *Kickapoo Tribe of Indians of Kickapoo Rsrv. in Kansas v. Babbitt*, 43 F.3d 1491, 1497 (D.C. Cir. 1995)).

The district court's other reasons likewise do not reasonably support vacatur. Contrary to the district court's conclusion, the possibility that Interior "could still decide to include all or part of the area

28

included in Lease Sale 257 in its next Five-Year Program" does not meaningfully decrease the disruptive effect of vacatur. Chevron will have no opportunity to bid on *any* offshore lease in the Gulf (or otherwise) for the foreseeable future. Interior has failed to take significant steps towards developing a new five-year plan and could be years away from finalizing one.[4]

Even if vacating Lease Sale 257 would only delay the "expeditious development of OCS resources," which Congress prioritized under OSCLA, that delay alone would be highly disruptive. *See Cal. Communities Against Toxics v. EPA*, 688 F.3d 989, 993 (9th Cir. 2012) (per curiam) (refusing to vacate an agency action when "vacatur … could well delay a much needed power plant"). But vacating Lease Sale 257 does much more than cause delay. There is no way for Interior to unravel Lease Sale 257 and reconduct it as part of some future five-year program.

---

[4] CRS, No. IF1-1909, Offshore Oil and Gas: Leasing "Pause," Federal Leasing Review, and Current Issues at 2 (Apr. 29, 2022) (acknowledging "timing requirements associated with program preparation suggest that a new program could not be finalized before the current program's expiration"); *see also* BOEM, Oil and Gas Leasing on the Outer Continental Shelf at 3 (2011), https://www.boem.gov/sites/default/files/uploadedFiles/BOEM/Oil_and_Gas_Energy_Program/Leasing/5BOEMRE_Leasing101.pdf (the process usually takes 2.5 years).

Any future lease sale will not provide Chevron the opportunity it had in Lease Sale 257. There is no guarantee that any future lease sale will even include the tracts Chevron invested in assessing, valuing, and bidding in Lease Sale 257. Interior is in the process of reevaluating its system for bidding on offshore leases.[5] In addition, the review mandated by Executive Order 14,008 led to a recommendation that Interior henceforth offer significantly fewer leases at a time, and on different terms.[6] And even if all the leases were included in a new sale, Chevron could lose them to competitors given that Chevron's confidential bids and proprietary data have been disclosed.

The district court's view that Interior "would not need to unravel anything" here because it could simply not award the leases to the high bidders on these tracts, JA__ (Dkt. 78 at 61), fundamentally

_See_ BOEM Budget Justifications and Performance Information Fiscal Year 2022 at 46 (2021), https://www.doi.gov/sites/doi.gov/files/fy2022-boem-budget-justification.pdf.

[6] _See_ CRS, No. IF1-1909, Offshore Oil and Gas: Leasing "Pause," Federal Leasing Review, and Current Issues at 1–2 (Apr. 29, 2022); _see also_ Exec. Order No. 14,008, Tackling the Climate Crisis at Home and Abroad, 95 Fed. Reg. 7,619 (Jan. 27, 2021).

misunderstands the complicated transactions and reliance interests underlying Lease Sale 257. This case presents the "quintessential disruptive consequence": Interior "cannot easily unravel a past transaction in order to impose a new outcome." *Am. Great Lakes*, 962 F.3d at 519. "[T]he egg has been scrambled and there is no apparent way to restore the status quo ante." *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002).

The district court was also wrong to find the irreversible disclosure of proprietary information not disruptive because bids are typically revealed at a lease sale. *See* JA__ (Dkt. 78 at 63). Congress created a system where — to maintain competition — companies' bids remain confidential during the period when a bidder can benefit from that confidentiality. Only after bidding is complete and competitors can no longer use the information (because the lease will be awarded based on existing bids) does the government reveal the bids. Chevron did not agree to provide its confidential and proprietary information in exchange for nothing. But vacatur will lead to that result.

Finally, the district court wrongly found that vacatur would not be unduly disruptive because, in light of this lawsuit, Chevron purportedly

"assumed the risk" that Lease Sale 257 would be vacated and the confidentiality of its bids destroyed. JA__ (Dkt. 78 at 63). The mere fact that agency action might be altered as the result of a lawsuit does not undo the disruptive effect of vacatur. The district court's view, taken to its logical conclusion, is that vacatur could virtually never be disruptive because the affected party knew a legal challenge was pending or forthcoming and could have avoided the risk of disruption via vacatur by declining to engage in its business or its regulated activities in the first place.

The error of this view is particularly striking where the bidders were participating in a lease sale in which Congress mandated procedures to protect the very confidentiality that vacatur would destroy. Moreover, this Court recognizes that regulated parties may "reasonably rel[y]" on agency actions, even if legal challenges are pending. *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 538 (D.C. Cir. 2018). In fact, disruptive consequences from such reliance counsel *against* vacatur. *Id.* Interior, not Chevron, scheduled the lease sale; if Chevron did not participate, another participant would be the high bidder. In faulting Chevron and other bidders for their reliance, the

32

district court "relied on an improper factor" and thereby abused its discretion in ordering vacatur. *Standing Rock*, 985 F.3d at 1053 (quoting *Kickapoo*, 43 F.3d at 1497).

Compounding these errors, the district court ordered vacatur despite recognizing that plaintiffs had made no effort to show that they would be irreparably harmed by leaving Lease Sale 257 in place while the agency addresses the greenhouse gas emissions analysis the court found wanting. JA__ (Dkt. 78 at 65). In *Oglala Sioux Tribe*, this Court remanded based on a NEPA violation but declined to vacate the agency action in the interim. 896 F.3d at 538–39. This Court noted the harms that vacatur would impose on the regulated party and, "[m]ore important," explained that the plaintiff "will not suffer harm— irreparable or otherwise—from a disposition that leaves the [agency action] in effect *for now*." *Id*. at 538.

The same is true here: The high bidders cannot take any actions that could implicate the foreign greenhouse gas emissions issue identified by the district court without further NEPA review by Interior. *See* API Br. 21. In these circumstances, imposing serious disruptive harms on Chevron is unwarranted.

# CONCLUSION

For these reasons, this Court should reverse.

Respectfully submitted,

/s/Ashley C. Parrish

Jennifer J. Clark
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
jennifer.clark@sidley.com

Ashley C. Parrish
Charles J. ("Tim") Engel
Nikesh Jindal
Amy R. Upshaw
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
aparrish@kslaw.com

*Counsel for Amicus Curiae*

Initial Brief:  June 13, 2022

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION, TYPEFACE
REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this brief complies with the type-volume limitation of Rules 29(a)(5) and 32(a)(7)(B) because it contains 6,433 words, excluding the parts exempted by Rule 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because the brief was prepared in 14-point Century Schoolbook font using Microsoft Word ProPlus 365.

Dated: June 13, 2022

*/s/Ashley C. Parrish*
Ashley C. Parrish

# CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25, I certify that on June 13, 2022, I caused a copy of this document to be served on all registered counsel via CM/ECF.

/s/Ashley C. Parrish
Ashley C. Parrish