**ORAL ARGUMENT SCHEDULED FOR MARCH 3, 2023**

No. 22-5036, 22-5037 (Consolidated)

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

FRIENDS OF THE EARTH, et al.,

*Plaintiffs-Appellees*,

v.

DEBRA A. HAALAND, in her official capacity as Secretary of the Interior, et al.,

*Defendants-Appellees*,

and

AMERICAN PETROLEUM INSTITUTE and STATE OF LOUISIANA,

*Intervenor-Defendants-Appellants*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
NO. 1:21-CV-02317
HONORABLE RUDOLPH CONTRERAS, U.S. DISTRICT COURT JUDGE

---

**FINAL BRIEF OF PLAINTIFFS-APPELLEES
FRIENDS OF THE EARTH, HEALTHY GULF, SIERRA CLUB, AND
CENTER FOR BIOLOGICAL DIVERSITY**

---

Erik Grafe                         Stephen D. Mashuda
EARTHJUSTICE                       Shana E. Emile

441 W 5th Ave., Suite 301
Anchorage, AK 99501
907-277-2500 Telephone
egrafe@earthjustice.org

Brettny E. Hardy
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
415-217-2000 Telephone
bhardy@earthjustice.org

EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
smashuda@earthjustice.org
semile@earthjustice.org

*Attorneys for Plaintiffs-Appellees
Friends of the Earth, Healthy Gulf,
Sierra Club, and Center for Biological
Diversity*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 27(a)(4), Plaintiffs-Appellees Friends of the Earth, Healthy Gulf, Sierra Club, and Center for Biological Diversity submit the following certificate of counsel, under Cir. R. 28(a)(1).

**A. Parties and Amici**

All parties, intervenors, and amici that appeared before the district court are listed in the Brief for Intervenor-Appellant American Petroleum Institute.

Except for amici BP Exploration & Production, Inc.; Shell Offshore, Inc.; the Chamber of Commerce; EnerGeo Alliance and the National Ocean Industries Association; the states of Montana, Alabama, Alaska, Arizona, Arkansas, Georgia, Kentucky, Mississippi, Missouri, Nebraska, Oklahoma, Texas, Utah, and West Virginia; and Chevron U.S.A. Inc., all parties, intervenors, and amici appearing in this Court are listed in the Brief for Intervenor-Appellant American Petroleum Institute.

**B. Rulings Under Review**

References to the rulings at issue appear in the Brief for Intervenor-Appellant American Petroleum Institute.

**C. Related Cases**

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... iii

TABLE OF AUTHORITIES ...................................................................... vi

GLOSSARY ........................................................................................... xiii

INTRODUCTION .................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................... 2

STATEMENT OF THE ISSUES ............................................................... 2

PERTINENT STATUTES AND REGULATIONS .................................... 3

STATEMENT OF THE CASE .................................................................. 3

I.      LEASE SALE 257 ........................................................................ 3

        A.      Environmental and climate impacts of offshore oil and gas
                leasing ............................................................................. 3

        B.      Interior's evaluation of Lease Sale 257's greenhouse gas
                emissions ......................................................................... 6

        C.      Friends' challenge to the lease sale ................................. 9

II.     STATUTORY FRAMEWORK/BACKGROUND ....................... 12

        A.      National Environmental Policy Act ............................... 12

        B.      Outer Continental Shelf Lands Act ............................... 14

SUMMARY OF ARGUMENT ............................................................... 14

STANDARD OF REVIEW .................................................................... 15

ARGUMENT ........................................................................................ 17

I.      THIS COURT LACKS APELLATE JURISDICTION ............... 17

II.     THE DISTRICT COURT CORRECTLY CONCLUDED IT COULD
        ADJUDICATE FRIENDS' CLAIM .......................................... 24

A.     Friends' claim is ripe for review. ........................................24

    1.     The district court correctly concluded that this Court's adjudications of five-year leasing plans support the prudential ripeness of Friends' lease sale claim. .....................29

    2.     The district court correctly distinguished wind leases..............33

B.     NEPA requires Interior to assess the potential downstream greenhouse gas emissions consequences of a lease sale decision...........................................................................36

III.   THE DISTRICT COURT CORRECTLY CONCLUDED THAT INTERIOR VIOLATED NEPA BY FAILING TO ASSESS THE LEASE SALE'S GLOBAL EMISSIONS CONSEQUENCES ...................40

A.     Interior's omission of global emissions is unsupported and led to a misleading disclosure of Lease Sale 257's climate consequences. ......................................................................41

B.     The Ninth Circuit and District of Alaska have assessed the same analysis, on functionally indistinguishable records, and determined it violates NEPA...............................................44

C.     Interior's assessment of global emissions for Lease Sale 258 belies its contention that it could not assess global emissions for Lease Sale 257........................................................................45

D.     Intervenors' objections mischaracterize the law and the record. ........47

    1.     Intervenors mischaracterize caselaw. ......................................47

    2.     Intervenors mischaracterize the record. ..................................48

    3.     Intervenors mischaracterize OCSLA. ......................................51

IV.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN VACATING THE LEASE SALE ...................................................55

CONCLUSION .......................................................................................65

CERTIFICATE OF COMPLIANCE ........................................................67

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*350 Montana v. Haaland*,
  29 F.4th 1158 (9th Cir. 2022) ...............................................................51

*\*Allied Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993)................................................56, 57, 59

*Alsea Valley All. v. Dep't of Com.*,
  358 F.3d 1181 (9th Cir. 2004) ..............................................................23

*Am. Great Lakes Ports Ass'n v. Schultz*,
  962 F.3d 510 (D.C. Cir. 2020)..............................................................57

*Am. Petroleum Inst. v. E.P.A.*,
  683 F.3d 382 (D.C. Cir. 2012)..............................................................26

*Amarin Pharmaceuticals Ireland Limited v. FDA*,
  No. 15-5214, 2015 WL 9997417 (D.C. Cir. Dec. 9, 2015)................22

*Amarin Pharms. Ireland Ltd. v. FDA*,
  106 F. Supp. 3d 196 (D.D.C. 2015)......................................................22

*Cook Inlet Tribal Council v. Mandregan*,
  No. 14-cv-1835 (EGS), 2019 WL 3816573 (D.D.C. Aug. 14, 2019) ...............22

*\*Ctr. for Biological Diversity v. Bernhardt* (*Liberty*),
  982 F.3d 723 (9th Cir. 2020) ...............................................40, 44, 45

*\*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
  563 F.3d 466 (D.C. Cir. 2009)...............................14, 29, 30, 52, 53

*Ctr. for Biological Diversity v. Zinke*,
  260 F. Supp. 3d 11 (D.D.C. 2017)............................................14, 36

*\*Ctr. for Sustainable Econ. v. Jewell*,
  779 F.3d 588 (D.C. Cir. 2015)......................................29, 30, 32, 33

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004)..............................................................................54

*FCC v. NextWave Pers. Commc'ns*,
    537 U.S. 293 (2003)................................................................56

*Fisheries Survival Fund v. Haaland*,
    858 F. App'x 371 (D.C. Cir. 2021).......................................33, 34, 35

*Fisheries Survival Fund v. Jewell*,
    Case No. 16-cv-2409 (TSC), 2018 WL 4705795 (D.D.C. Sept. 30,
    2018) .....................................................................................34, 35

*Found. on Econ. Trends v. Heckler*,
    756 F.2d 143 (D.C. Cir. 1985).................................................13

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
    844 F.3d 1095 (9th Cir. 2016) ................................................49

*\*Gulf Restoration Network v. Haaland*,
    No. 20-5179, 2022 WL 3722429 (D.C. Cir. Aug. 30, 2022) ...............25, 30, 60

*Kastigar v. United States*,
    406 U.S. 441 (1972).................................................................53

*Kifafi v. Hilton Hotels Ret. Plan*,
    701 F.3d 718 (D.C. Cir. 2012)..................................................60

*In re Long-Distance Telephone Service Federal Excise Tax Refund
    Litigation*,
    751 F.3d 629 (D.C. Cir. 2014)...............................................21, 22

*Mobil Oil Corp. v. FTC*,
    562 F.2d 170 (2d Cir. 1977) ....................................................29

*Mobil Oil Expl. & Producing Se., Inc. v. United States*,
    530 U.S. 604 (2000).................................................................31

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins Co.*,
    463 U.S. 29 (1983)...................................................................16

*N. Air Cargo v. U.S. Postal Serv.*,
    674 F.3d 852 (D.C. Cir. 2012)..................................................17

*N. Slope Borough v. Andrus*,
    486 F. Supp. 332 (D.D.C. 1980)...............................................39

*N. Slope Borough v. Andrus*,
   642 F.2d 589 (D.C. Cir. 1980)..........................................................27, 32, 39, 40

*N.C. Fisheries Ass'n v. Gutierrez*,
   550 F.3d 16 (D.C. Cir. 2008) ........................................................................17

*Nat. Res. Def. Council, Inc. v. Hodel*,
   865 F.2d 288 (D.C. Cir. 1988) ......................................................................53

*Nat'l Parks Conservation Ass'n v. Semonite*,
   422 F. Supp. 3d 92 (D.D.C. 2019) ...........................................................55, 57

*Nat'l Parks Conservation Ass'n v. Semonite*,
   925 F.3d 500 (D.C. Cir. 2019) ......................................................................55

*Nat'l Treasury Emps. Union v. United States*,
   101 F.3d 1423 (D.C. Cir. 1996) ....................................................................24

*Native Ecosystems Council v. U.S. Forest Serv.*,
   418 F.3d 953 (9th Cir. 2005) ........................................................................13

*Native Vill. of Point Hope v. Jewell*,
   740 F.3d 489 (9th Cir. 2014) .............................................................37, 38, 54

*Neb. Dep't of Health & Human Servs. v. Dep't. of Health & Human Servs.*,
   435 F.3d 326 (D.C. Cir. 2006) ................................................................16, 55

*New York v. Nuclear Regul. Comm'n*,
   681 F.3d 471 (D.C. Cir. 2012) ......................................................................12

*Occidental Petroleum v. Sec. and Exch. Comm'n*,
   873 F.2d 325 (D.C. Cir. 1989) ......................................................................18

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
   896 F.3d 520 (D.C. Cir. 2018) ......................................................................59

*Pit River Tribe v. U.S. Forest Serv.*,
   615 F.3d 1069 (9th Cir. 2010) ......................................................................23

*Pub. Emps. for Env't Resp. v. Fish & Wildlife Serv.*,
   189 F. Supp. 3d 1 (D.D.C. 2016) ..................................................................60

*Pueblo of Sandia v. Babbitt,*
   231 F.3d 878 (D.C. Cir. 2000)....................................................................17, 21

*New Mexico ex rel. Richardson v. Bureau of Land Management,*
   565 F.3d 683 (10th Cir. 2009) ..................................................................23, 24

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989)...........................................................................................49

*Sanchez v. Off. of the State Superintendent of Educ.,*
   959 F.3d 1121 (D.C. Cir. 2020)........................................................................25

*Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n,*
   481 F.2d 1079 (D.C. Cir. 1973)........................................................................49

*Sierra Club v. EPA,*
   292 F.3d 895 (D.C. Cir. 2002).........................................................................15

*Sierra Club v. FERC,*
   867 F.3d 1357 (D.C. Cir. 2017)........................................ 13, 37, 40, 49, 54, 55

*Sierra Club v. Peterson,*
   717 F.2d 1409 (D.C. Cir. 1983)....................................................................29, 36

*Sierra Club v. U.S. Dep't of Agric.,*
   716 F.3d 653 (D.C. Cir. 2013).....................................................................17, 20

*Sierra Club v. U.S. Dep't of Energy,*
   867 F.3d 189 (D.C. Cir. 2017).........................................................................48

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.* (*Willow*),
   555 F.Supp.3d 739 (D. Alaska 2021) ...........................................................44, 45

*Stand Up for California! v. Dep't of Interior,*
   879 F.3d 1177 (D.C. Cir. 2018).........................................................................57

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   471 F. Supp. 3d 71 (D.D.C. 2020)..................................................................64, 65

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   985 F.3d 1032 (D.C. Cir. 2021)............................... 16, 55, 56, 59, 60, 61, 64, 65

*State of Cal. by & through Brown v. Watt*,
   712 F.2d 584 (D.C. Cir. 1983) ...................................................................31, 54

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ...........................................................................................25

*Thomas v. Albright*,
   139 F.3d 227 (D.C. Cir. 1998) ..........................................................................60

*United Steel v. Mine Safety & Health Admin.*,
   925 F.3d 1279 (D.C. Cir. 2019) ........................................................................57

*Vill. of False Pass v. Clark*,
   733 F.2d 605 (9th Cir. 1984) .......................................................................14, 32

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
   165 F.3d 43 (D.C. Cir. 1999) .............................................................................29

**Statutes**

5 U.S.C. § 706 ....................................................................................................16, 56

28 U.S.C. § 1291 ..........................................................................................2, 14, 17, 23

42 U.S.C. § 4321 .................................................................................................1, 2, 12

42 U.S.C. § 4331 ...............................................................................................12, 52

42 U.S.C. § 4332 ......................................................................................................13

43 U.S.C. § 1331 ..................................................................................................2, 14

43 U.S.C. § 1332 ..............................................................................................53, 55, 64

43 U.S.C. § 1334 .....................................................................................31, 32, 35, 53, 55

43 U.S.C. § 1337 ............................................................................................14, 33, 34, 54

43 U.S.C. § 1340 ..............................................................................................14, 31, 35

43 U.S.C. § 1341 ......................................................................................................53

43 U.S.C. § 1344 ...........................................................................................14, 52, 53, 55

43 U.S.C. § 1346 ......................................................................................................14

43 U.S.C. § 1351 ...................................................................................14, 28, 32, 35

43 U.S.C. § 1866 ...................................................................................................52

49 U.S.C. § 13902 ................................................................................................54

**Regulations**

30 C.F.R. § 550.105 ............................................................................................27

30 C.F.R. § 550.181 ............................................................................................32

30 C.F.R. § 550.181 ............................................................................................34

30 C.F.R. § 550.182 ............................................................................................32

30 C.F.R. § 550.183 ............................................................................................32

30 C.F.R. § 550.201-.210 ...................................................................................27

30 C.F.R. § 550.202 ............................................................................................27

30 C.F.R. § 550.207 ............................................................................................27

30 C.F.R. § 550.269 ......................................................................................28, 35

30 C.F.R. § 550.271 ............................................................................................32

30 C.F.R. § 550.628 ............................................................................................34

30 C.F.R. § 556.301 ............................................................................................53

30 C.F.R. § 556.302 ............................................................................................53

30 C.F.R. § 556.516 ......................................................................................54, 63

30 C.F.R. § 556.1102 ..........................................................................................34

30 C.F.R. § 585.437 ............................................................................................34

30 C.F.R. § 585.605 ............................................................................................34

30 C.F.R. § 585.613 ............................................................................................34

40 C.F.R. § 1500.1 ......................................................................................12, 13, 52

40 C.F.R. § 1502.16 ............................................................................13

40 C.F.R. § 1508.8 .............................................................................. 40

40 C.F.R. § 1502.24 ............................................................................13

40 C.F.R. § 1508.7 ..............................................................................13

40 C.F.R. § 1508.8 .......................................................................13, 37

74 Fed. Reg. 66,496 (Dec. 15, 2009) ..................................................4

85 Fed. Reg. 43,304 (July 16, 2020) .................................................12

86 Fed. Reg. 50,160 (Sept. 7, 2021) ...................................................3

86 Fed. Reg. 54,728 (Oct. 4, 2021) .....................................................3

86 Fed. Reg. 7619 (Feb. 1, 2021) ........................................................6

87 Fed. Reg. 40,859 (July 8, 2022) ...................................................18

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| API | American Petroleum Institute |
| EIS | Environmental Impact Statement |
| NEPA | National Environmental Policy Act |
| OCSLA | Outer Continental Shelf Lands Act |

## INTRODUCTION

The Department of the Interior (Interior) decided to hold Lease Sale 257 in the Gulf of Mexico—the largest offshore oil and gas sale in U.S. history—without conducting a complete analysis of the downstream greenhouse gas emissions and environmental impacts from the sale. Although it had the tools and the information to estimate those emissions, Interior arbitrarily limited its assessment and reached the counterintuitive conclusion that greenhouse gas emissions would actually be higher if Interior decided *not* to offer 80 million acres of the Gulf for leasing to oil and gas companies.

The district court, in a thorough and well-reasoned opinion, held that Interior's failure to take a hard look at the greenhouse gas emissions resulting from the sale was a serious violation of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* (NEPA). It vacated the record of decision for Lease Sale 257 and remanded to Interior for further proceedings. Interior did not appeal, but Intervenor-Appellants American Petroleum Institute (API) and State of Louisiana (together, Intervenors), nevertheless ask this Court to prematurely wade into Interior's ongoing analyses of oil and gas drilling in the Gulf of Mexico and limit Interior's responsibility to make decisions based on a complete analysis of the effects of offering tens of millions of acres of public lands for oil and gas drilling. The district court considered and correctly rejected each of Intervenors'

1

jurisdictional and merits arguments. This Court should do the same and either dismiss this appeal for lack of jurisdiction or uphold the district court's decision on the merits.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this matter under 28 U.S.C. § 1331 (federal question) because the claims arose under NEPA, 42 U.S.C. §§ 4321 *et seq*. Plaintiffs-Appellees Friends of the Earth, *et al.* (Friends) have Article III standing to maintain this action. *See* JA97-JA161, JA200-JA206.

This Court lacks jurisdiction over this appeal because the district court's remand order is not a final, appealable order under 28 U.S.C. § 1291. *See infra* pp. 17-24.

## STATEMENT OF THE ISSUES

1. Whether the district court's remand order is an appealable final order.

2. Whether Friends' claim is prudentially ripe.

3. Whether the district court correctly concluded that Interior arbitrarily excluded foreign greenhouse gas emission impacts from its evaluation of the environmental effects of Lease Sale 257 in violation of NEPA and the Administrative Procedure Act (APA).

4.     Whether the district court abused its discretion when it vacated Lease Sale 257 after finding that Interior had committed a serious error which outweighed the disruptive consequences of vacatur.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reprinted in the Addendum filed herewith.

## STATEMENT OF THE CASE

### I.     LEASE SALE 257

Lease Sale 257 was the largest oil and gas lease sale in U.S. history. It offered for lease 80.8 million acres in the Gulf of Mexico to the oil and gas industry for development. JA679-JA691. Interior published a Record of Decision for the sale on September 7, 2021, 86 Fed. Reg. 50,160, 50,161 (Sept. 7, 2021), issued a Final Notice of Sale on October 4, 2021, 86 Fed. Reg. 54,728 (Oct. 4, 2021), and held the sale on November 17, 2021, in the midst of summary judgment briefing in the district court. JA236.

### A.     Environmental and climate impacts of offshore oil and gas leasing

Lease Sale 257 took place against the backdrop of a dramatically changing climate and an urgent need to transition away from fossil fuel energy. Interior estimated that Lease Sale 257 could result in the production of 1.118 billion barrels of oil and up to 4.4 trillion cubic feet of natural gas. JA677; 86 Fed. Reg. at 50,161.

3

When burned, this oil and gas would release greenhouse gases that contribute to climate change.

The world has warmed substantially over the last 150 years, with remarkable acceleration in recent decades, resulting in changes in surface, atmospheric, and oceanic temperatures, and in melting glaciers, reduced snow cover, shrinking sea ice, rising sea levels, ocean acidification, and changes in precipitation patterns, among other effects. JA163; JA534-JA535; JA460-JA461. Human-caused emissions of greenhouse gases are primarily responsible for these changes. 74 Fed. Reg. 66,496 (Dec. 15, 2009); JA163-JA164; JA534-JA535. Chief among the drivers is increasing atmospheric concentration of carbon dioxide and other greenhouse gases, including methane, nitrous oxide, fluorinated gases, and black carbon. JA534.

U.S. greenhouse gas emissions come largely from "the consumption of fossil fuels including oil, natural gas, and coal," primarily through electricity generation and transportation. JA462. Greenhouse gas emissions from the transportation sector originate almost entirely from petroleum (oil) products. *Id*. The lifecycle greenhouse gas emissions from oil and gas include both "downstream" emissions from consumption and "upstream" emissions from the production process. JA536. The production of oil and gas from offshore lease blocks will lead to increased lifecycle greenhouse gas emissions from: operations on the lease blocks

4

(exploration, development, and production); the onshore processing (refining and storage); delivery of the final products to consumers; and the consumption of the oil and gas products downstream. JA459; JA464-JA468.

Extensive research demonstrates that to hold global average temperatures below 2°C above pre-industrial levels, the United States and the world will have to adhere to a finite carbon budget. *See* JA166-JA189; JA197-JA198. The upstream and downstream greenhouse gas emissions from offshore lease blocks could consume a measurable piece of both the world's and the United States' remaining greenhouse gas emissions budget. JA451.

The nation and the Gulf region have already begun to feel the harmful effects of rising temperatures. JA534-JA535. For example, "[c]limate-induced changes to ocean ecosystems, such as increasingly warming oceans, species shifts, rising sea levels, and ocean acidification, are already happening" and having dramatic impacts on fisheries resources and communities throughout the nation. JA549. As much as 88 percent of the northern Gulf coast is highly vulnerable to sea level rise, with levels expected to rise by as much as 19 inches in places over the next fifty years. JA440. Further, strong storms have become increasingly severe in the Gulf. JA781-JA782. The Fourth National Climate Assessment predicts that Texas alone will see hundreds of additional deaths per year due to

rising temperatures and as much as $21 billion in damages to flooded coastal

property by 2030. JA790; JA793.

The United States has recognized the extreme threat from climate warming

and emphasized the significant greenhouse gas emissions that result from oil and

gas development. 86 Fed. Reg. 7619 (Feb. 1, 2021). Accordingly, the

administration has directed agencies to make significant reductions in greenhouse

gas emissions; to build resilience against the impacts of climate change; to address

actions that conflict with these objectives; and to "combat the climate crisis" by

implementing a government-wide approach that reduces climate pollution in every

sector of the economy. *Id.* The United States also formally recommitted to climate

change targets under the Paris Agreement on January 20, 2021, that require the

nation to steadily decrease greenhouse gas emissions. JA95-JA96.

**B.     Interior's evaluation of Lease Sale 257's greenhouse gas emissions**

Interior did not analyze the emissions effects specific to Lease Sale 257.

Instead, it relied on a previously prepared assessment of the emissions

consequences of the programmatic decision to schedule lease sales in the 2017-

2022 Five-Year Leasing Program. Specifically, Interior issued a document

concluding that three prior EISs adequately analyzed the impacts of Lease Sale

257: a Program Environmental Impact Statement (EIS) analyzing the effects of the

2017-2022 Five-Year Program; a Multisale EIS analyzing the impacts of the lease

6

sales in the Gulf of Mexico under the 2017-2022 Program; and a supplemental Lease Sale EIS for two lease sales scheduled in 2018. JA705-JA706; *see also* JA679. All three EISs rely entirely on a 2016 Interior analysis entitled "OCS Oil and Natural Gas: Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon" (Wolvovsky Report). JA536-JA540 (Program EIS); JA444-JA445 (Multisale EIS); JA618 (Lease Sale EIS).

In the Wolvovsky Report, Interior compared the greenhouse gas consequences of holding all the lease sales scheduled in the 2017-2022 Five-Year Leasing Program with the consequences of not holding the sales (the No Action scenario). JA476; JA482; *see generally* JA447-JA502. Interior calculated emissions that could result from the Five-Year Program by summing the various components of the lifecycle emissions of oil that could be produced and burned as a result of the sales. JA463-JA464. Interior calculated the greenhouse gas consequences of the No Action scenario using a substitution analysis that predicted how global energy markets will react if Interior did not hold offshore lease sales. JA468-JA469; JA475. Interior then assessed the greenhouse gas emissions of the resulting energy mix. JA469.

The substitution analysis showed that other sources of energy would replace oil left undeveloped if Interior does not hold lease sales. The single largest source of replacement energy would be oil imported by the United States from foreign

countries. JA476 (Table 6-3, showing oil imports would replace about 63 percent of oil forgone by not holding lease sales). Increased U.S. imports of oil, in turn, would cause foreign oil consumption to drop by as much as 6 billion barrels of oil. JA481.

Although the report predicted up to a 6 billion barrel reduction in foreign oil consumption caused by increased U.S. imports under the No Action scenario, it did not factor the reduction in foreign emissions caused by this reduced consumption. JA481 ("GHG impacts for this reduction in oil consumption . . . are not captured"). Interior recognized that climate change is a global phenomenon, and emissions anywhere, foreign or domestic, contribute to the problem. JA459-JA461; JA534; JA866. But it calculated only domestic emissions and represented them as describing the global emissions consequences of the lease sale decision. JA481-JA482; JA728 ("GHG emissions that would occur domestically . . . serve as a proxy for assessing [the leasing decision's] . . . contribution to climate change globally").

Interior rationalized its decision to ignore any foreign emissions reductions by claiming that it lacked sufficiently reliable information to assess them. JA728-JA730. However, studies in the record completed by Peter Erickson and others at the Stockholm Environmental Institute demonstrated that estimations of foreign emissions resulting from these changes in consumption were possible and were

8

available to Interior. JA625; JA647-JA650; JA673-JA675. One study showed that when accounting for the foreign emissions, the No Action alternative over the life of the 2017-2022 leasing program would decrease global greenhouse gas emissions by up to 2.3 billion tons of carbon dioxide—greater than a year's worth of emissions from the entire U.S. transportation sector (i.e., 1.7 billion tons carbon dioxide). JA672.

Rather than apply this information, Interior instead based its analysis of greenhouse gas emissions on U.S. consumption only and concluded that the No Action scenario (not holding the lease sales and leaving the oil undeveloped) would result in "higher" greenhouse gas emissions than the Program (holding the lease sales and developing and burning the oil). JA494; JA482 (Table 8-1); *see also* JA538 (Program EIS); JA445 (Multisale EIS); JA618 (Lease Sale EIS). Interior relied on this faulty analysis in its Record of Decision for Lease Sale 257. JA679.

### C.    Friends' challenge to the lease sale

On August 31, 2021, the same day the Record of Decision was published, Friends filed suit challenging Interior's decision to hold Lease Sale 257 in reliance on arbitrary environmental analyses, in violation of NEPA and the APA. JA16 (Compl. ¶ 1). Friends specifically challenged Interior's reliance on EISs that underestimated the climate-change-inducing greenhouse gas emissions that would

9

result from the sale because they arbitrarily omitted the decision's impact on foreign emissions. JA60-JA63 (Compl. ¶¶ 169-84). Friends asked the Court to (1) declare that Interior's Record of Decision to hold Lease Sale 257 violates NEPA and the APA; (2) declare that the EISs Interior issued in connection with holding Lease Sale 257 violate NEPA and the APA; and (3) vacate the Record of Decision and vacate or enjoin any leases executed pursuant to Lease Sale 257. JA65-JA66(Request for Relief).

Friends took steps to ensure the litigation could be resolved on an expedited timeline. On September 9, 2021, Friends filed a Notice Requesting Pre-motion Conference asking the court to expedite briefing to afford the court an ability to consider the merits before relief became more complicated. JA72-JA73. At a pre-motion conference on September 20, 2021, all parties subsequently agreed to a briefing schedule that would "provide an opportunity for the Court to make a decision on the merits before January 1, 2022, which is Defendant's best estimate of the earliest date a lease would be issued and effective after Lease Sale 257." JA84 (citing Dkt. No. 19-1 at 3 (Thomas Decl. ¶ 12) (Sept. 17, 2021)). Subsequently the court granted API and Louisiana's motions to intervene in support of Interior. Dkt. No. 13 (Sept. 13, 2021); Dkt. No. 24 (Sept. 22, 2021); Dkt. No. 31 (Oct. 8, 2021); Dkt. No. 60 (Dec. 11, 2021).

On January 27, 2022, the district court granted Friends' motion for summary judgment in part, holding that Interior arbitrarily excluded foreign consumption from its greenhouse gas emissions calculation for the lease sale in violation of NEPA and the APA. JA282, JA318-JA319. The court agreed with Friends that "excluding the reduction in foreign consumption emissions was not a reasonable methodology" and that Interior "provided no reasons . . . to think that it was." JA318. "Barreling full-steam ahead with blinders on was simply not a reasonable action," especially after having been informed of this problem by "not one but two different courts." *Id*. The court concluded that Interior's justification for excluding the emissions—that it lacked adequate information to calculate them—was contrary to the record and thus arbitrary and capricious. JA307. It found that the decision was further undercut by the October 2021 Draft EIS for Lease Sale 258, which contained the analysis Interior said it could not conduct here. JA316-JA317. The court concluded that the omission arbitrarily led Interior to downplay the extent to which not holding the lease sale would reduce global emissions. JA302-JA320.

The court determined that the flaw was central to the lease sale decision because it caused Interior to conclude that holding the lease sale would reduce greenhouse gas emissions more than not holding the lease sale. JA336-JA340. The district court found that "the ordinary practice" of vacating unlawful agency action

was warranted because the flaw was central and industry overstated the disruptive

consequences, JA337-JA348 (quoting *Standing Rock Sioux Tribe v. U.S. Army

Corps of Eng'rs*, 985 F.3d 1032, 1050 (D.C. Cir. 2021)), and "vacate[ed] the

Record of Decision for Lease Sale 257, and the action taken based on that Record

of Decision, including Lease Sale 257, and remand[ed] to the agency for further

proceedings." JA280; JA347.

## II.    STATUTORY FRAMEWORK/BACKGROUND

### A.    National Environmental Policy Act

NEPA is this country's "basic national charter for protection of the

environment." 40 C.F.R. § 1500.1 (2019);[1] *see* 42 U.S.C. § 4331 *et seq*. Congress

enacted NEPA to "promote efforts which will prevent or eliminate damage to the

environment" and to ensure that federal agencies incorporate environmental

concerns into the decision-making process. 42 U.S.C. §§ 4321, 4331(a)-(b); *see

New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 476 (D.C. Cir. 2012). NEPA's

environmental review requirements "insure that environmental information is

available to public officials and citizens before decisions are made and before

---

[1] The version of the NEPA regulations in force in 2019 applied to Lease Sale 257, which Interior began working on in 2016. *See* 85 Fed. Reg. 43,304, 43,372, 43,340 (July 16, 2020) (stating that the 2020 revisions to the regulations "apply to any NEPA process begun after September 14, 2020").

actions are taken." 40 C.F.R. § 1500.1(b). NEPA's aim is not to produce better

documents, but to achieve better decisions. 40 C.F.R. § 1500.1(c); *see also Found.*

*on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985).

To that end, NEPA requires all federal agencies to prepare a "detailed" EIS

for all "major federal actions significantly affecting the quality of the human

environment." 42 U.S.C. § 4332(2)(C). The EIS process "forces the agency to take

a 'hard look' at the environmental consequences of its actions, including

alternatives to its proposed course," and "ensures that these environmental

consequences, and the agency's consideration of them, are disclosed to the public."

*Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) (citations omitted). An

agency must employ "reasonable forecasting" to evaluate the cumulative, 40

C.F.R. § 1508.7, and indirect, *id.* at §§ 1508.8(b), 1502.16(b), effects of its action.

*Sierra Club*, 867 F.3d at 1374. An agency must perform this duty using high-

quality, accurate scientific information and may not rely on incorrect assumptions

or data. 40 C.F.R. §§ 1500.1(b), 1502.24; *see Native Ecosystems Council v. U.S.*

*Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005). NEPA also requires an agency to

show its work: the agency must, in the EIS, "identify any methodologies used and

. . . make explicit reference . . . to the scientific and other sources relied upon for

conclusions." 40 C.F.R. § 1502.24.

### B. Outer Continental Shelf Lands Act

The Outer Continental Shelf Lands Act (OCSLA) governs the leasing, exploration, development, and production of oil and gas deposits on the outer continental shelf. 43 U.S.C. § 1331 *et seq*. OCSLA authorizes Interior to lease portions of the outer continental shelf to qualified bidders and prescribes tiered stages for Interior to manage offshore oil and gas development: 1) five-year leasing programs; 2) lease sales; 3) exploration plans; and 4) development and production plans. 43 U.S.C. §§ 1344, 1337, 1340, 1351. Interior is required to complete an EIS at the lease sale stage—a "critical stage" in this process. *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 481 (D.C. Cir. 2009); *see also* 43 U.S.C. § 1346(a)(1); *Vill. of False Pass v. Clark*, 733 F.2d 605, 609, 614 (9th Cir. 1984); *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 18 (D.D.C. 2017).

### SUMMARY OF ARGUMENT

This Court lacks jurisdiction over Intervenors' consolidated appeal because the district court's remand order is not an appealable final order pursuant to 28 U.S.C. § 1291, and the limited "collateral order" exception does not apply.

Interior held Lease Sale 257, the largest offshore lease sale ever, in the middle of a climate crisis. In assessing the climate consequences of its decision, Interior concluded that holding the sale and burning the oil it could yield would

14

result in fewer greenhouse gas emissions than leaving the oil reserves in the ground unburned. It reached this surprising conclusion by assessing only the domestic emissions consequences of not leasing and omitting emissions reductions that could result from lower foreign oil consumption in the absence of a lease sale.

Interior's decision to limit its analysis violates NEPA because (1) an offshore lease sale is a consequential decision that transfers valuable right to leaseholders and constrains Interior's future discretion; (2) NEPA requires analysis of the full impacts of greenhouse gas emissions at the lease sale stage; and (3) Interior's justification for assessing only domestic emissions is contrary to the record.

The district court did not abuse its discretion when it applied the normal remedy and vacated the sale. It applied the correct legal standard and fully considered the seriousness of Interior's error and Intervenors' arguments about vacatur's consequences.

## STANDARD OF REVIEW

1. The party invoking this Court's jurisdiction bears the burden of establishing jurisdiction over the appeal. *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002).

2. Courts review an agency's NEPA decisions under the "arbitrary and capricious" standard of the APA which requires courts to "hold unlawful and set

aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins Co.*, 463 U.S. 29, 43 (1983). This Court reviews the district court's grant of summary judgment in a NEPA case de novo.

3. This court reviews an order vacating and remanding an agency action for further proceedings under a deferential abuse of discretion standard. *Neb. Dep't of Health & Human Servs. v. Dep't. of Health & Human Servs*., 435 F.3d 326, 330 (D.C. Cir. 2006). In reviewing for abuse of discretion, courts "consider whether the decision maker failed to consider a relevant factor, whether he [or she] relied on an improper factor, and whether the reasons given reasonably support the conclusion." *Standing Rock*, 985 F.3d at 1053 (citing *Kickapoo Tribe of Indians of Kickapoo Rsrv. in Kan. v. Babbitt,* 43 F.3d 1491, 1497 (D.C. Cir. 1995)).

# ARGUMENT

## I.    THIS COURT LACKS APELLATE JURISDICTION

This Court lacks jurisdiction over Intervenors' consolidated appeal because the district court's remand order is not an appealable final order pursuant to 28 U.S.C. § 1291. In this Circuit, it is "axiomatic" that parties other than the federal government "may not appeal a district court's order remanding to an agency because it is not final" within the meaning of 28 U.S.C. § 1291. *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 857 (D.C. Cir. 2012) (citing *N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 19-20 (D.C. Cir. 2008)). The district court's order here remanded the matter to Interior for further proceedings. JA280; JA347. These proceedings are ongoing. Nonetheless, Interior and API request the Court to extend a "narrow and modest" government exception to the rule to private party[2] Intervenors. *Sierra Club v. U.S. Dep't of Agric.*, 716 F.3d 653, 657 (D.C. Cir. 2013); Fed. Br. 15-16, Doc. 1952370; API Br. 19, Doc. 1949489. The Court should decline this invitation and apply its default rule to dismiss the consolidated appeals.

The "relevant inquiry [for the exception allowing appeals of non-final orders] . . . is whether the putative appellant's interests will be irretrievably lost in

---

[2] This Court subjects any non-federal party, including non-federal government parties like the State of Louisiana, to this rule. *See, e.g., Pueblo of Sandia v. Babbitt*, 231 F.3d 878 (D.C. Cir. 2000) (applying the remand rule to dismiss an appeal by New Mexico county).

the absence of an immediate appeal." *Occidental Petroleum v. Sec. and Exch.*

*Comm'n*, 873 F.2d 325, 329 (D.C. Cir. 1989) (internal quotations and citation

omitted). As Interior concedes, "[g]enerally only the Government can satisfy" the

test, because it would be forced to expend resources during the remand period

absent an immediate appeal. Fed. Br. 16. Interior and API's arguments that

Intervenors meet the test here are unavailing.

API and Interior contend that Interior is unable to complete a remand in this

case, and on that basis, claim Intervenors will not have an opportunity again to

seek judicial review. Fed. Br. 10-14; API Br. 19. But recent events fatally

undermine this contention. Interior is currently analyzing and deciding whether and

how to offer additional Gulf lease sales in its next five-year program. The draft of

that program, released on July 1, 2022, explicitly includes the option to hold up to

ten lease sales in the Gulf of Mexico, each of which could be regional sales that

offer the same acreage as Lease Sale 257 (all available areas). 87 Fed. Reg. 40,859

(July 8, 2022).[3] At least one additional lease sale of "some or all of the same

blocks offered in Lease Sale 257," Fed. Br. 14, is therefore more than a mere

---

[3] *2023-2028 National Outer Continental Shelf Oil and Gas Leasing Proposed Program* 5, 1-22 (July 2022),
https://www.boem.gov/sites/default/files/documents/oil-gas-energy/national-program/2023-2028_Proposed%20Program_July2022.pdf.

"theoretical possibility"—it is within the current proposal that Interior is offering as part of its draft program.[4]

Arguments that these processes for a new program are not named "The Remand" or a "re-run [of] Lease Sale 257," API Br. 46, are about labels, not substance. Whatever the moniker, the practical effect of Interior's consideration is the same. Interior will complete a new NEPA analysis and decide whether, where, or on what conditions it may offer these blocks again in a lease sale. This process will yield a final decision that Intervenors can challenge, including on grounds that the original remand was flawed.[5]

The recently passed Inflation Reduction Act, *see* Doc. 1959663, further underscores that Intervenors' appeal is premature.[6] The legislation directs Interior to issue Lease Sale 257 leases. Depending how Interior squares this directive with the district court's remand order requiring Interior to comply with NEPA, these

---

[4] Interior's attempt to downplay this practical outcome by labeling the process "speculative," Fed. Br. 14, fails to distinguish this situation from any other remand, where the outcome is always necessarily uncertain at the outset.

[5] Both Interior and API appear to believe that the remand required a new lease sale. *See, e.g.,* Fed. Br. 12-13 (discussing extensively why Interior could not hold another lease sale before or after the June 30 expiration of the 2017-2022 program); API Br. 19. But Interior's only obligation is to make a new decision whether and, if so, how to do so based on a complete NEPA analysis.

[6] The parties disagree on whether and how the Inflation Reduction Act affects this appeal. They are engaged in separate motion practice concerning how the Court should adjudicate their dispute.

further proceedings may satisfy Intervenors, or they may give rise to a decision that API could challenge. The remand rule compels dismissal of the appeal pending Interior's completion of all of its decisions regarding the lease sale and the district court's resolution of any resulting disputes.

Because Interior is currently considering whether, where, and on what conditions to offer or lease those areas subject to Lease Sale 257, API has ample opportunity to participate in those processes and, if unsatisfied at their conclusion, can challenge the results, including the arguments advanced in this case. *U.S. Dep't of Agric.*, 716 F.3d at 657 (citing cases). The remand rule thus compels dismissal of the appeal pending final administrative resolution of this process.

Proceeding with an appeal now, on the other hand, would waste the Court's and the parties' resources. *U.S. Dep't of Agric.*, 716 F.3d at 656 (explaining purpose of the remand rule is to avoid piecemeal appeals). While waiting for these ongoing processes to end may involve the passage of some time, "this [C]ourt has recognized that although [Section] 1291 inevitably results in some delay, 'Congress has determined that such delay must be tolerated.'" *Id.* at 658 (quoting *Salazar ex rel. Salazar v. District of Columbia*, 671 F.3d 1258, 1261 (D.C. Cir.

20

2012).[7] This Court "has consistently declined invitations to apply the doctrine to private-party appeals from remand orders" and should do so again here. *Id.* at 657.

API, in an argument Interior does not join, goes a step further and insists that the district court's vacatur itself provides jurisdiction to hear this appeal. API Br. 16-18. After observing that orders remanding without vacatur are non-final and cannot be appealed, API posits that the converse must therefore be true: that orders remanding with vacatur are final and appealable. *Id.* at 16-17. This leap is both illogical and legally unsupported. API does not cite any case, nor is Friends aware of any, where a court has found a remand order immediately appealable because the district court vacated the agency decision.

Just the opposite. This Court and others have often determined that an order remanding with vacatur is not a final, appealable order. In *Pueblo of Sandia*, 231 F.3d at 879-80, this Court held that it lacked jurisdiction to consider a district court order that "vacated . . . and remanded the case . . . 'for agency action consistent with [the court's] Opinion.'" *Compare with* JA347 (vacating and "remand[ing] to

---

[7] API's and Interior's analogy to *In re Long-Distance Telephone Service Federal Excise Tax Refund Litigation*, 751 F.3d 629 (D.C. Cir. 2014), is misplaced. API Br. 19; Fed. Br. 17. In that case, the agency did not act on remand for over two years and expressly conceded that it was "not planning" to engage in future rulemaking in response to the remand order. *In re Long-Distance Telephone Service*, 751 F.3d at 633. And, even then, the court ultimately turned to the merits only because appellants' merits arguments were "plainly insubstantial" and therefore easily and efficiently rejected. *Id.* In contrast, Interior here is actively engaged in processes that may address API's concerns.

21

the agency for further proceedings"). Likewise, in *Amarin Pharmaceuticals Ireland Limited v. FDA*, this Court held that an "order remanding to the FDA is not an appealable final order, because it anticipates further agency action." No. 15-5214, 2015 WL 9997417, at *1 (D.C. Cir. Dec. 9, 2015); *see Amarin Pharms. Ireland Ltd. v. FDA*, 106 F. Supp. 3d 196, 219 (D.D.C. 2015) (noting that the court "vacated" FDA's decision); *see also Cook Inlet Tribal Council v. Mandregan*, No. 14-cv-1835 (EGS), 2019 WL 3816573, at *6 (D.D.C. Aug. 14, 2019) (holding order vacating and remanding could not be construed as "final" because the remand contemplated further agency proceedings).

API tries to distinguish *Pueblo of Sandia,* which is directly on point, by asserting that the finality argument based on vacatur was never made in that case. API Br. 18. But API cannot explain why, if vacatur is *the* determinative factor, neither the parties nor the courts addressed the issue in *Pueblo*, or any of these other cases. Similarly, in *In re Long-Distance Telephone Service*, on which API and Interior elsewhere rely, this Court considered the final-judgment rule in the context of a remand order with vacatur. 751 F.3d at 633. Although the Court found that it had jurisdiction, it based that ruling on other grounds and never considered or even mentioned vacatur in its reasoning.

The law elsewhere is the same. For example, the Ninth Circuit has often held that orders vacating and remanding agency decisions are not final, appealable

orders under Section 1291. *E.g.*, *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1074, 1077 (9th Cir. 2010) (holding that an order vacating lease extensions and decision to approve a power plant was not a final, appealable order); *Alsea Valley All. v. Dep't of Com.*, 358 F.3d 1181, 1185-86 (9th Cir. 2004) (considering private party appeal of order vacating agency action and holding "we lack jurisdiction over the entire Remand Order, including its provision setting aside the" agency's decision).

Like in each of these cases, the district court here directed Interior to remedy its NEPA error and remanded "for further proceedings." JA347. The district court's extensive discussion of remedy demonstrates that the court expected Interior to act on remand in some way, even if it ultimately decided not to hold the sale. JA336-JA343.

In addition to contradicting the case law, API's argument makes little sense, considering that vacatur is the default remedy in APA cases, while remand without vacatur is the exception to the rule. JA337-JA338. Under API's proposed test, every order vacating an agency's decision under the APA would automatically become a final appealable order regardless of whether the agency had an opportunity to address the underlying legal flaws on remand.[8]

---

[8] API's reliance on *New Mexico ex rel. Richardson v. Bureau of Land Management* to support this argument is misplaced. *See* API Br. 18-19. In that case, the district

The Court should dismiss API and Louisiana's appeals of the district court's non-final remand order for lack of jurisdiction.

## II. THE DISTRICT COURT CORRECTLY CONCLUDED IT COULD ADJUDICATE FRIENDS' CLAIM

The district court correctly rejected API and Louisiana's various arguments that it is too early to adjudicate Friends' claim. API renews these arguments on appeal in two ways. It argues that Friends' challenge is not ripe as a prudential matter, because Friends can bring their claim at later stages, API Br. 20-26, and it argues that NEPA itself does not require an analysis of later-stage effects like downstream greenhouse gas emissions at the lease sale stage, *id.* at 27-30. Whether cast as going to ripeness or the merits, each of these arguments fails.

### A. Friends' claim is ripe for review.

As an initial matter, it is uncontested that Friends' claim is constitutionally ripe. Constitutional ripeness is coextensive with the injury-in-fact requirement of standing, *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996), and no party challenges the district court's conclusion that Friends have satisfied that requirement. JA291 at n.3. Under Article III, courts must entertain

---

court did not remand for further proceedings—instead it simply enjoined Interior from committing further NEPA violations. *Richardson*, 565 F.3d 683, 698 (10th Cir. 2009) (explaining that the district court's order differed from a typical remand because it "did not require [Interior] to recommence a proceeding, or indeed to take any action at all—it simply enjoined [Interior] from further NEPA violations").

24

claims that are constitutionally ripe. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (describing that "'a federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging'") (quoting *Lexmark Int'l, Inc. v. Static Control Components*, 572 U.S. 118, 126 (2014)).

Friends' claim also satisfies prudential ripeness considerations, to the extent the doctrine applies. *See Susan B. Anthony List*, 573 U.S. at 167 (questioning "the continuing vitality of the prudential ripeness doctrine"). Indeed, API raised— and this Court recently rejected—the very same prudential ripeness arguments in an indistinguishable case challenging Gulf of Mexico Lease Sales 250 and 251. This Court concluded that issuing leases is the "point of inevitability" where Interior is committing resources, and NEPA challenges are therefore ripe at the lease sale stage. *Gulf Restoration Network v. Haaland*, No. 20-5179, 2022 WL 3722429, at *4 (D.C. Cir. Aug. 30, 2022).

Like plaintiffs' claims in *Gulf Restoration Network*, Friends' claim is prudentially ripe. Prudential ripeness tests two factors: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Sanchez v. Off. of the State Superintendent of Educ.*, 959 F.3d 1121, 1124 (D.C. Cir. 2020) (citation omitted). "The fitness requirement is primarily meant to protect the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding

25

unnecessary adjudication and in deciding issues in a concrete setting." *Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 387 (D.C. Cir. 2012) (internal quotations and citation omitted). Friends claim that Interior's decision to hold Lease Sale 257 without estimating the associated global greenhouse gas emissions violated NEPA. This issue will not benefit from further agency refinement or factual development: Interior has completed its NEPA analysis for the decision to hold the sale, and it held the sale in reliance on that analysis. And, as described below, consideration of the emissions implications of the oil and gas development that is the whole point and hoped-for result of the sale is best considered as a whole, at the lease sale stage, rather than piecemeal at later development stages for smaller projects.[9]

The hardship factor also favors adjudication. Neither Interior, which did not contest ripeness, nor Intervenors argue that they would suffer hardship if Friends' claim is adjudicated now. However, Friends will suffer significant hardship if they cannot bring their challenge to the lease sale now in at least two respects. First, as the district court correctly recognized, JA296-JA297, offshore oil and gas leases immediately authorize on-the-water activities that harm Friends' interests. They

---

[9] Contrary to API's argument, API Br. 24-26, the potential that Interior may also analyze the greenhouse gas consequences of subsequent decisions about individual activities (like drilling approvals) does not render the issue here—whether Interior's analysis for the lease sale decision suffices—any less final or fit for review.

permit the lessee to begin "ancillary" activities without any further Interior approvals. *See* 30 C.F.R. § 550.105 (defining "ancillary activities" as "activities on your leases or unit that you . . . can conduct without [Interior's] approval of an application or permit"); *id.* at §§ 550.201-.210 (describing notification requirements for ancillary activity); JA430 ("certain ancillary activities are actually authorized by the lease"). These activities include geological and geophysical activities, which can harm Friends' interests. 30 C.F.R. §§ 550.207, .105 (defining geological and geophysical activities); *N. Slope Borough v. Andrus*, 642 F.2d 589, 594 (D.C. Cir. 1980) (lessees are permitted to engage in "'preliminary activities' . . . [that] fall under the broad rubric of 'testing,'" such as "geological, geophysical, and other surveys necessary to develop a comprehensive exploration plan."). These ancillary activities can result in noise that can harass and harm marine life, increased levels of trash or marine debris, increased vessel strikes, light pollution, and potential entanglement, all of which would be deleterious to local wildlife. *See e.g.*, JA868-JA869; JA876 ("vessel and equipment noise that could disturb sea turtles"); JA541 (finding impacts from "lighting visible infrastructure noise and traffic"); JA546 ("light pollution"). API dismisses any harm from ancillary activities because Interior can stop those it determines cause "undue or serious harm" or damage to the human, marine, or coastal environment. 30 C.F.R. § 550.202(e); API Br. 24 (selectively quoting same regulation). However, as the

district court correctly concluded, this reactive process is no substitute for preventing harm to species and Friends' members in the first instance. JA297-JA298.

Requiring Friends to wait until a later stage in the offshore development process, like a drilling plan on a single or even several lease blocks, to challenge the adequacy of Interior's NEPA analysis for the lease sale also would create hardship by skewing the balance of equities for any relief.[10] By the time Interior approves a drilling plan, Interior and lessees will have devoted significant resources toward developing any purchased lease, heightening the disruptive consequences of undoing the lease sale if a court determines at that later stage it was held in violation of NEPA.

Moreover, pursuant to the statute, regulations, and its own guidance, Interior does not prepare an EIS—let alone one of equal scope—for these later stages of development. *See* JA298-JA300; 43 U.S.C. § 1351(e)(1); 30 C.F.R. § 550.269 (exempting development and production plans in the Gulf of Mexico from EIS requirement); Interior NEPA Manual, Pt. 516, Ch. 15.4(A)[11] (requiring EIS for

---

[10] Deferring an analysis of the cumulative greenhouse gas emissions from hundreds or thousands of leases until the individual project stage also masks the collective contribution of these projects to climate change. *See* JA299-JA300; *infra* pp. 38-40.

[11] https://www.doi.gov/sites/doi.gov/files/elips/documents/516-dm-15.pdf.

lease sales but excluding development and production plans in the central and western Gulf of Mexico from EIS requirement). The decision to hold a lease sale is the final time Interior will prepare an EIS. Intervenors simply cannot explain how a regulatory system for post-lease-sale activities in the Gulf that minimizes opportunities for additional NEPA compliance can somehow guarantee a future hard look of the same scope and depth as the EIS at issue in this case.

Thus, the balance of hardships also strongly favors current adjudication of Friends' claim.

1.  *The district court correctly concluded that this Court's adjudications of five-year leasing plans support the prudential ripeness of Friends' lease sale claim.*

Contrary to API's argument, API Br. 20-21, 24-25, *Center for Biological Diversity* and *Center for Sustainable Economy* demonstrate the prudential ripeness of Friends' challenge to Lease Sale 257. Applying the Court's prudential ripeness principles in the offshore oil and gas development context, these opinions conclude that NEPA claims ripen when Interior makes an irreversible and irretrievable commitment of resources—which both cases identify as the lease sale stage. [12]

---

[12] This Court has at times described the commitment of resource as relevant to ripeness or as relevant to the merits of the NEPA claim. *Compare Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983) and *Mobil Oil Corp. v. FTC*, 562 F.2d 170 (2d Cir. 1977) (adjudicating the issue as a merits question) *with Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43 (D.C. Cir. 1999); *Ctr. for Biological Diversity*, 563 F.3d at 480; and *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588,

Their analyses focus on whether "rights have yet been implicated, or actions taken," and whether adjudicating NEPA claims "would essentially create an additional procedural requirement" for Interior. *Ctr. for Sustainable Econ.*, 779 F.3d at 599 (quoting *Ctr. for Biological Diversity*, 563 F.3d at 480). In holding that NEPA claims were not ripe at the earliest, pre-lease sale, five-year planning stage of offshore development, they conclude such claims *would* be ripe at the subsequent lease sale stage and partly justify their forbearance at the five-year planning stage on the availability of this review at the lease sale stage. *Ctr. for Biological Diversity*, 563 F.3d at 480 (declining to adjudicate challenge because "[n]o lease-sales had yet occurred"); *id.* at 481 (noting "Petitioners suffer little by having to wait until the leasing stage"); *Ctr. for Sustainable Econ.*, 779 F.3d at 600 (concluding that petitioner would "have an opportunity to raise its NEPA claims . . . in response to specific lease sales"). The Court recently applied these holdings and confirmed that NEPA claims ripen at the lease sale stage. In *Gulf Restoration Network*, it adjudicated NEPA claims against two offshore lease sales and explicitly rejected API's ripeness arguments. 2022 WL 3722429, at *4 (holding that Interior makes an irreversible and irretrievable commitment of resources at the leasing stage).

---

593 (D.C. Cir. 2015) (adjudicating the issue as a ripeness question). That categorization does not affect the outcome of this appeal.

A lease sale clearly constitutes a point of irreversible and irretrievable commitment. Prior to holding a lease sale, Interior has unconstrained discretion to protect an area from oil and gas activity. Even if Interior schedules a lease sale in the first offshore development stage, the five-year leasing plan, it is under no obligation to actually hold the sale. *See State of Cal. by & through Brown v. Watt*, 712 F.2d 584, 588 (D.C. Cir. 1983) (stating "while an area excluded from the leasing program cannot be leased, explored, or developed, an area included in the program may be excluded at a latter stage"); JA310 at n.15 (describing Interior's same interpretation). By contrast, when Interior holds a lease sale, it transfers significant contractual rights over public resources to private parties, for which they pay millions of dollars. *See, e.g.*, *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 619-20 (2000) (concluding that the government violated the contractual terms of an offshore lease when it sought to implement legislation post-dating the lease).

Moreover, once it has held a lease sale, Interior's discretion is substantially constrained. For example, OCSLA requires Interior to approve or disapprove an exploration drilling plan within 30 days, 43 U.S.C. § 1340(c)(1), and limits disapproval to circumstances in which Interior concludes that the plan "would probably cause serious harm or damage to life (including fish and other aquatic life), to property . . . , to the national security or defense, or to the marine, coastal,

31

or human environment," *id*. at §§ 1334(a)(2)(A)(i), 1340(c)(1), and "cannot be modified to avoid such condition," *id*. at § 1340(c)(1)(B). *See also* JA300-JA301. OCSLA similarly proscribes Interior's discretion to disapprove a development drilling plan. 43 U.S.C. § 1351(h)(1) (requiring specific conclusions about negative impacts or "exceptional circumstances" before disapproval). It also proscribes the conditions under which Interior can cancel a lease, 43 U.S.C. § 1334(a)(2)(A), (B), and cancellation entitles the lessee to compensation, *id.* at § 1334(a)(2)(C). Interior's discretion at the lease sale stage is comparably unfettered. It can decide not to offer a lease sale at all, or to exclude certain areas based on harm to the environment. JA954 (for each lease sale, Interior "makes individual decisions on *whether and how* to proceed." (emphasis added)). Because a lease transfers rights and substantially constrains Interior's discretion, a lease sale constitutes an irreversible and irretrievable commitment of resources.[13]

Nor would adjudicating Interior's NEPA compliance at the lease sale stage "create an additional procedural requirement" for Interior. *Ctr. for Sustainable*

---

[13] *Village of False Pass* and *North Slope Borough* are not to the contrary. In describing expansive discretion to cancel leases for environmental reasons, these opinions cite regulations "relax[ing] the [statutory] constraints on cancellation." *Vill. of False Pass*, 733 F.2d at 614 (citing 30 C.F.R. § 250.12 (1982)); *N. Slope Borough*, 642 F.2d at 606 & n.103 (citing same regulation). Those regulations are no longer in effect, and Interior's current regulations do not expand its discretion beyond the statutory terms in Section 1334. *See* 30 C.F.R. §§ 550.181, .182, .183 (replicating statutory terms); *see also id.* at § 550.271.

*Econ.*, 779 F.3d at 599. Interior has long recognized its obligation to prepare an EIS for lease sales. *See* Interior NEPA Manual, Pt. 516, Ch. 15.4(C)(10) (identifying "[a]pproval of an offshore lease" sale as "Major Actions Normally Requiring an EIS"); *see also* JA679 (Record of Decision for Lease Sale 257 describing reliance on multiple lease-sale EISs); JA300 (describing how Interior characterizes its five-year planning EIS as discretionary but makes no such assertion about its lease sale EIS, citing JA509, JA430, and JA561). And, as the district court noted, JA293, courts have routinely adjudicated the adequacy of Interior's NEPA compliance for lease sale decisions.

> 2.    *The district court correctly distinguished wind leases.*

API's reliance on the unpublished disposition in *Fisheries Survival Fund v. Haaland*, 858 F. App'x 371 (D.C. Cir. 2021), which addressed an offshore wind lease sale, is misplaced. API Br. 22-23. To the extent the disposition carries weight beyond the dispute it resolved, *see* D.C. Cir. R. 36(e)(2) (unpublished decision carries no precedential value), it is readily distinguishable, as the district court correctly concluded, JA295-JA302.

Interior's wind leasing process differs significantly from its oil leasing. OCSLA proscribes a multi-step process for oil development on the outer continental shelf, with explicit constraints on Interior's authority to prevent activities at each stage. *See supra* pp. 31-32. By contrast, OCSLA contains a single

provision authorizing Interior to offer leases for renewable energy development. 43 U.S.C. § 1337(p). Other than setting forth some broad parameters for activities on these non-oil leases, *id.* at § 1337(p)(4), the provision leaves the details of leasing and regulating activities on leases entirely to Interior's discretion, *id.* at § 1337(p)(5).

In filling in the details, Interior's regulations reserve to Interior full authority to preclude all activity on the leases. Unlike oil leases, which allow ancillary activities to commence without further affirmative action from Interior, *see supra* pp. 26-27, wind lessees cannot conduct *any* activities without submitting a plan to Interior for NEPA review and approval, *see id.* at § 585.605, and Interior retains discretion, without limits, to "approve, disapprove, or approve with modifications," *id.* at §§ 585.613(e), .628(f). There are also no requirements for suspension of leases prior to their cancelation, unlike oil leases, which require five years of suspension prior to cancelation. *Compare* 30 C.F.R. § 585.437 *with id.* at §§ 556.1102, 550.181(d).

The terms of wind leases themselves reflect Interior's broad discretion to preclude activities. The lease in *Fisheries*, for example, stated that (1) "the lease does not, by itself, *authorize any activity* within the leased area," *Fisheries Survival Fund v. Jewell*, Case No. 16-cv-2409 (TSC), 2018 WL 4705795, at *8 (D.D.C. Sept. 30, 2018) (emphasis added) (citation omitted); and (2) Interior

retains the broad ability to disapprove any further steps if it finds they would cause any "unacceptable environmental consequences," *Fisheries Survival Fund*, 858 Fed. App'x at 372 (citation omitted). *Compare with* 43 U.S.C. §§ 1334(a)(2)(A)(i), 1340(c)(1) (Interior can disapprove development plan only where it "would probably cause serious harm" to aquatic life "or to the marine, coastal, or human environment"). They thus explicitly "reserve[] . . . the authority to preclude all activities pending submission of site-specific proposals." *Fisheries Survival Fund*, 858 Fed. App'x at 372 (citing *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983)). This discretion is in stark contrast to the way OCSLA and Interior's regulations treat oil and gas development, and it compels a different outcome here.

The difference between Interior's discretion in the wind and the oil leasing contexts also manifests in Interior's NEPA-compliance practices for each type of lease. Interior typically does not complete an EIS until after it issues a wind lease and the lessee submits a site-assessment plan and a construction and operations plan. *Fisheries Survival Fund*, 2018 WL 4705795, at *2-3. For Gulf of Mexico oil and gas leases, by contrast, Interior prepares an EIS for lease sales, *see supra* pp. 28-29, but it does not prepare an EIS at the exploration and development stages, *see* 43 U.S.C. § 1351(e)(1) (exempting Gulf from requirement to prepare an EIS for development plans); 30 C.F.R. § 550.269 (same); Interior NEPA Manual, Pt. 516, Ch. 15.4(C)(10) (categorically excluding, with limited exceptions, approval of

exploration and development plans in the central or western Gulf of Mexico from NEPA requirements altogether). As a practical matter, Interior excludes even risky, frontier exploration plans from NEPA evaluation following a lease sale. *See Zinke*, 260 F. Supp. 3d at 18 (noting that "Interior invoked these categorical exclusions when it approved British Petroleum's initial and revised exploration plan" for the well that eventually "blew out and caused the Deepwater Horizon oil rig to explode" (internal quotations and citation omitted)).

In light of these differences between wind and oil lease sales, *Fisheries Survival Fund* does not support delaying adjudication of Friends' challenge to Lease Sale 257. Rather, as the district court concluded, JA296-JA298, this case more closely resembles the challenge this Court concluded was ripe and adjudicated on the merits in *Peterson*, 717 F.2d at 1414. As in *Peterson*, Interior's options here are meaningfully restricted following a lease sale, and thus the "appropriate time for preparing an EIS is *prior* to a decision, when the decisionmaker retains a maximum range of options." *Id.*

## B.    NEPA requires Interior to assess the potential downstream greenhouse gas emissions consequences of a lease sale decision.

API's argument that Friends' claim is premature because NEPA does not require analysis of later-stage effects (like downstream greenhouse gas emissions), API Br. 27-30, also fails. This Court and others have repeatedly affirmed the basic principle, enshrined in NEPA's regulations, that an agency must consider the

indirect effects of its decisions, namely those that "are caused by the [project] and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). "Effects are reasonably foreseeable if they are 'sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision.'" *Sierra Club*, 867 F.3d at 1371 (quoting *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016)); *see also Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 498 (9th Cir. 2014) (NEPA requires an EIS to "provid[e] sufficient detail to foster informed decision-making" at the stage in question. (citation omitted)). Because the very purpose of a lease sale is to promote oil development, the effects of that development, including emissions consequences, are reasonably foreseeable, and NEPA requires their analysis.

Interior itself concluded that later stages of development are reasonably foreseeable effects of a lease sale and must be analyzed in a lease-sale EIS. The central mechanism Interior used in the EIS to analyze the effects and alternatives of its lease sale decision is a scenario "formulated using historical information and current trends in the oil and gas industry," and which projects the oil and gas activities "that are considered reasonably foreseeable and suitable for presale impact analyses." JA437. The scenario Interior used for Lease Sale 257 includes the impacts of "routine" and other activities such as exploration and development drilling, transportation of oil, and discharges into the water and air, and accidental

oil spills to provide the public and decisionmaker with a description of the foreseeable impacts of holding a lease sale. JA435-JA436. As Interior acknowledges, downstream greenhouse gas emissions from oil and gas produced as a result of the sale are one of these foreseeable impacts. JA459; JA464-JA468.

The Ninth Circuit has held, "[o]nce [Interior] made the determination that production is reasonably foreseeable, it was required to consider the full cumulative impact of that production." *Native Vill. of Point Hope*, 740 F.3d at 503; *id.* at 504 (concluding that Interior "is required to take into account the full environmental effects of its actions" at the lease sale stage). The court highlighted the importance of this assessment at the lease sale stage, explaining that "[i]t is only at the lease sale stage that the agency can adequately consider cumulative effects of the lease sale on the environment, including the overall risk of oil spills and the effects of the sale on climate change." *Id.* at 504. While it may be appropriate to defer full consideration of effects that are "site-specific" in nature (e.g., harm to wildlife in a specific location) to a later analysis, *see id.* at 498-99, "[a] later project or site-specific environmental analysis is an inadequate substitute" for analyzing systemic or cumulative effects at the lease sale stage, *id.* at 504. For these reasons, and since Interior itself has determined that a lease sale EIS must analyze future development activities, requiring assessment of impacts would not prematurely divert agency resources, as API suggests. API Br. 27.

API and Louisiana argue that Interior needed only to analyze effects of preliminary activities permitted during the lease sale phase and could ignore effects from later-stage activities, like oil exploration and development, including emissions effects. API Br. 27-28; La. Br. 10-15, Doc. 1949416. They cite *North Slope Borough v. Andrus*, but the opinion does not support this position. The EIS at issue there *did* assess effects from later-stage activities, including from an oil spill. *See* 642 F.2d at 605 ("We affirm the district court's holding that '(t)he worst case analysis contained in the EIS was a reasonable means of alerting the decision maker to the dangers presented by proceeding in the face of uncertainty.'"); *N. Slope Borough v. Andrus*, 486 F. Supp. 332, 346 (D.D.C. 1980) (describing the EIS's "worst case analysis," prepared under a since-repealed regulation, that assessed the impacts of an oil spill on resources such as bowhead and gray whales); *Andrus*, 642 F.2d at 600-01 (discussing EIS's assessment of cumulative impacts). The *Andrus* court held that the EIS's assessment (through a worst-case analysis) of oil spills that could result from oil development on leases was adequate, not that a lease sale EIS can altogether ignore effects from oil development.[14]

---

[14] In addition, the 1980 Alaska offshore context the Court addressed in *Andrus* differs significantly from the context here. In Alaska, Interior is required to prepare an EIS at later stages, and the Court relied on this requirement in determining the depth of NEPA analysis required at the lease sale stage. *N. Slope Borough*, 642

API and Louisiana also make much of the fact that the *Liberty* and *Willow* opinions address later stages of oil development. API Br. 29-30; La. Br. 17-18. While true, this is irrelevant to their persuasive effect. Like the agencies in those cases, Interior here concluded (correctly) that downstream emissions are a reasonably foreseeable consequence of its decision and purported to analyze them in the EIS. Having so decided, it was required to analyze these effects in full. *Liberty* and *Willow* demonstrate that it is arbitrary and unlawful for Interior, faced with a materially indistinguishable record as those cases, *see infra* 45-27, to minimize emissions impacts of its lease sale decision here by omitting the foreign emissions consequences from its analysis.

## III.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT INTERIOR VIOLATED NEPA BY FAILING TO ASSESS THE LEASE SALE'S GLOBAL EMISSIONS CONSEQUENCES

NEPA requires Interior to adequately consider the reasonably foreseeable indirect effects of its action, including the impacts from greenhouse gas emissions. 40 C.F.R. §§ 1502.16(b), 1508.8(b); *see also Sierra Club*, 867 F.3d at 1371; *Ctr. for Biological Diversity v. Bernhardt* (*Liberty*), 982 F.3d 723, 737 (9th Cir. 2020)

---

F.2d at 606 (noting that "a second EIS is required by the OCSLA covering the development and production stage of an OCS project"); *see also* JA307. This is not true for the Gulf region. *See supra* p. 35. The Court in *Andrus* also relied on regulations that no longer exist to find that Interior has wide discretion to cancel or suspend a lease sale for environmental reasons at a later stage. *See supra* p. 39.

("An EIS that does not adequately consider the indirect effects of a proposed action violates NEPA."). Interior's assessment of the greenhouse gas emissions that could result from its Lease Sale 257 decision violates NEPA and the APA because it arbitrarily omitted consideration of foreign emissions, a key component of the analysis. Interior's justification for omitting foreign emissions was contrary to the record, directly at odds with court decisions in the District of Alaska and the Ninth Circuit, and is belied by its inclusion of foreign emissions in the EIS for its next lease sale. The error here likely caused Interior to seriously understate the emissions benefits of forgoing the lease sale.

### A. Interior's omission of global emissions is unsupported and led to a misleading disclosure of Lease Sale 257's climate consequences.

To determine the greenhouse gas emissions consequences of its lease sale decision, Interior compared emissions that could result from producing and consuming oil from leases (the proposed action) to the emissions consequences of forgoing the lease sale and leaving the oil undeveloped (the no action alternative). *See supra* pp. 6-9. It calculated emissions under the no leasing scenario by predicting how the global oil market would react in the absence of the lease sale. *Id.* Although it concluded that not holding the lease sale would result in increased imports to the United States, and that these imports would reduce foreign consumption of oil, it did not quantify the emissions consequences of this reduced foreign oil consumption. *Id.*

41

Interior justified its decision not to quantify emissions from foreign consumption on the ground that it lacked information about individual foreign country consumption patterns. JA481. This explanation cannot be squared with evidence in the record. As the district court properly determined, JA312 (citing studies), several studies in the record demonstrate the feasibility of calculating the global emissions consequences of changes to foreign consumption caused by U.S. oil and gas production policies. *See, e.g.,* JA623-JA670 (comprehensive analysis that calculates and presents, at JA650, the global greenhouse gas consequences of ending fossil fuel leasing on U.S. federal lands); JA673-JA675 (critiquing Multisale EIS for failing to calculate lease sales' global emissions consequences). One study, authored by the Stockholm Environmental Institute, addresses the very report on which Interior relied here—the Wolvovsky Report. JA671-JA673. It notes that while Interior's report acknowledges that the decision to forgo leases in the five-year plan would decrease foreign oil consumption, JA671, it fails to conduct "the simple calculation of what that change in oil consumption would mean for $CO_2$," JA672. Using publicly available government databases, the study then calculates that, by reducing foreign consumption, not holding the lease sales would reduce global emissions by up to 2.3 billion tons of carbon dioxide over the life of the five-year program—greater than a year's worth of emissions from the entire U.S. transportation sector (i.e., 1.7 billion tons of carbon dioxide). JA672.

42

Interior's failure to incorporate these greenhouse gas emissions reductions into its assessment of the no action alternative is highly consequential. Without accounting for the emissions reductions, Interior concluded that not holding lease sales (the no action alternative) would result in *higher* emissions than holding lease sales (the program decision). JA482; JA538. Had Interior considered foreign emissions reductions, it would have reached the opposite conclusion. For example, applying the Stockholm Environmental Institute estimates to Wolvovsky highlights that not holding any lease sales scheduled in Interior's five-year leasing plan (of which Lease Sale 257 is one) results in far fewer emissions, 5.7 billion tons of carbon dioxide[15] compared to Interior's estimate of 7.9 billion tons of carbon dioxide if it held the sales (JA482). Interior's faulty conclusion that not holding Lease Sale 257 would increase greenhouse gas emissions prevented it from accurately assessing the environmental effects likely to result from the proposed lease sale and caused it to undervalue the environmental benefits of not holding the lease sale. In short, it caused Interior to present a misleading picture to the decisionmaker and the public about how the decision to hold Lease Sale 257 would affect climate change.

---

[15] Domestic emissions of 8 billion (JA482) minus reduced foreign emissions of 2.3 billion (JA672).

43

**B.     The Ninth Circuit and District of Alaska have assessed the same analysis, on functionally indistinguishable records, and determined it violates NEPA.**

Two courts have already addressed the greenhouse gas emissions analysis Interior employed here and concluded that its exclusion of global emissions violates NEPA and the APA. *See Liberty*, 982 F.3d at 738-40; *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.* (*Willow*), 555 F.Supp.3d 739, 762-65 (D. Alaska 2021). *Liberty* and *Willow* addressed the very same Wolvovsky Report at issue here that concluded that leasing decisions would change foreign oil consumption but nonetheless omitted emissions consequences of those changes. *Liberty*, 982 F. 3d at 737-38; *Willow*, 555 F. Supp. 3d at 762 n.107. Like here, in *Liberty* and *Willow*, Interior justified its exclusion of foreign emissions on the ground that it lacked sufficient information to calculate the emissions consequences of foreign consumption changes. *Liberty*, 982 F. 3d at 737-38; *Willow*, 555 F. Supp. 3d at 763-65, 764 n.124. Yet like here, "the record belie[d] [Interior's] contention," because it contained evidence that demonstrated Interior could assess foreign emissions. *Liberty*, 982 F.3d at 738; *Willow*, 555 F. Supp. 3d at 765.

The courts in *Liberty* and *Willow* both determined Interior's exclusion of foreign emissions was unlawful because, like here, the record showed that leaving U.S. oil and gas undeveloped increases oil prices and decreases global

consumption. *Liberty*, 982 F.3d at 737 (describing Wolvovsky Report at JA481 in this record); *see also* JA673-JA675. In both cases the courts determined—based on the same studies and evidence in the record here—that it was possible to estimate the emissions reductions that would result from decreased demand if oil is left undeveloped, and concluded that Interior's failure to account for foreign oil emissions violated NEPA and the APA. *See Liberty*, 982 F.3d. at 738-39, 740; *Willow*, 555 F. Supp. 3d at 764-65, n.129. This Court should reach the same conclusion here.

### C.    Interior's assessment of global emissions for Lease Sale 258 belies its contention that it could not assess global emissions for Lease Sale 257.

Mere weeks after it published the Record of Decision, Interior demonstrated that it was possible to calculate the emissions resulting from changes to foreign consumption with the information available, directly contradicting its contention that it could not have done so for Lease Sale 257. On October 22, 2021, only seven weeks after signing the Lease Sale 257 Record of Decision, Interior published a Draft EIS for Lease Sale 258 in Cook Inlet. JA216 at n.6 (Nov. 10, 2021); JA223-JA235. In it, Interior conducted a quantitative analysis of the emissions impacts of reduced foreign oil consumption, the very analysis it foreswore for Lease Sale 257. JA220 (Nov. 21, 2021); JA228-JA230; *see also* JA216 at n.6. Specifically, Interior used its existing "foreign oil consumption estimate" and a publicly available

"generic GHG emissions factor" to make a "reasonable estimate for GHG emissions from foreign oil consumption." JA220. When Interior used this generic emission factor it showed that "[f]oreign oil consumption estimated under the No Action Alternative emits . . . less GHG emissions compared to foreign consumption estimated under the Proposed Action." JA220-JA221. This directly contradicted Interior's previous conclusions: when excluding foreign consumption from its analysis it concluded that U.S. emissions would be "higher" if Interior chose the no action alternative (foregoing a lease sale). JA494.

Lease Sale 258 directly contradicts any argument that Interior did not have the information or that "none of the available scientific literature contained the data it needed," API Br. 38, to calculate emissions from foreign consumption. The Draft EIS states that "[n]o new data or capabilities have been made available to [Interior] since the Liberty decision," but it was nevertheless possible to complete this analysis. JA224-JA225. API's speculation that the Draft EIS for Lease Sale 258 "was subject to public input that may well have caused Interior to reconsider its reliability," is irrelevant. API Br. 39. The point of Interior's estimates for Lease Sale 258 is that, contrary to what Interior asserted for Lease Sale 257, it had the information to estimate foreign emissions—the same analysis it had just weeks before disclaimed as impossible. Interior had the information and ability to

46

estimate foreign emissions but simply chose not to do so for Lease Sale 257. As in *Liberty* and *Willow*, that error is fatal to its decision.

**D.    Intervenors' objections mischaracterize the law and the record.**

Intervenors' remaining objections are based on a misreading of the caselaw, OCSLA, and the record.

> *1.    Intervenors mischaracterize caselaw.*

Contrary to Louisiana's suggestion, *WildEarth Guardians v. Zinke*, does not hold that NEPA categorically allows exclusion of global emissions. La. Br. 19-20 (quoting 368 F. Supp. 3d 41, 77 (D.D.C. 2019)). Rather, the court in *WildEarth Guardians* found, on that record, that Interior lacked sufficient information about foreign greenhouse gas emitting projects to include them in its cumulative impacts analysis of a lease sale. *WildEarth Guardians*, 368 F. Supp. 3d at 67-77. In this case, by contrast, the record and Interior's use of this information in the Draft EIS for Lease Sale 258, *supra* Section III.C, show that Interior did have information needed to include foreign emissions consequences of the lease sale in its analysis. *See*, *e.g*., JA673-JA675.

API's reliance on *Sierra Club v. U.S. Dep't of Energy* (*Flex*), API Br. 35-36, is similarly misplaced. In *Flex*, the D.C. Circuit upheld an agency analysis of downstream greenhouse gas emissions because the agency compared the foreign emissions from exported liquified natural gas "to emissions of coal or other

sources of natural gas" but did not also consider "the potential for [liquified natural gas] to compete with renewables." 867 F.3d 189, 202 (D.C. Cir. 2017). The Court excused this omission because it concluded that necessary information was missing such that the analysis "would be far too speculative to be useful." *Id.* at 199. By contrast, in this case, the record and Interior's subsequent Lease Sale 258 analysis demonstrate the opposite—Interior had the information to conduct the analysis.

### 2.    *Intervenors mischaracterize the record.*

API's argument that Interior's focus on "American emissions" was not misleading because the agency never claimed to be analyzing anything else, API Br. 36, misses the point. As Interior itself recognizes, emissions anywhere affect the climate. *Supra* p. 8. Global emissions are the relevant metric for measuring climate change effects, as the effects of those emissions are felt both domestically and worldwide. Whether or not Interior set out to do so, using "American emissions" as the metric of comparison for leasing and not leasing is meaningless (and misleading, where it omits the significant global emissions reductions of forgoing leasing). Where, as here, a domestic federal action causes measurable changes to global emissions—and hence effects the global (including the "American") environment—NEPA prohibits Interior from donning blinders to the causes and significant effects of that activity. "Reasonable forecasting . . . is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their

responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'" *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973).

Intervenors' argument that the addendum cures any deficiencies in the EIS fails for two reasons. API Br. 37-38; La. Br. at 20-21. First, as the district court correctly recognized, JA320, a post-EIS discussion in an addendum is procedurally improper and cannot cure deficiencies in the EISs. NEPA documents serve a vital informational role—to give "the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process and, perhaps more significantly, provide[] a springboard for public comment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (internal quotations and citation omitted). The requirement that the analysis appear within the EIS ensures "NEPA's goal of allowing the public the opportunity to 'play a role in . . . the decisionmaking process'" is given effect. *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016); *see also Sierra Club*, 867 F.3d at 1374 (agency's assumptions "can be checked" by disclosing the estimates so that readers could make informed decisions regarding the project and its

49

consequences). The discussion and emissions analysis must appear within the EIS, not in an addendum that is not part of NEPA's public process.[16]

Second, as the district court also correctly concluded, JA318-JA320, the addendum fails to cure deficiencies in the EIS, because it does not provide a convincing explanation of why Interior cannot assess foreign emissions in light of the contrary evidence in the record. The addendum only generally refers to "[a] survey of relevant studies and literature show[ing] that . . . reliable and uniform global data are not reasonably available at this time." JA729-JA730. This is wholly inadequate in light of the detailed evidence to the contrary in the Stockholm Environmental Institute reports, the fact that the *Liberty* and *Willow* courts determined on a functionally indistinguishable record that Interior did have information sufficient to conduct the analysis missing here, and the fact that Interior used the very same information in the record here less than two months later to estimate foreign emission reductions in the Lease Sale 258 EIS.

The Addendum's attempt to downplay the relevance of the missing greenhouse gas analysis to the lease sale decision, JA729-JA730, also misses the mark. As the district court rightly concluded, Interior's failure to quantify foreign emissions "likely does change the bottom line of a key conclusion" underlying the

---

[16] Indeed, the addendum was not even publicly disclosed until the agency filed its administrative record in this case. Dkt. No. 30 (Oct. 8, 2021).

decision whether or not to hold Lease Sale 257. JA318-JA319. The error led Interior to conclude that holding the sale would reduce greenhouse gas emissions and thus be better for the climate. Moreover, it is well-established that bare comparisons of a project's emissions and global emissions, without more, "are of almost no utility," and fail to satisfy NEPA. *350 Montana v. Haaland*, 29 F.4th 1158, 1176-77 (9th Cir. 2022).

The Addendum's reference to a "qualitative analysis" of foreign emissions, JA730-JA731, fares no better, as the district court correctly described, JA319. The EISs on which Interior relied for Lease Sale 257 do not contain any such analysis. While the Addendum itself allows that "it is reasonable to assume" that foreign emissions would be lower without Lease Sale 257, JA730, it does not explain how those lower foreign emissions would offset domestic emissions or change Interior's overall conclusion about emissions. Instead, it concludes that it "does not expect this information to change any conclusions from the previous NEPA analyses," JA731, i.e., that holding the lease sale would result in lower emissions than forgoing it.

### 3. Intervenors mischaracterize OCSLA.

API's additional argument, made for the first time on appeal, that OCSLA itself precludes Interior from considering downstream greenhouse gas emissions when making lease sale decisions also fails. OCLSA broadly directs Interior to

manage the outer continental shelf "in a manner which considers economic, social, and *environmental values* of the renewable and nonrenewable resources contained in the outer Continental Shelf, and the potential impact of oil and gas exploration on other resource values of the outer Continental Shelf and the marine, coastal, and human environments." 43 U.S.C. § 1344(a)(1) (emphasis added). Congress explicitly provided that "nothing in this chapter shall be construed to amend, modify, or repeal any provision of . . . the National Environmental Policy Act." 43 U.S.C. § 1866(a). Accordingly, NEPA, and its associated regulations govern the agency's decision to offer a lease sale. 40 C.F.R. § 1500.1 (2019); 42 U.S.C. § 4331 *et seq*. Under NEPA, downstream greenhouse gas emissions are a reasonably foreseeable consequence of a lease sale decision that require analysis in an EIS. *See supra* pp. 36-40.

API points to *Center for Biological Diversity* to argue that OCSLA precludes consideration of emissions effects at any stage. API Br. 31-33. That opinion rejected a claim that 43 U.S.C. § 1344 *obligates* Interior to consider climate change impacts from burning produced oil and gas in formulating a five-year program. *Ctr. for Biological Diversity*, 563 F.3d at 484-85. Its further suggestion that the provision *prohibits* consideration of those impacts, however, is dicta, because the only question actually presented for decision in *Center for Biological Diversity* was whether consideration of the impacts was *required*, not

whether consideration would be permissible. *Id.* at 484; *see Kastigar v. United States*, 406 U.S. 441, 454-55 (1972) ("[B]road language . . . unnecessary to the Court's decision . . . cannot be considered binding authority."); *see also Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 295-96 (D.C. Cir. 1988) (describing that OCSLA does not displace NEPA's information-forcing role). The dicta is unpersuasive because nothing in OCSLA supports the conclusion that the statute limits Interior's discretion to consider the end-use effects of oil when making leasing decisions. While the statute charges Interior with overseeing the "expeditious and orderly development" of offshore oil and gas resources, development must be "subject to environmental safeguards" and "consistent with . . . other national needs." 43 U.S.C. § 1332(3). 43 U.S.C. § 1344 itself directs that one of the "principles" of preparing a five-year program is that "[m]anagement of the outer Continental Shelf shall be conducted in a manner which considers . . . the potential impact of oil and gas exploration on . . . [the] human environment[]." *Id.* at § 1344(a)(1). OCSLA's other provisions reinforce the broad discretion it affords the decisionmaker in making leasing decisions. *See id.* at § 1334(a) (broadly authorizing leasing and promulgation of leasing regulations); *id.* at § 1341(a) (President may withdraw areas from leasing disposition for any reason); *see also* 30 C.F.R. §§ 556.301-.302 (describing broad discretion of agency to select or omit

areas to offer for lease); *id.* at § 556.516(b) (providing that the agency may reject any bids received on leases).

OCSLA does not share the discretion-constraining characteristics that narrowed an agency's NEPA obligations in *Public Citizen*, cited by API. API Br. 32-33. The statute there *obligated* the agency to register cross-border trucks if they met the statute's enumerated safety and financial criteria. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 766 (2004) (describing 49 U.S.C. § 13902(a)(1)). By contrast, OCSLA does not obligate Interior to hold a lease sale under any condition. To the contrary, it broadly authorizes Interior to decide whether and how to hold lease sales, 43 U.S.C. § 1337; *Watt*, 712 F.2d at 588 ("an area included in the program may be excluded at a latter stage"); JA310 at n.15, and OCSLA's other provisions, *supra* pp. 52-53, require consideration of environmental factors at OCSLA's various stages. Full environmental consideration is especially critical at the lease sale stage, where Interior maintains a maximum range of options. *Native Vill. of Point Hope*, 740 F.3d at 504.

The discretion OCSLA affords the decisionmaker to lease or not easily exceeds the level this Court found sufficient to require downstream emissions analysis in *Sierra Club*, 867 F.3d at 1373, also cited by API, API Br. 31-33. The Court there found a statute that "instructed the agency to consider 'the public convenience and necessity' when evaluating applications to construct and operate

interstate pipelines," ample enough to require a NEPA analysis of greenhouse gas emissions. *Sierra Club*, 867 F.3d at 1373 (citing 15 U.S.C. § 717f(e)). OCSLA's instructions to consider the effects of oil and gas activities on, and to safeguard, the environment, 43 U.S.C. §§ 1332(3), 1344(a)(1), and its broad delegation of leasing authority, *id.* at § 1334(a), do not constrain Interior's ability to consider and act upon the downstream emissions consequences of its lease sale decision.

## IV.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN VACATING THE LEASE SALE

The district court properly exercised its broad discretion when applying the *Allied Signal* factors and deciding to vacate Lease Sale 257. Like all remedial orders, the district court's vacatur order is reviewed under a deferential "abuse of discretion" standard. *Neb. Dep't of Health v. Dep't of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006). This highly deferential standard recognizes that the district court is "best positioned" to "make factual findings, and determine the remedies necessary to protect the purpose and integrity of the EIS process." *Nat'l Parks Conservation Ass'n v. Semonite*, 925 F.3d 500, 502 (D.C. Cir. 2019); *see also Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019) (application of the *Allied-Signal* exception "turns on the [District] Court's assessment of the overall equities and practicality of the alternatives"). Under this standard, the court "cannot decide the issue by determining whether [it] would have reached the same conclusion" to vacate the lease sale, *Standing Rock*, 985

F.3d at 1053 (quoting *United States v. Mathis Gardner*, 783 F.3d 1286, 1288 (D.C. Cir. 2015)), but looks to whether the lower court "failed to consider a relevant factor" or "relied on an improper factor," *id.* (quoting *Kickapoo Tribe*, 43 F.3d at 1497 (stating that the appeals court reviews whether the lower court "did not apply the correct legal standard" or "misapprehended the underlying substantive law." (quoting *Hunt v. Nat'l Broadcasting Co.*, 872 F.2d 289, 292 (9th Cir. 1989)))).

API attempts to cast doubt on the district court's exercise of discretion by arguing that the court applied the wrong standards when balancing the *Allied-Signal* factors. Although it does its best to cloak them as misapprehensions of the law, its critiques are about the decision the court made in weighing numerous facts and properly exercising its discretion, not any error of law. Louisiana, for its part, makes no attempt to argue that the district court abused its discretion. Rather it repeats, in places verbatim, *compare* La. Br. 22-24 *with* JA267-JA268, the arguments it made before the district court. The court considered this evidence, JA340-JA341, and reasonably concluded that no departure from vacatur is warranted here.

The APA commands that a court "shall . . . hold unlawful and set aside" agency action that is arbitrary and capricious. 5 U.S.C. § 706(2)(A); *FCC v. NextWave Pers. Commc'ns*, 537 U.S. 293, 300 (2003) ("in all cases agency action must be set aside" if inconsistent with APA). Under *Allied Signal, Inc. v. U.S.*

56

*Nuclear Reg. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993), a narrow exception to this rule can be made, based on consideration of: a) the "seriousness" of the decision's deficiencies, and b) the "disruptive consequences" of vacatur. Such an exception remains appropriate only in the "rare case." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019); *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020) (remand without vacatur is an "exceptional remedy"). Defendants, not plaintiffs, bear the burden of showing that they are entitled to it. *Semonite*, 422 F. Supp. 3d at 99.

Here, the district court "acted well within its discretion" when it properly weighed both *Allied-Signal* factors in a fact-specific inquiry. *Stand Up for California! v. Dep't of Interior*, 879 F.3d 1177, 1190 (D.C. Cir. 2018). The court correctly articulated the well-established standard, JA338, and it hewed to it closely when assessing the facts before it. Like the two other courts that have addressed functionally indistinguishable agency errors, *Liberty* and *Willow*, it reasonably concluded that no departure from vacatur is warranted here. API's protestations to the contrary are unavailing.

As to the first *Allied-Signal* prong, contrary to API's characterization, the court did not "believe[] that a NEPA violation changes the vacatur inquiry." API Br. 42-43. Rather, the court correctly focused its inquiry on the question of whether the agency's error cast "substantial doubt that the agency chose correctly."

57

JA339 (citing *Standing Rock*, 985 F.3d at 1052). In answering that question in the affirmative, the court recited factual findings directly relevant to this question. It found that Interior's analysis of greenhouse gas emissions was "completely contradictory" to its finding that not holding the lease sale would result in a significant decrease in foreign emissions. JA338-JA339. This error led Interior to disclose that emissions would be higher if no lease sale took place than if one did. *Id.* And this conclusion was "highly relevant to the ultimate decision in light of the otherwise careful consideration [Interior] gave to the effects of climate change." JA339. As such, the court found "substantial doubt that the agency chose correctly." *Id.* Each of these well-supported findings is directly relevant to the question of whether the agency chose correctly.

API suggests that the district court thought "the relevant [vacatur] question" was whether Interior could successfully "justify its old reasoning" to exclude global emissions. API Br. 41-42. However, on the pages of the opinion from which API selectively quotes, JA339-JA340, the district court only describes how Interior's resistance to remedying its analysis in the face of the *Liberty* decision further supports vacatur here. Vacatur will help ensure that the agency considers the lease sale decision anew in light of a complete NEPA analysis, rather than retroactively justifying the decision it made based on its original, flawed analysis.

API also misses the mark when it protests that Interior's error cannot be serious because it could be remedied quickly or easily. API Br. 40-41. That the error is obvious, and that Interior has already demonstrated in the Draft EIS for Lease Sale 258 that it knows how to correct itself, does not render it less significant. As the district court correctly recognized, significance depends on the error's role in the decision. JA338-JA339; *Allied-Signal*, 988 F.2d at 151.[17]  Nor is it correct, as API would have it, API Br. 42, that vacatur is inappropriate where it is "at least conceivable" that Interior could hold the lease sale again after accounting for foreign emissions. Were that the rule, courts could never vacate a decision because it violated NEPA. However, as this Court has explained, NEPA violations can be serious "notwithstanding an agency's argument that it might ultimately be able to justify the challenged action." *Standing Rock*, 985 F.3d at 1053; *see also Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 536 (D.C. Cir. 2018) (stating that where an agency's NEPA review suffers from a

---

[17] Indeed, the analysis in the Draft EIS for Lease Sale 258 demonstrates the seriousness of the error for the far larger Lease Sale 257. Factoring in foreign emissions reductions there showed that the No Action alternative (not holding the lease sale) would result in 40 percent fewer greenhouse gas emissions than holding the lease sale. JA229 (compare 88.378 million metric tons for the sale (Table 4-11) (Proposed Action) with 53,608 metric tons of emissions for the No Action alternative (84.963 million metric tons of domestic emissions from replacement sources for No Action (Table 4-11) minus 31.355 million metric tons reduced foreign emissions for No Action (Table 4-12))).

significant deficiency, refusing to vacate the corresponding agency action would undermine the statute).

API cites a number of opinions in which this Court has remanded without vacatur based on its assessment of the *Allied-Signal* factors. API Br. 40-44. However, none of these opinions address whether a court abused its discretion in applying the factors, so they shed no light on the relevant question here.[18] Opinions have come out the other way, too, and vacated decisions found to be unlawful. *See, e.g., Standing Rock*, 985 F.3d at 1053; *see also Pub. Emps. for Env't Resp. v. Fish & Wildlife Serv.*, 189 F. Supp. 3d 1, at *2 (D.D.C. 2016) ("A review of NEPA cases in this district bears out the primacy of vacatur to remedy NEPA violations."). That courts may differ in how they balance the facts when applying *Allied Signal* only illustrates that they exercise discretion. It does not demonstrate that the district court abused its discretion in the way it exercised it here.[19]

─────────────────────

[18] The two cases cited by API that do address abuse of discretion are cited for the unremarkable proposition that misapplying substantive law is an abuse of discretion and are otherwise inapposite. *See Kifafi v. Hilton Hotels Ret. Plan*, 701 F.3d 718, 728 (D.C. Cir. 2012) (holding the district court did not abuse its discretion in fashioning a damages remedy for an ERISA violation); *Thomas v. Albright*, 139 F.3d 227, 229 (D.C. Cir. 1998) (concluding district court abused its decision by permitting class members to opt out of a class settlement).

[19] For the same reason, this Court's recent remand without vacatur in *Gulf Restoration Network* does not suggest the district court abused its discretion here. 2022 WL 3722429, at *4. Moreover, unlike the intervenors in *Gulf Restoration Network*, intervenors here have not acted in reliance on the leases, significantly lessening any disruptive consequences of vacatur. Nor has Interior, which has not

API's additional suggestion that the district court misapplied *Standing Rock* is wrong on two counts. API Br. 43. First, it misconstrues *Standing Rock. Standing Rock* does not establish a "narrow rule" that limits vacatur to instances in which an agency "bypassed a fundamental procedural step." API Br. 44. Rather, it assessed an agency's inadequate NEPA analysis and concluded that the agency's error gave rise to "substantial doubt that the agency chose correctly." *Standing Rock*, 985 F.3d at 1052 (internal quotations and citation omitted). This is a straight-forward application of *Allied-Signal*. Second, API misconstrues the district court's opinion. The district court did not conclude that Interior here bypassed a procedural step; it explicitly found the opposite. JA339 (noting "this is not a situation" in which it skipped a procedural step). Nonetheless, applying the *Allied-Signal* test affirmed in *Standing Rock*, it reasonably concluded that the (different but equally serious) error here raised doubts about choices the agency made that warrant vacatur. JA339-JA340.

As to the second *Allied-Signal* factor, API recognizes that the disruptive consequences prong is meant to consider "the interests of parties that 'reasonably

---

appealed the district court's vacatur, made "a colorable case that the [error] ultimately should not change the bottom line," as the *Gulf Restoration Network* court concluded it had in declining to vacate the leases at issue there. *Id.* Quite the opposite. As the district court correctly concluded, Interior's error here went straight to the bottom line—it led Interior to conclude that holding Lease Sale 257 would better address climate change than not holding it. *See supra* pp. 11, 58.

relied' on an agency's deficient action." API Br. 44. But API fails to appreciate that this prerequisite largely disqualifies them here. The district court extensively documented the history of the case and highlighted that API's members submitted bids on November 17, 2021, with full knowledge not only that the lease sale was being challenged, but that the schedule in the case had been expedited specifically to ensure that a decision could be issued before the leases were issued. *See* JA289; JA345; *see also* JA84. Indeed, the sale itself was conducted after API had submitted its opening brief on the merits. Dkt. No. 44 (Nov. 10, 2021). Knowing this, API's members made a decision to take a risk and try to change the facts on the ground, but the free and informed judgment call to take that risk does not qualify them to benefit when the gamble didn't pay off. API's members cannot claim lack of information or surprise. To the contrary, they could hardly have been more informed about the claims, the status of the case, the parties' positions and agreements, and the court's willingness to promptly resolve the case.

In an attempt to distract from the facts, API myopically focuses on the district court's citation to *Standing Rock* for the observation that adverse economic consequences are a routine part of private enterprise's calculations in highly controversial areas and contested public resources cases like this. *See* API Br. 46 (citing JA341-JA342 (citing *Standing Rock*, 282 F. Supp. 3d at 104 (observing that it is in the "nature of doing business, especially in an area fraught with bureaucracy

62

and litigation")")). API takes this statement out of context and portrays it as the application of a "too-strict rule," API Br. 47, but that is not the standard the court applied. It looked at all of the facts, applied *Allied Signal,* and determined that any consequences of reliance on the agency's decision were primarily of the companies' own making and did not outweigh the seriousness of the errors. JA340-JA344.[20]

Intervenors posit adverse consequences from vacatur because the Lease Sale 257 bids are now public. But any consequences are at best minimal and self-inflicted, and they cannot outweigh Interior's serious errors and the importance of getting the analysis right. In negotiating and agreeing to the expedited briefing schedule to resolve this case, no party identified the opening of bids as the point at which vacatur would be foreclosed. And with good reason: Interior has the discretion to reject bids before leases become effective. 30 C.F.R. § 556.516(b). The consequences of that rejection in the ordinary course of bid review are indistinguishable from vacatur: in both instances, the bids are public information available for others to use the next time the blocks are available for sale. In other

---

[20] API is wrong that vacatur cannot restore the status quo. API Br. 44-45. The status quo is not the lease sale—just the opposite. It is the absence of the lease sale: the state of affairs/status of the parties before Interior made its decision to offer 80 million acres for leasing based on an illegal NEPA analysis.

words, the "adverse consequences" of public bids are not a surprise consequence of vacatur—they are a reality that the companies can and do factor into their bidding strategies. Moreover, vacatur would not prevent companies from submitting competitive bids in the future should Interior offer these blocks again after complying with NEPA. While companies may need to factor the availability of their previous bids into any subsequent competitive bid, that is only one of an array of global market factors affecting industry's interest in sales and valuation of leases. Here, in fact, the vast majority of bids (299 out of 308) submitted for Lease Sale 257 were *non-competitive*, meaning only one company placed a bid on each block.[21] *See* JA276. Although the price of certain lease blocks may rise incrementally if Interior offers another sale and other bidders are interested, this type of competition is contemplated under OCSLA, 43 U.S.C. § 1332(3). It is not a reason to forego vacatur. *See Standing Rock*, 985 F.3d at 1053 (upholding vacatur despite economic disruptions). This is especially true here, where companies entered bids in November 2021 with full knowledge of this litigation and Friends' requested relief. If the companies' risky bidding has affected their future options, Friends—and the environment—should not pay the penalty. *Standing Rock Sioux*

---

[21] Bureau of Ocean Energy Management: Gulf of Mexico OCS Region, *Sale Day Statistics* (Nov. 27, 2021), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/sale-257-stats.pdf (showing that only 9 of 308 lease blocks sold had two bids).

*Tribe v. U.S. Army Corps of Eng'rs*, 471 F. Supp. 3d 71, 85-86 (D.D.C. 2020),

*aff'd in part, rev'd in part sub nom.*, 985 F.3d 1032 (D.C. Cir. 2021) (refusing to

stay vacatur of a pipeline decision based solely on economic concerns because

such "economic myopia" is contrary to purpose of NEPA).

## CONCLUSION

The Court should dismiss Intervenors' appeal pending completion of the

remand. If it adjudicates the appeal, it should affirm the district court's judgment.

Respectfully submitted this 25th day of January, 2023.

<div style="margin-left:40%">

/s/ Erik Grafe
Erik Grafe
EARTHJUSTICE
441 W 5th Ave., Suite 301
Anchorage, AK 99501
907-277-2500 Telephone
egrafe@earthjustice.org

Brettny E. Hardy
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
415-217-2000
bhardy@earthjustice.org

Stephen D. Mashuda
Shana E. Emile
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
206-343-1526 Fax

</div>

smashuda@earthjustice.org
semile@earthjustice.org

*Attorneys for Plaintiffs-Appellees Friends of the Earth, Healthy Gulf, Sierra Club, and Center for Biological Diversity*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Fed. R. App. P.

32(a)(7)(B) because it contains 15,310 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in a proportionally spaced typeface using Microsoft Word in 14-

point Times New Roman.

*/s/ Erik Grafe*
Erik Grafe
EARTHJUSTICE
441 W 5th Ave., Suite 301
Anchorage, AK 99501
907-277-2500 Telephone
egrafe@earthjustice.org

67