**ORAL ARGUMENT SCHEDULED FOR MARCH 3, 2023**
No. 22-5036, 22-5037
(consolidated)

**IN THE UNITED STATES COURT OF APPEALS FOR
THE DISTRICT OF COLUMBIA CIRCUIT**

FRIENDS OF THE EARTH, et al.,
Plaintiffs-Appellees,

v.

DEBRA A. HAALAND, in her official capacity as Secretary of the Interior, et al.,
Defendants-Appellees,
and
AMERICAN PETROLEUM INSTITUTE and STATE OF LOUISIANA,
Intervenors-Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia
No. 21-cv-02317-RC
District Judge Rudolph Contreras

**FINAL AMENDED AMICUS CURIAE BRIEF
OF MEMBERS OF CONGRESS
IN SUPPORT OF PLAINTIFF-APPELLEES**

W. Eric Pilsk (DC Bar No. 419901)
Nathaniel H. Hunt (DC Bar No. 63519)
William C. Mumby (CA Bar No. 324540)
Kaplan Kirsch & Rockwell LLP
1634 I (Eye) St., NW, Suite 300
Tel: 202-955-5600
Washington, DC
epilsk@kaplankirsch.com
nhunt@kaplankirsch.com
wmumby@kaplankirsch.com

*Counsel for Members of Congress*

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

### A. Parties and Amici

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Defendant-Appellees and in the Brief for Plaintiff-Appellees.

### B. Rulings Under Review

References to the ruling at issue appear in the Brief for Defendant-Appellees.

### C. Related Cases

There are no related cases to amici's knowledge.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY OF ABBREVIATIONS ................................................. vii

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ..... viii

STATEMENT REGARDING ADDENDUM OF STATUTES AND REGULATIONS.................................................................. viii

INTRODUCTION .............................................................................1

STATEMENT OF IDENTITY AND INTERESTS OF *AMICI*..............................3

ARGUMENT ...................................................................................5

I.   Congress and the Bureau Intended to Preserve Robust NEPA Review at the OCSLA Lease-Sale Stage ......................................................5

   A. The Statutory Framework of NEPA and OCSLA ...................................5

   B. The 1978 Amendments to OCSLA Preserve NEPA's Requirement to Prepare an EIS at the Lease-Sale Stage.................................................7

      1. The Legislative History of the 1978 Amendments Shows that Congress Intended to Preserve NEPA Review of Gulf Lease Sales.................................................................8

      2. The Regulatory History of the Bureau's OCSLA Regulations Shows that the Bureau Intended to Preserve Robust NEPA Review at the Lease Stage.................................................................10

   C. Courts Have Long Recognized that Lease Sales Under OCSLA Require an EIS.................................................................11

   D. The Bureau Itself Recognizes Its Obligation To Analyze Downstream Greenhouse Gas Impacts Before Awarding a Lease ..........13

II.  Analysis of Downstream Emissions Cannot Be Postponed to the Post-Lease-Sale Stage.................................................................13

A. An EIS is Necessary at the Lease-Sale Stage Because it is the Last Opportunity to Fully Capture the Collective Impacts of Leases in the Gulf of Mexico ................................................................................14

B. None of the Legal Authority Cited by Intervenor-Appellants and Amici States Supports Omitting Downstream Greenhouse Gas Emissions from a Lease-Sale EIS ...........................................................17

III. The Bureau's Greenhouse Gas Analysis Failed to Adequately Consider Global Downstream Emissions.....................................................20

IV. Amici States Mischaracterize the Lessons of Current High Energy Prices......................................................................................................23

CONCLUSION ..................................................................................................28

# TABLE OF AUTHORITIES

**Cases**

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
  462 U.S. 87 (1983) ................................................................5

*Calvert Cliffs' Coord. Comm. v. United States A.E. Com'n*,
  449 F.2d 1109 (D.C. Cir. 1971) ...........................................22

*Ctr. for Biological Diversity v. Bernhardt* ("*Liberty*"),
  982 F.3d 723 (9th Cir. 2020) ........................................ 20, 21

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
  563 F.3d 466 (D.C. Cir. 2009) ............................... 14, 15, 19

*Ctr. for Biological Diversity v. Zinke*,
  260 F. Supp. 3d 11 (D.D.C. 2017) ....................................7, 15

*Fisheries Survival Fund v. Haaland*,
  858 F. App'x 371 (D.C. Cir. 2021) ............................... 17, 18

*Friends of the Earth v. Haaland*,
  583 F. Supp. 3d 113 (D.D.C. 2022) ........................ 6, 15, 16, 21, 23

*Gulf Restoration Network v. Bernhardt*,
  456 F. Supp. 3d 81 (D.D.C. 2020) ......................................15

*Gulf Restoration Network v. Haaland*,
  47 F.4th 795 (D.C. Cir. 2022) ............................................12

*Izaak Walton League v. Marsh*,
  655 F.2d 346 (D.C. Cir. 1981) ...........................................11

*NASDAQ Stock Mkt. LLC v. SEC*,
  38 F.4th 1126 (D.C. Cir. 2022) .........................................7, 8

*Nat. Res. Def. Council v. Hodel*,
  865 F.2d 288 (D.C. Cir. 1988) ..........................................6, 17

*Nat. Res. Def. Council v. Lujan*,
  768 F. Supp. 870 (D.D.C. 1991) ........................................12

*Native Vill. of Point Hope v. Jewell*,
  740 F.3d 489 (9th Cir. 2014) .................................................................17

*North Slope Borough v. Andrus*,
  642 F.2d 589 (D.C. Cir. 1980) ......................................................... 18, 19

*Oceana v. Bureau of Ocean Energy Mgmt.*,
  37 F. Supp. 3d 147 (D.D.C. 2014) .................................................... 12, 15

*Physicians for Soc. Resp. v. Wheeler*,
  956 F.3d 634 (D.C. Cir. 2020) .............................................................23

*Public Emp's. for Envtl. Resp. v. Hopper*,
  827 F.3d 1077 (D.C. Cir. 2016) ...........................................................22

*Sec'y of Interior v. California*,
  464 U.S. 312 (1984) ............................................................................12

*Sierra Club v. FERC*,
  867 F.3d 1357 (D.C. Cir. 2017) .........................................................5, 11

*Sierra Club v. Peterson*,
  717 F.2d 1409 (D.C. Cir. 1983) ...........................................................18

*Sierra Club v. United States Army Corps of Eng'rs*,
  990 F. Supp. 2d 9 (D.D.C. 2013) .........................................................22

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.* ("*Willow*"),
  555 F. Supp. 3d 739 (D. Alaska 2021)............................................. 20, 21

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
  933 F.3d 728 (D.C. Cir. 2019) .............................................................16

*Vill. of Barrington v. Surface Transp. Bd.*,
  636 F.3d 650 (D.C. Cir. 2011) .............................................................20

*WildEarth Guardians v. Bernhardt*,
  502 F. Supp. 3d 237 (D.D.C. 2020) .....................................................12

*WildEarth Guardians v. Zinke*,
  368 F. Supp. 3d 41 (D.D.C. 2019) .......................................................13

## Statutes

5 U.S.C. §§ 701–706 ................................................................3

42 U.S.C. § 4321 ....................................................................1

42 U.S.C. § 4332 .................................................................5, 6

43 U.S.C. § 1331 ....................................................................6

43 U.S.C. § 1344 ...............................................................4, 19

43 U.S.C. § 1351 ............................................................. 6, 8, 15

43 U.S.C. § 1801 ....................................................................7

43 U.S.C. § 1802 ....................................................................7

## Regulations

30 C.F.R. § 550.269 ......................................................... 10, 13

40 C.F.R. § 1500.1 (2019) ...........................................................6

40 C.F.R. § 1501.2 (2019) ..........................................................14

40 C.F.R. § 1502.24 (2019) ..........................................................6

40 C.F.R. § 1507.3 .................................................................16

40 C.F.R. § 1508.7 (2019) ..................................................... 16, 17

44 Fed. Reg. 53,686 (Sept. 14, 1979) ...............................................10

## Congressional Reports

H.R. REP. 95-1474 (1978) (Conf. Rep.),
    1978 U.S.C.C.A.N. 1674 .......................................................8

H.R. REP. No. 95-590 (1977) .....................................................7, 9

## Publications

Climate Change and Health Equity,
    U.S. Department of Health & Human Services ..................................27

*Don't Look to Oil Companies to Lower High Retail Gasoline Prices*,
    FED. RES. BANK OF DALLAS (May 10, 2022)........................................................25

*Gasoline and Diesel Fuel Update*,
    U.S. ENERGY INFORMATION ADMINISTRATION (Dec. 12, 2022)............................25

Isabella Simonetti, *Gas Prices in the U.S. Fall Below $4 a Gallon*,
    NY TIMES (Aug. 11, 2022) .................................................................................25

Jeff Sommer, *Russia's War is Raising Gas Prices and Roiling
    Financial Markets*, NY TIMES (Mar. 10, 2022) ..................................................25

LAURA ZACHARY, REVIEW OF AN INDUSTRY REPORT ON THE IMPACTS
    OF A DELAY IN FED, OFFSHORE OIL AND GAS LEASING
    (Apogee Econ. And Policy, 2022)........................................................................24

*Managing the NEPA Process, Minerals Management Service,
    Interior Manual*, 516 DM § 15.4(A), U.S. Dep't of Interior
    (last updated May 2004) .....................................................................................15

Philip Bump, *Will Producing More Oil Lower Gas Prices?
    It Hasn't in the Past.*, WASH. POST (March 8, 2022) ..........................................26

*Rural Vulnerabilities to our Changing Climate*,
    U.S. CLIMATE RESILIENCE TOOLKIT (June 28, 2021) ..........................................27

Thomas Frank, *Rise in Extreme Heat Will Hit Minority Communities
    Hardest*, E&E NEWS: CLIMATEWIRE (Aug. 15, 2022)........................................27

U.S. DEP'T OF THE INTERIOR, REPORT ON THE FEDERAL OIL AND GAS
    LEASING PROGRAM: PREPARED IN RESPONSE TO EXECUTIVE ORDER
    14008 (November 2021).......................................................................................26

U.S. GLOBAL CHANGE RESEARCH PROGRAM,
    FOURTH NATIONAL CLIMATE ASSESSMENT (2018)..............................................26

WILLIAM D. POPKIN, STATUTORY INTERPRETATION:
    A PRAGMATIC APPROACH (2018)...........................................................................7

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| Bureau | Bureau of Ocean Energy Management |
| EIS | Environmental Impact Statement |
| Interior | Department of the Interior |
| IRA | Inflation Reduction Act |
| NEPA | National Environmental Policy Act |
| OCSLA | Outer Continental Shelf Lands Act |

## STATEMENT OF AUTHORSHIP AND
## FINANCIAL CONTRIBUTIONS

Under Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, Members of Congress state that no party's counsel authored this brief in whole or in part.  No person contributed money intended to fund the preparation or submission of this brief.

## STATEMENT REGARDING ADDENDUM
## OF STATUTES AND REGULATIONS

Except for the relevant statutes and regulations in the attached addendum, all applicable statutes and regulations are included in the Plaintiff-Appellees' brief.

## INTRODUCTION

Lease Sale 257 is the largest oil lease sale in history.  Opening 80 million acres of the Gulf of Mexico to fossil fuel extraction would have dire consequences for the climate.  An agency action of such immense consequence demands strict adherence to the mandates of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq*., to carefully evaluate and disclose the anticipated environmental impacts of the action.

Appellants and their supporting intervenors and amici present an array of arguments in an effort to minimize, or avoid entirely, the robust environmental review of a proposed lease sale required by both NEPA and the Outer Continental Shelf Lands Act (OCSLA).  This amicus brief represents the interests of members of Congress who provide important insight into the objectives and requirements of NEPA and how those statutory mandates interact with OCSLA's oil leasing process. Understanding how Congress intended the two statutes to work together makes clear that OCSLA intended to *preserve* NEPA's requirement that the Bureau of Ocean Energy Management (Bureau)[1] take a hard look at the environmental consequences of the leasing of oil and gas extraction rights in the Gulf of Mexico *before* awarding

---

[1] In this brief, the term "Bureau" includes its parent agency the Department of the Interior.

1

the lease. The legislative and regulatory history of OCSLA and consistent application of NEPA by the courts show that rigorous analysis of global greenhouse gas emissions is required prior to the sale of offshore oil leases.

Further, Intervenor-Appellants' and Amici States' arguments that Lease Sale 257 must be approved because of current high inflation and energy prices and because they perceive NEPA as wasteful red tape are both irrelevant and incorrect. They are irrelevant because those economic arguments fail to show any legal error in the District Court's decision applying the law as it exists today. They are incorrect because there is no inflationary exception to NEPA or OCSLA, and the dramatic reduction in gas prices since those briefs were filed underscores the folly of basing arguments, and judicial decisions, on newspaper headlines. While the oil industry and states allied with its cause would clearly prefer that NEPA not exist, they cannot erase it by playing a shell game with the OCSLA process or invoking economic problems that Lease Sale 257 will not solve.

Although the Bureau correctly determined that the magnitude of Lease Sale 257—opening an area of the Gulf of Mexico the size of Kansas for oil and gas extraction—required it to analyze the impacts of global greenhouse gas emissions, the Bureau failed to use current and accurate scientific information, which it knew existed, relying instead on an approach of excluding foreign oil use rejected by courts and abandoned by the Bureau itself. Such an uninformed lease-sale decision

violates NEPA and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, and is contrary to two recent federal court decisions finding that the same approach to emissions modeling violated NEPA.

The District Court correctly recognized the deficiency in the Bureau's NEPA analysis by failing to consider global downstream emissions, vacated Lease Sale 257, and remanded for NEPA-compliant review of the full scope of greenhouse gas emissions impacts. *Amici* join Plaintiff-Appellee environmental organizations in asking this Court to affirm the ruling below.

## STATEMENT OF IDENTITY AND INTERESTS OF *AMICI*

Pursuant to Circuit Rule 29, *Amicus Curiae* Members of Congress submit this brief in support of Plaintiff-Appellees' position that the District Court's ruling should be affirmed. *Amici*'s brief is necessary to provide the perspectives and represent the interests of members of Congress that are not present in the Parties' briefs. *Amici* are Representatives Alan Lowenthal, Raúl Grijalva, and Jared Huffman who are members of Congress and the House Committee on Natural Resources that, among other things, oversees and monitors the development of oil and gas on onshore and offshore federal lands. Representative Grijalva serves as Chair of the Committee. *Amici* are devoted to promoting policies and laws addressing climate change—the most important environmental issue of our time—while supporting and promoting smart, sustainable use and development of the

country's natural resources. Congress' interests in lease-sale decisions and the adequacy of environmental review is expressly recognized in OCSLA, which requires that the Secretary of the Interior submit any proposed leasing program to Congress at least 60 days prior to approving the program. 43 U.S.C. § 1344(d)(2).

*Amici* are actively working on federal policies and laws intended to reduce greenhouse gas emissions and promote sustainable energy development.[2] However, *Amici* rely on the enforcement of existing environmental laws, including NEPA, to ensure that climate change is adequately addressed in federal decisions, which enables Congress to focus its effort on new laws and measures that are needed to further address the growing climate crisis.

*Amici* file this brief to uphold the objectives of NEPA and ensure that the current work of Congress and the Biden Administration to direct the United States on a path towards limiting the effects of climate change are not thwarted by the Bureau's unlawful Lease Sale 257 decision.

---

[2] *See* STAFF OF H. SELECT COMM. ON THE CLIMATE CRISIS, 116TH CONG., SOLVING THE CLIMATE CRISIS: THE CONGRESSIONAL ACTION PLAN FOR A CLEAN ENERGY ECONOMY AND A HEALTHY, RESILIENT, AND JUST AMERICA 479–87 (Comm. Print                                    2020), https://climatecrisis.house.gov/sites/climatecrisis.house.gov/files/Climate%20Crisis%20Action%20Plan.pdf.

## ARGUMENT

## I.    Congress and the Bureau Intended to Preserve Robust NEPA Review at the OCSLA Lease-Sale Stage

Appellants and their Amici seek to play NEPA and OCSLA off each other to justify a reduced level of environmental review for Lease Sale 257.  That legal shell game, however, is contrary to the clear language of both NEPA and OCSLA that requires a robust level of environmental review *before* the award of a lease under OCSLA.

### A.    The Statutory Framework of NEPA and OCSLA

NEPA requires that an environmental impact statement (EIS) be prepared for all major federal actions significantly affecting the environment.  42 U.S.C. § 4332(2)(C).  An EIS must "consider every significant aspect of the environmental impact of a proposed action."  *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 87 (1983) (internal citations omitted).  The EIS serves two purposes: (1) forcing the agency to take a "hard look" at the environmental consequences of the proposed action; and (2) requiring disclosure of the impacts and the agency's analysis so that they must face public scrutiny.  *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017).  Under NEPA's "hard look" requirement, an agency's analysis of environmental impacts must be "fully informed," "well-considered," and

based on "[a]ccurate scientific analysis." *Nat. Res. Def. Council v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988); 40 C.F.R. §§ 1500.1(b) (2019), 1502.24 (2019).[3]

OCSLA establishes a four-stage process for potential offshore oil and gas production in the Outer Continental Shelf. 43 U.S.C. §§ 1331 *et seq.*; *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 125–26 (D.D.C. 2022). First, the Department of Interior (Interior) creates a leasing program which consists of a five-year schedule of expected lease sales. Second, Interior solicits bids and auctions leases for specific offshore leasing areas. Third, lessees begin geological surveys and development of lease areas and submit more detailed exploration plans for approval. Fourth, the development and production of the oil leases begin. This final stage involves submission of a development and production plan to Interior for approval, but these plans are exempt from the requirement to prepare an EIS in the Gulf of Mexico. While OCSLA generally requires Interior to declare that the approval of a development and production plan is "a major Federal action" thereby triggering environmental review under NEPA,[4] it exempts plans for activity in the Gulf of Mexico from that requirement. 43 U.S.C. § 1351(e)(1) ("At least once the

---

[3] As explained by the District Court, the 2019 NEPA regulations are controlling as they were in effect at the time of the challenged action. *Friends of the Earth*, 583 F. Supp. 3d at 134, n. 9.

[4] *See* 42 U.S.C. § 4332(2)(C).

Secretary shall declare the approval of a development and production plan in any area or region (as defined by the Secretary) of the outer Continental Shelf, *other than the Gulf of Mexico*, to be a major Federal action.") (emphasis added); *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 17–18 (D.D.C. 2017) (explaining Interior's determination that no EIS is required for approval of offshore oil lease exploration, development/production plans, or application for permit to drill in the Gulf of Mexico under OCSLA).

### B.    The 1978 Amendments to OCSLA Preserve NEPA's Requirement to Prepare an EIS at the Lease-Sale Stage

Amici States argue that the 1978 amendments exempting post-lease production plans from NEPA review somehow limit NEPA review at the *lease stage* because Congress intended to expedite oil and gas extraction and reduce what they decry as the "excessive nature of NEPA review." Amici States Brief at 19–21 (citing 43 U.S.C. §§ 1801(8), 1802; H.R. REP. No. 95-590, at 53 (1977)).

That position is inconsistent with the plain terms of the 1978 amendments that exempted *only* post-lease development and production plans from the EIS requirement, clearly showing an intent to *preserve* the EIS requirement at the lease stage. *See* WILLIAM D. POPKIN, STATUTORY INTERPRETATION: A PRAGMATIC APPROACH 139 (2018) (under the statutory interpretation canon *expressio unius est exclusio alterius* "the express inclusion of one (or more) thing(s) implies the exclusion of other[s]"); *NASDAQ Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1137 (D.C.

7

Cir. 2022) (internal citations omitted) (*expressio unius* canon is "a useful aide" in contexts where the drafter's mention of one thing reasonably implies the preclusion of alternatives). Amici States' position is also inconsistent with the statutory and regulatory history of the 1978 amendments.

1. **The Legislative History of the 1978 Amendments Shows that Congress Intended to Preserve NEPA Review of Gulf Lease Sales**

In 1978 Congress exempted Bureau actions in the development and production phase of oil and gas extraction in the Gulf of Mexico from NEPA's requirement to prepare an EIS. 43 U.S.C. § 1351(e)(1). However, Congress also intended to *preserve* NEPA's requirement to prepare an EIS *before* awarding a lease for oil and gas extraction. A Congressional Committee Conference Report considering the 1978 Amendments to OCSLA indicated the intent of this exemption was to "limit bureaucratic redtape and otherwise minimize delays in the *search for and production of* oil and gas." H.R. REP. 95-1474, at 115 (1978) (Conf. Rep.), 1978 U.S.C.C.A.N. 1674, 1714 (emphasis added). This report specifically discussed how exempting the approval of development and production plans in the Gulf of Mexico—which are submitted after the lease has been issued—from the EIS requirement would mitigate delay. *Id.* The Ad Hoc Select Committee on the Outer Continental Shelf further described how the amendments would reduce delay because "[e]nvironmental studies are generally to be conducted *before or while*

exploration activities are conducted."   H.R. REP. NO. 95-590, at 48-49 (1977) (emphasis added).

The Committee's careful, and limited, focus on the exploration and production phase underscores the limited scope of the exemption, and the intent to preserve the full application of NEPA prior to the award of a lease.

The Conference Report demonstrates that the Ad Hoc Select Committee did not recommend amending OCSLA to allow unchecked exploitation of offshore resources.   The Ad Hoc Select Committee stated that the goal of the OCSLA amendments was to increase oil production to become less dependent on foreign oil, while simultaneously protecting the environment.   H.R. REP. NO. 95-590, at 53 (1977). The reports make clear that the Outer Continental Shelf oil development was a temporary solution until alternative energy sources could be pursued.   Indeed, the Committee stated "[d]evelopment of our [Outer Continental Shelf] resources will afford us needed time—as much as a generation—within which to develop alternative sources of energy."   *Id.*  The generation that Congress contemplated has passed, and now—with the threat of ever-worsening climate change—the need to evaluate the environmental consequences of an oil and gas lease *before* a lease is awarded has only increased.   Once the decision to issue a lease has been made, production may proceed expeditiously.   But NEPA's requirement that any decision

to award a lease must be based on a thorough understanding of the environmental consequences of the lease remains undiminished.

> **2.    The Regulatory History of the Bureau's OCSLA Regulations Shows that the Bureau Intended to Preserve Robust NEPA Review at the Lease Stage**

The regulatory history of the Bureau's regulations implementing the 1978 amendments, 30 C.F.R. § 550.269, further indicates that the Bureau itself intended to preserve the EIS requirement at the lease-sale stage for Gulf of Mexico leases.  In the preamble to the original regulation, the Bureau pushed back against commenters that argued an environmental report at the exploration stage and at the development and production stage is tantamount to an additional EIS, which would make it redundant.  44 Fed. Reg. 53,686, 53,687(6) (Sept. 14, 1979).  In support of the environmental review regulations, Interior stated, "the information and data contained in the corresponding lease sale EIS are not generally sufficiently site-specific to provide adequate environmental review of exploration or development and production plans."  *Id.*  The Bureau clearly understood that an EIS would be prepared *before* a lease sale and designed its regulations with that in mind.  The regulations contemplated the environmental reports incorporating information from the lease sale EIS such that the environmental reports would serve the role of shorter environmental assessments that tier to the larger-scale analysis in the lease-sale EIS to evaluate site-specific impacts from production and development activities.  *Id.*

10

Even where the Bureau sought to expedite the production phase of the OCSLA process, it acknowledged the continued applicability of NEPA at earlier stages, including the need to prepare an EIS at the lease stage.[5]

### C. Courts Have Long Recognized that Lease Sales Under OCSLA Require an EIS

Amici States' argument that the 1978 amendments to OCSLA limited NEPA review further ignores long-standing judicial acknowledgment that a lease sale under OCSLA remains subject to NEPA's requirements, and Amici States cite no authority construing OCSLA or NEPA to support their novel position to the contrary. Amici States Brief at 19–21. As this Court held in *Sierra Club v. FERC*, a quantitative analysis of downstream greenhouse gas emissions is necessary to engage in "informed decision making with respect to the greenhouse-gas effects of this project" and to ensure informed public comment. 867 F.3d 1357, 1371–74 (D.C. Cir. 2017). In general, NEPA and the APA require consideration of global greenhouse gas emissions in analysis of environmental impacts from federal actions.

---

[5] Despite the Congressional mandate to issue oil leases under the Inflation Reduction Act (IRA), the Bureau must still comply with NEPA's Congressionally mandated environmental review. As Plaintiff-Appellees have persuasively argued in their Opposition to the Motions to Dismiss, the IRA merely requires issuance of leases and does not implicitly repeal the Bureau's obligations under NEPA. Congress knows how to change laws and it did not alter NEPA with the IRA. *See Izaak Walton League v. Marsh*, 655 F.2d 346, 366–67 (D.C. Cir. 1981) (holding that repeal of NEPA by implication is disfavored).

First, courts have recognized generally that the OCSLA leasing process does not excuse compliance with NEPA or other environmental laws. *See Sec'y of Interior v. California*, 464 U.S. 312, 338 (1984) (before making a lease-sale decision under OCSLA, the "[r]equirements of [NEPA] and the Endangered Species Act must be met first"); *Nat. Res. Def. Council v. Lujan*, 768 F. Supp. 870, 880 (D.D.C. 1991) (given that NEPA requires strict compliance with its procedures, "courts have been especially reluctant to hold that another statute overrules it").

Second, courts have specifically held that the oil lease-sale decisions under OCSLA are subject to NEPA's requirement to prepare an EIS. *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 798–99 (D.C. Cir. 2022) (acknowledging that Interior must prepare an EIS during the OCSLA process and that the Bureau treated lease sales as agency actions requiring NEPA review); *Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F. Supp. 3d 147, 154 (D.D.C. 2014) (explaining the Bureau's process for preparing EISs for lease sales).

Third, that is consistent with cases holding that leasing decisions under other statutes trigger a robust analysis of the environmental impacts of oil, gas, and coal leases, including analysis of downstream greenhouse gas emissions. *WildEarth Guardians v. Bernhardt,* 502 F. Supp. 3d 237, 250 (D.D.C. 2020) (finding BLM's analysis of cumulative impacts of emissions deficient for failure to consider "impact that the Wyoming Lease Sales would have when added to the lease sales in

neighboring states"); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 83 (D.D.C. 2019) (requiring BLM assess at the *leasing stage* the reasonably foreseeable impacts of drilling, including greenhouse gas emissions from the downstream use of oil and gas produced on the leased parcels).

> **D.    The Bureau Itself Recognizes Its Obligation To Analyze Downstream Greenhouse Gas Impacts Before Awarding a Lease**

The Bureau in this case determined that NEPA and its regulations require preparation of an EIS evaluating downstream emissions impacts at the lease-sale stage, although that analysis was inadequate as explained below.  The Bureau, in its 2017 Multisale EIS, recognized the wisdom of preparing an EIS up front—including analysis of the downstream environmental impacts—"in order to provide the context and setting of future proposed actions and to better understand the potential impacts associated with these types of activities as well as the cumulative impacts on [Gulf of Mexico] resources."  JA430 [AR0008199].  The Bureau's reasoning is consistent with the OCSLA regulations streamlining environmental analysis *after* the lease sale has occurred.  *See* 30 C.F.R. § 550.269(a) (excluding western and central Gulf of Mexico from EIS requirement for OCSLA development and production plans).

**II.    Analysis of Downstream Emissions Cannot Be Postponed to the Post-Lease-Sale Stage**

Intervenor-Appellants' argue, somewhat inconsistently, that any analysis of downstream greenhouse gas emissions should come *after* the lease-sale stage.  API Brief at 27–30; Louisiana Brief at 10–18.  That argument rings hollow for the simple

reason that the 1978 amendments *exempt* post-lease-sale decisions from the EIS requirement. The narrower environmental review the Bureau conducts under OCSLA cannot, and does not, replace the more robust analysis of an EIS.

Intervenor-Appellants' argument is a transparent attempt to avoid NEPA altogether, a position that has no legal support. Indeed, Intervenor-Appellants do not identify what more will be known at later stages that is not already known or knowable now at the leasing stage, especially when the key environmental impacts at issue here relate to modeling of greenhouse gas emissions from the entire lease area and their effects on global climate change. Given that NEPA requires that analysis be conducted "at the earliest possible time" to make sure that "decisions reflect environmental values," delaying this analysis would be improper. 40 C.F.R. § 1501.2 (2019).

## A. An EIS is Necessary at the Lease-Sale Stage Because it is the Last Opportunity to Fully Capture the Collective Impacts of Leases in the Gulf of Mexico

The lease stage is the last meaningful stage of NEPA review for oil and gas extraction in the Gulf of Mexico and the failure to analyze impacts now could mean overlooking severe environmental consequences that could occur later. An "agency's NEPA obligations mature only once it reaches a critical stage of a decision which will result in irreversible and irretrievable commitments of resources to an action that will affect the environment." *Ctr. for Biological Diversity v. U.S. Dep't*

14

*of Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009) (internal quotations omitted). As the District Court acknowledged, Lease Sale 257 is a NEPA point of no return and amounts to an "irreversible and irretrievable commitment[] of resources." *Friends of the Earth*, 583 F. Supp. 3d at 136. Once the lease sale goes forward, OCSLA dictates that the Bureau cannot undo it for at least five years and even if it does, the United States faces a financial penalty for doing so. *Id.*

Courts in the D.C. Circuit have "routinely addressed NEPA claims on the merits" at the leasing stage of the OCSLA process. *Id.* at 131 (citing *Gulf Restoration Network v. Bernhardt*, 456 F. Supp. 3d 81, 90 (D.D.C. 2020) and *Oceana*, 37 F. Supp. 3d at 154).

Moreover, as the District Court pointed out, a comprehensive NEPA analysis at the leasing stage is critical because the Interior's Manual covering the Bureau interprets OCSLA and NEPA to create a categorical exclusion for many post-leasing steps in the Gulf of Mexico, with narrow exceptions. *Friends of the Earth*, F. Supp. 3d 133–34 (citing *Managing the NEPA Process, Minerals Management Service, Interior Manual*, 516 DM § 15.4(A), U.S. Dep't of Interior, *available at* https://www.doi.gov/sites/doi.gov/files/elips/documents/516-dm-15.pdf (last updated May 2004) and 43 U.S.C. § 1351(e)(1)); *see also Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d at 18 (D.D.C. 2017) (explaining that "Interior invoked these categorical exclusions when it approved British Petroleum's initial

and revised exploration plan" for the well that "blew out and caused the Deepwater Horizon oil rig to explode").

A categorical exclusion, as the lowest level of NEPA review, minimizes the degree of environmental analysis and public notice required. 40 C.F.R. § 1507.3 (laying out procedures and criteria for agencies to categorically exclude agency actions from further NEPA review); *see, e.g.*, *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 742–43 (D.C. Cir. 2019) (explaining Federal Communications Commission's categorical exclusion for collocation of cell tower equipment resulted in "streamlined and minimized review"). Deferring analysis of lease sales to later stages subject only to minimal categorical exclusions provides no assurance that a "hard look" at collective effects of leasing or cumulative effects of greenhouse gas emissions required by NEPA will occur. *See Friends of the Earth*, 583 F. Supp. 3d at 134 ("[D]eciding whether to apply a categorical exemption for a particular lease is not a substitute for the requirement to take a 'hard look' at the environmental consequences of the project.").

Further, delaying review until later is "ill-suited for considering the collective impacts of the leases together, something the agency is required to consider under NEPA." *Friends of the Earth*, 583 F. Supp. 3d at 134. Under NEPA's cumulative impacts analysis requirement, the Bureau must consider the combined effects of all the leases that could potentially be developed as a result of Lease Sale 257. *See* 40

C.F.R. § 1508.7 (2019) (defining cumulative impacts under NEPA); *Nat. Res. Def. Council*, 865 F.2d at 297–98 (finding EIS inadequate for failure to consider cumulative impact of multiple leases). "It is only at the lease sale stage that the agency can adequately consider cumulative effects of the lease sale on the environment, including . . . the effects of the sale on climate change." *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 504 (9th Cir. 2014). Failure to analyze those impacts now means that such an analysis will never be completed because, after the lease auction, all required environmental analysis will be piecemeal evaluation of individual leases and localized well impacts.

**B.    None of the Legal Authority Cited by Intervenor-Appellants and Amici States Supports Omitting Downstream Greenhouse Gas Emissions from a Lease-Sale EIS**

Intervenor-Appellants fail to identify any textual basis in NEPA, OCSLA, or the Bureau's regulations for their position that analysis of greenhouse gas emissions is not necessary at the lease stage. Instead, they rely solely on three inapplicable cases.

First, Intervenor-Appellants cite *Fisheries Survival Fund v. Haaland*, 858 F. App'x 371 (D.C. Cir. 2021) (per curiam), which involved an OCSLA lease for an offshore windfarm. Unlike an oil and gas lease, which will almost inevitably result in significant greenhouse gas emissions, a windfarm by design poses no downstream emissions impacts. *Fisheries* acknowledges that the issuance of an energy lease

triggers NEPA unless the lease "reserves both the authority to preclude all activities pending submission of site-specific proposals and the authority to prevent proposed activities if the environmental consequences are unacceptable." *Fisheries*, 858 F. Appx. at 372 (citing *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983)). Thus, the lease in *Fisheries* prohibited all activity on the lease until subsequent approvals had been obtained. Lease Sale 257, in contrast, provided leases authorizing ancillary geological exploration and survey activities that the Bureau lacked unfettered discretion to prevent. The potential for immediate environmental impacts from these leases along with the potential for downstream greenhouse gas emissions necessitate careful consideration of environmental impacts before such leases are issued. *Id.*

Second, in *North Slope Borough v. Andrus*, 642 F.2d 589, 605–06 (D.C. Cir. 1980), the D.C. Circuit held that uncertain costs and benefits of a worst-case scenario oil spill in the Beaufort Sea need not be considered in an EIS at the lease-sale stage because an EIS is also required for development and production. In *North Slope*, the crux of the D.C. Circuit's reasoning focused on preparing an EIS before oil was produced. *Id.* at 606. Unlike the Beaufort Sea lease in *North Slope,* OCSLA exempts the Gulf from later robust NEPA review making the pre-lease EIS the appropriate, and necessary, time to consider greenhouse gas emission impacts.

Contrary to Intervenor-Appellants' assertions, *North Slope* did not reject the need to contemplate downstream emissions of oil extracted as a result of a lease sale. API Brief at 27–28; Louisiana Brief at 10–13. This Court, despite reasoning that more information at later stages could help address uncertainties about environmental impacts of spills, declared that review at the lease-sale stage was "not exclusively" concerned with limited preliminary activities and affirmed the holding that the worst-case oil spill analysis in the lease EIS "was a reasonable means of alerting the decision maker to the dangers presented by proceeding in the face of uncertainty." *North Slope*, 642 F.2d at 605–06. Similarly, here, analysis of downstream greenhouse gas emissions is appropriate, and necessary, at the lease stage to alert decisionmakers of the environmental risks using available information, including modeling data on global emissions.

Third, *Center for Biological Diversity v. U.S. Department of Interior* is even farther afield because it did not involve a lease sale at all. Rather, the court rejected as unripe NEPA claims brought at the first stage of the OCSLA process—the five-year program—before any lease sale was at issue. *Ctr. for Biological Diversity*, 563 F.3d at 480–81. Intervenor-Appellants rely on dicta from *Center for Biological Diversity* suggesting that the agency's analysis is restricted to local environmental effects focused on the OCSLA-based climate change claims under 43 U.S.C. § 1344. API Brief at 32. But nothing in 43 U.S.C. § 1344 statutorily bars the Bureau from

19

considering global emissions at the lease-sale stage *under NEPA*. *See Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 665 (D.C. Cir. 2011) (internal quotations omitted) ("NEPA may, within the boundaries set by Congress, authorize the agency to make decisions based on environmental factors not expressly identified in the agency's underlying statute.").  In fact, the Bureau attempted to consider those emissions for Lease Sale 257 but failed to comply with NEPA's mandate that environmental impacts be adequately analyzed.

## III.  The Bureau's Greenhouse Gas Analysis Failed to Adequately Consider Global Downstream Emissions

The District Court correctly concluded that the Bureau's NEPA analysis failed to adequately consider greenhouse gas emissions from foreign oil by relying on a problematic use of the "MarketSim" model.  Both the Ninth Circuit and the District Court for the District of Alaska evaluated the Bureau's exclusion of foreign oil consumption from the "MarketSim" model—the same application of the market model employed by the Bureau here—and found these assumptions excluding foreign greenhouse gas emissions to be arbitrary and capricious.  *See Ctr. for Biological Diversity v. Bernhardt* ("*Liberty*"), 982 F.3d 723, 739–40 (9th Cir. 2020) ("[T]he EIS should have either given a quantitative estimate of the downstream greenhouse gas emissions that will result from consuming oil abroad, or explained more specifically why it could not have done so . . . .") (internal quotations omitted); *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.* ("*Willow*"), 555 F.

20

Supp. 3d 739, 762–67 (D. Alaska 2021) (holding that failure to quantify downstream greenhouse gas emissions from consuming foreign oil or explain more specifically why such an analysis was infeasible was arbitrary and capricious).

While *Liberty* and *Willow* are not binding authority, they are directly on point because they discuss the same flawed application of the "MarketSim" model to calculate downstream emissions from foreign oil consumption as occurred here. *Friends of the Earth*, 583 F. Supp. 3d at 137 n.12. The Bureau's resulting conclusion that not drilling for oil would result in more greenhouse gas emissions defies common sense and was flatly rejected in *Liberty*. *Liberty*, 982 F.3d at 739. And both *Liberty* and *Willow* held that failure to analyze foreign emissions without a reasoned explanation violates NEPA and the APA. *Id.* at 739–40; *Willow*, 555 F. Supp. 3d at 762–67.

Amici States decry the District Court's decision as "moving the NEPA goalposts" and claim that environmental groups have "upended national policy properly fixed by . . . Congress." Amici States Brief at 34. But rejecting an EIS based on the use of a flawed methodology is well within NEPA's mandate for informed decision making, which accounts for the latest scientific developments, as well as the APA's bedrock standards for reasoned agency decision making. "Congress enacted NEPA as a call to the federal government to consider the environmental consequences of its actions . . . , and the regulations implementing

NEPA describe it as the country's 'basic national charter' for environmental protection." *Sierra Club v. United States Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 18 (D.D.C. 2013) (citations omitted).  The "sweep of NEPA is extraordinarily broad, compelling consideration of any and all types of environmental impact of federal action." *Calvert Cliffs' Coord. Comm. v. United States A.E. Com'n*, 449 F.2d 1109, 1122 (D.C. Cir. 1971).  The hard look requirement demands using current science to obtain complete data.  *See Publ. Emp's. for Envtl. Resp. v. Hopper*, 827 F.3d 1077, 1083 (D.C. Cir. 2016) (holding that agency failed to take requisite hard look at downstream environmental consequences of leasing decision where it did not obtain complete and adequate data of geophysical environment).

Accordingly, judicial review of NEPA analysis has evolved with our understanding of the severity of climate change and has appropriately adapted to carefully consider greenhouse gas emissions from fossil fuel projects because of their intensive greenhouse gas emissions and potential for environmental harm.  The District Court's ruling that NEPA requires consideration of downstream greenhouse gas emissions before a lease-sale falls well within what the statute contemplates, as the numerous cases cited above make clear.  If any party is seeking to move the goal posts, it is the Amici States and Intervenor-Appellants.

Furthermore, as the District Court acknowledged, the Bureau's position here that its exclusion of foreign emissions from its analysis was adequate to satisfy the

NEPA hard look requirement for Lease Sale 257 is contradicted by its recent acknowledgement that its past analysis of lease sales was inadequate. *Friends of the Earth*, 583 F. Supp. 3d at 146–47. Interior's press release on its decision to appeal in *Louisiana v. Biden* stated that "the current programs fail to adequately incorporate consideration of climate impacts into leasing decisions or reflect the social costs of greenhouse gas emissions." *See* Press Release, Dep't of Interior, Interior Dep't Issues Statement on Oil and Gas Leasing Program (Aug. 16, 2021). The inconsistency of that position with the Bureau's approach to analyzing emissions from Lease Sale 257 undermines the Bureau's insistence here that its analysis was somehow correct. *Cf. Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 648 (D.C. Cir. 2020) ("Because the Directive contains no discussion of [the agency's] prior conclusion at all, the Directive crossed the line from the tolerably terse to the intolerably mute.") (internal quotations omitted). The Bureau's failure to even acknowledge its more recent view of its analysis demonstrates its failure to take a hard look at the environmental impacts of Lease Sale 257.

## IV.    Amici States Mischaracterize the Lessons of Current High Energy Prices

Unable to prevail on the law, Amici States present something of a screed, painting an incomplete and misleading picture of the current national economic situation to attack the current administration's economic and energy policies rather than the District Court's decision. While ignoring the complex dynamics of Russia's

war in Ukraine and the COVID-19 pandemic, Amici States argue that approving Lease Sale 257 will somehow alleviate today's economic problems. Amici States Brief at 5–11. However, cherrypicked news articles do not accurately depict the current economic climate, and certainly do not reveal any legal flaw in the District Court's decision.

Citing news stories of high gas prices, Amici States argue that oil obtained from Lease Sale 257 might ease consumer pain. *Id.* at 5. Of course, the long lead time to bring any oil from Lease 257 to the gas pump exposes Amici State's argument as meritless.[6] A recent report analyzing the impacts of ending offshore oil and gas leasing in the next five-years revealed there would be virtually no effects on jobs or gas prices for at least two decades.[7] Even after three decades, a permanent end to drilling would only add about 2 cents per gallon to gas prices.[8] In any event, gas prices are reflective of complex global market dynamics; they are not determined

---

[6] Production from oil leases can take over 10 years from the time those leases are sold. LAURA ZACHARY, REVIEW OF AN INDUSTRY REPORT ON THE IMPACTS OF A DELAY IN FEDERAL OFFSHORE OIL AND GAS LEASING, at 3 (Apogee Econ. And Policy, 2022).

[7] *Id.* at 5-6. While some job losses will occur in the fossil fuel sector, those losses are expected to be heavily outweighed by the jobs created in connection with the transition to a net-zero economy. *Id.* at 6.

[8] *Id.* at 5.

on a national basis.[9]  Indeed, independent from any new increase in domestic oil

production, gas prices have declined with the national average dipping below $4.00

per gallon in August and remaining below $4.00 per gallon ever since.[10]  As of

December 5, 2022, regular gasoline prices sat at $3.39 per gallon.[11]

Further, there is already ample leased acreage available for development that

remains untapped.  The Bureau's own leasing information shows that over 8 million

acres out of the 10.8 million total leased acreage of active offshore leases in the Gulf

of Mexico—75 percent—is currently non-producing, but much of this could produce

oil in the future.  Of the millions of acres under lease, the "55 percent of the leased

acreage that is non-producing may be in an earlier stage of the development process,

or being held for speculative reasons, indicating a sufficient inventory of leased

---

[9] *Don't Look to Oil Companies to Lower High Retail Gasoline Prices*, FED. RES. BANK OF DALLAS (May 10, 2022), https://www.dallasfed.org/research/economics/2022/0510; Jeff Sommer, *Russia's War is Raising Gas Prices and Roiling Financial Markets*, N.Y. TIMES (Mar. 10, 2022), https://www.nytimes.com/2022/03/10/business/russia-ukraine-war-gas-prices.html.

[10] Isabella Simonetti, *Gas Prices in the U.S. Fall Below $4 a Gallon*, N.Y. TIMES (Aug. 11, 2022), https://www.nytimes.com/2022/08/11/business/gas-prices-4-a-gallon.html; *Gasoline and Diesel Fuel Update*, U.S. ENERGY INFORMATION ADMINISTRATION (Dec. 12, 2022), https://www.eia.gov/petroleum/gasdiesel/.

[11] *Id.*

25

acreage to sustain development for years to come."[12]  Clearly, there is sufficient leased acreage available for development *today* to provide continued economic activity while the Bureau performs the tasks necessary to comply with NEPA and the APA.  Furthermore, domestic oil production does not necessarily lead to more gasoline because of limitations in the quality of oil and refinery technology, so any insinuation that Lease Sale 257 would help lower gas prices is speculative.[13]

Amici States rightly highlight that these are trying economic times for many, and particularly for communities of color and rural households.  But Amici States' attempt to champion the causes of these communities, Amici States Brief at 10-11, turns a blind eye to the reality that fossil-fuel induced climate change is expected to have the most severe impacts on these same people, impacts that would be exacerbated by Lease Sale 257 going forward.  *See, e.g.*, U.S. GLOBAL CHANGE RESEARCH PROGRAM, FOURTH NATIONAL CLIMATE ASSESSMENT (2018), Chapters 10, 14–15, 28, https://nca2018.globalchange.gov (discussing impacts to rural

---

[12] U.S. DEP'T OF THE INTERIOR, REPORT ON THE FEDERAL OIL AND GAS LEASING PROGRAM: PREPARED IN RESPONSE TO EXECUTIVE ORDER 14008 5 (November 2021), https://www.doi.gov/sites/doi.gov/files/report-on-the-federal-oil-and-gas-leasing-program-doi-eo-14008.pdf.

[13] *See* Philip Bump, *Will Producing More Oil Lower Gas Prices? It Hasn't in the Past.*, WASH. POST (March 8, 2022), https://www.washingtonpost.com/politics/2022/03/08/will-producing-more-oil-lower-gas-prices-it-hasnt-past/ (illustrating that increased oil production does not always reduce prices).

communities, human health, indigenous peoples, and climate adaptation).[14]  Indeed, climate change is already disproportionately impacting these communities.[15] Complying with NEPA's requirements to fully analyze emissions stemming from Lease Sale 257 will ensure these severe impacts and vulnerable communities are not ignored.  Reversing the District Court will not provide any short-term economic relief to any community while imposing substantial long-term impacts to the nation, and to communities of color and disadvantaged communities in particular.

At bottom, Amici States' economic-based arguments amount to a lot of hand waving and political rhetoric, not facts and certainly not legal arguments.  If their grievances have any validity, they require a legislative solution, not a judicial one. Even if their economic concerns were relevant to the adequacy of the NEPA analysis

---

[14] *See also* Thomas Frank, *Rise in Extreme Heat Will Hit Minority Communities Hardest*, E&E NEWS: CLIMATEWIRE (Aug. 15, 2022), https://www.eenews.net/articles/rise-in-extreme-heat-will-hit-minority-communities-hardest/ (explaining that, in 2023, "ZIP codes where a majority of the residents are a racial or ethnic minority will experience an average of 27.5 days with . . . extreme heat [of over 100 degrees Fahrenheit]" compared with 17 days in the average ZIP code); *Rural Vulnerabilities to our Changing Climate*, U.S. CLIMATE RESILIENCE TOOLKIT (June 28, 2021), https://toolkit.climate.gov/regions/southeast/rural-impacts ("Rising sea levels, land cover and ecosystem changes, increased intensity of hurricanes, and changing economic dynamics further affect agriculture and seafood industries in rural areas of the Southeast.").

[15] *Climate Change and Health Equity*, U.S. DEP'T OF HEALTH & HUMAN SERV. (May 6, 2022), https://www.hhs.gov/climate-change-health-equity-environmental-justice/climate-change-health-equity/index.html.

here, there is no evidence that Lease Sale 257 would solve the nation's current economic woes or address the inequities faced by vulnerable communities—no matter how desperately Amici States wish it would.

## CONCLUSION

The District Court correctly concluded that the Bureau's approval of Lease Sale 257 was arbitrary and in violation of NEPA and the APA. *Amici* respectfully request that the District Court's ruling be affirmed.

Respectfully submitted January 25, 2023.

/s/ *W. Eric Pilsk*
W. Eric Pilsk (DC Bar No. 419901)
Nathaniel H. Hunt (DC Bar No. 63519)
William C. Mumby (CA Bar No. 324540)
Kaplan Kirsch & Rockwell LLP
1634 I (Eye) St., NW, Suite 300
Washington, DC
Telephone: (202) 955-5600
epilsk@kaplankirsch.com
nhunt@kaplankirsch.com
wmumby@kaplankirsch.com

*Counsel for Members of Congress*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rules 29(a)(4)(G) and 32(g) of the Federal Rules of Appellate Procedure and corresponding local rules, W. Eric Pilsk, a partner of the firm Kaplan Kirsch & Rockwell LLP, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,490 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)–(7) and corresponding local rules.

_____/s/ *W. Eric Pilsk*_____
W. Eric Pilsk

1

**CERTIFICATE OF SERVICE**

I certify that on this 25th day of January, 2023, I filed the above Final Amended Amicus Curiae Brief Of Members Of Congress In Support Of Plaintiff-Appellees with the Court's CM/ECF system, which provided notice of this filing by email to all counsel of record.

/s/ *W. Eric Pilsk*
W. Eric Pilsk

No. 22-5036, 22-5037
(consolidated)

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

FRIENDS OF THE EARTH, et al.,
Plaintiffs-Appellees,

v.

DEBRA A. HAALAND, in her official capacity as Secretary of the Interior, et al.,
Defendants-Appellees,
and
AMERICAN PETROLEUM INSTITUTE and STATE OF LOUISIANA,
Intervenors-Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia
No. 21-cv-02317-RC
District Judge Rudolph Contreras

## ADDENDUM TO AMICUS CURIAE BRIEF OF MEMBERS OF CONGRESS IN SUPPORT OF PLAINTIFF-APPELLEES

W. Eric Pilsk (DC Bar No. 419901)
Nathaniel H. Hunt (DC Bar No. 63519)
William C. Mumby (CA Bar No. 324540)
Kaplan Kirsch & Rockwell LLP
1634 I (Eye) St., NW, Suite 300
Tel: 202-955-5600
Washington, DC
epilsk@kaplankirsch.com
nhunt@kaplankirsch.com
wmumby@kaplankirsch.com

*Counsel for Members of Congress*

# ADDENDUM TO AMICUS CURIAE BRIEF OF
# MEMBERS OF CONGRESS
## TABLE OF CONTENTS
### Federal Statutes

5 U.S.C. §§ 701–706 .......................................................................... Add. 1

43 U.S.C. § 1331 ................................................................................. Add. 4

43 U.S.C. § 1344 ................................................................................. Add. 7

43 U.S.C. § 1801 ............................................................................... Add. 10

43 U.S.C. § 1802 ............................................................................... Add. 12

### Federal Regulations

40 C.F.R. § 1501.2 (2019) ................................................................ Add. 13

40 C.F.R. § 1507.3 ............................................................................ Add. 14

40 C.F.R. § 1508.7 (2019) ................................................................ Add. 17

44 Fed. Reg. 53,686, 53,687(6) (1979) ............................................ Add. 18

sions of this chapter shall not be subject to judicial review. When an action for judicial review of a rule is instituted, any regulatory flexibility analysis for such rule shall constitute part of the whole record of agency action in connection with the review.

''(c) Nothing in this section bars judicial review of any other impact statement or similar analysis required by any other law if judicial review of such statement or analysis is otherwise provided by law.''

**Statutory Notes and Related Subsidiaries**

Effective Date of 1996 Amendment

Amendment by Pub. L. 104–121 effective on expiration of 90 days after Mar. 29, 1996, but inapplicable to interpretative rules for which a notice of proposed rulemaking was published prior to Mar. 29, 1996, see section 245 of Pub. L. 104–121, set out as a note under section 601 of this title.

Effective Date

Section effective Jan. 1, 1981, see section 4 of Pub. L. 96–354, set out as a note under section 601 of this title.

## § 612. Reports and intervention rights

(a) The Chief Counsel for Advocacy of the Small Business Administration shall monitor agency compliance with this chapter and shall report at least annually thereon to the President and to the Committees on the Judiciary and Small Business of the Senate and House of Representatives.

(b) The Chief Counsel for Advocacy of the Small Business Administration is authorized to appear as amicus curiae in any action brought in a court of the United States to review a rule. In any such action, the Chief Counsel is authorized to present his or her views with respect to compliance with this chapter, the adequacy of the rulemaking record with respect to small entities and the effect of the rule on small entities.

(c) A court of the United States shall grant the application of the Chief Counsel for Advocacy of the Small Business Administration to appear in any such action for the purposes described in subsection (b).

(Added Pub. L. 96–354, §3(a), Sept. 19, 1980, 94 Stat. 1170; amended Pub. L. 104–121, title II, §243(b), Mar. 29, 1996, 110 Stat. 866.)

**Editorial Notes**

Amendments

1996—Subsec. (a). Pub. L. 104–121, §243(b)(1), which directed substitution of ''the Committees on the Judiciary and Small Business of the Senate and House of Representatives'' for ''the committees on the Judiciary of the Senate and the House of Representatives, the Select Committee on Small Business of the Senate, and the Committee on Small Business of the House of Representatives'', was executed by making the substitution for ''the Committees on the Judiciary of the Senate and House of Representatives, the Select Committee on Small Business of the Senate, and the Committee on Small Business of the House of Representatives'' to reflect the probable intent of Congress.

Subsec. (b). Pub. L. 104–121, §243(b)(2), substituted ''his or her views with respect to compliance with this chapter, the adequacy of the rulemaking record with respect to small entities and the'' for ''his views with respect to the''.

**Statutory Notes and Related Subsidiaries**

Change of Name

Committee on Small Business of Senate changed to Committee on Small Business and Entrepreneurship of Senate. See Senate Resolution No. 123, One Hundred Seventh Congress, June 29, 2001.

Effective Date of 1996 Amendment

Amendment by Pub. L. 104–121 effective on expiration of 90 days after Mar. 29, 1996, but inapplicable to interpretative rules for which a notice of proposed rulemaking was published prior to Mar. 29, 1996, see section 245 of Pub. L. 104–121, set out as a note under section 601 of this title.

Effective Date

Section effective Jan. 1, 1981, see section 4 of Pub. L. 96–354, set out as a note under section 601 of this title.

Termination of Reporting Requirements

For termination, effective May 15, 2000, of reporting provisions in subsec. (a) of this section, see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance, and page 191 of House Document No. 103–7.

## CHAPTER 7—JUDICIAL REVIEW

Sec.
701.    Application; definitions.
702.    Right of review.
703.    Form and venue of proceeding.
704.    Actions reviewable.
705.    Relief pending review.
706.    Scope of review.

**Statutory Notes and Related Subsidiaries**

Short Title

The provisions of sections 551 to 559 of this title and this chapter were originally enacted by act June 11, 1946, ch. 423, 60 Stat. 237, popularly known as the ''Administrative Procedure Act''. That Act was repealed as part of the general revision of this title by Pub. L. 89–554 and its provisions incorporated into sections 551 to 559 of this title and this chapter.

## § 701. Application; definitions

(a) This chapter applies, according to the provisions thereof, except to the extent that—
  (1) statutes preclude judicial review; or
  (2) agency action is committed to agency discretion by law.

(b) For the purpose of this chapter—
  (1) ''agency'' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—
    (A) the Congress;
    (B) the courts of the United States;
    (C) the governments of the territories or possessions of the United States;
    (D) the government of the District of Columbia;
    (E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;
    (F) courts martial and military commissions;
    (G) military authority exercised in the field in time of war or in occupied territory; or

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix;[1] and

(2) ''person'', ''rule'', ''order'', ''license'', ''sanction'', ''relief'', and ''agency action'' have the meanings given them by section 551 of this title.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 103–272, §5(a), July 5, 1994, 108 Stat. 1373; Pub. L. 111–350, §5(a)(3), Jan. 4, 2011, 124 Stat. 3841.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| (a) .............. | 5 U.S.C. 1009 (introductory clause). | June 11, 1946, ch. 324, §10 (introductory clause), 60 Stat. 243. |

In subsection (a), the words ''This chapter applies, according to the provisions thereof,'' are added to avoid the necessity of repeating the introductory clause of former section 1009 in sections 702–706.

Subsection (b) is added on authority of section 2 of the Act of June 11, 1946, ch. 324, 60 Stat. 237, as amended, which is carried into section 551 of this title.

In subsection (b)(1)(G), the words ''or naval'' are omitted as included in ''military''.

In subsection (b)(1)(H), the words ''functions which by law expire on the termination of present hostilities, within any fixed period thereafter, or before July 1, 1947'' are omitted as executed. Reference to the ''Selective Training and Service Act of 1940'' is omitted as that Act expired on Mar. 31, 1947. Reference to the ''Sugar Control Extension Act of 1947'' is omitted as that Act expired on Mar. 31, 1948. References to the ''Housing and Rent Act of 1947, as amended'' and the ''Veterans' Emergency Housing Act of 1946'' have been consolidated as they are related. The reference to former section 1641(b)(2) of title 50, appendix, is retained notwithstanding its repeal by §111(a)(1) of the Act of Sept. 21, 1961, Pub. L. 87–256, 75 Stat. 538, since §111(c) of the Act provides that a reference in other Acts to a provision of law repealed by §111(a) shall be considered to be a reference to the appropriate provisions of Pub. L. 87–256.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

**Editorial Notes**

REFERENCES IN TEXT

Sections 1884 and 1891–1902 of title 50, appendix, referred to in subsec. (b)(1)(H), were a part of the various Housing and Rent Acts which were classified to section 1881 et seq. of the former Appendix to Title 50, War and National Defense, and had been repealed or omitted from the Code as executed prior to the elimination of the Appendix to Title 50. See Elimination of Title 50, Appendix note preceding section 1 of Title 50. Section 1641 of title 50, appendix, referred to in subsec. (b)(1)(H), was repealed by Pub. L. 87–256, §111(a)(1), Sept. 21, 1961, 75 Stat. 538.

AMENDMENTS

2011—Subsec. (b)(1)(H). Pub. L. 111–350 struck out ''chapter 2 of title 41;'' after ''title 12;''.

1994—Subsec. (b)(1)(H). Pub. L. 103–272 substituted ''subchapter II of chapter 471 of title 49; or sections'' for ''or sections 1622,''.

---

[1] See References in Text note below.

## § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(a). | June 11, 1946, ch. 324, §10(a), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

**Editorial Notes**

AMENDMENTS

1976—Pub. L. 94–574 removed the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review.

## § 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style as outlined in the preface to the report.

**Editorial Notes**

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

### § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

**Statutory Notes and Related Subsidiaries**

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.    Congressional review.
802.    Congressional disapproval procedure.
803.    Special rule on statutory, regulatory, and judicial deadlines.
804.    Definitions.
805.    Judicial review.
806.    Applicability; severability.
807.    Exemption for monetary policy.
808.    Effective date of certain rules.

### § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit

## § 1312. Seaward boundaries of States

The seaward boundary of each original coastal State is approved and confirmed as a line three geographical miles distant from its coast line or, in the case of the Great Lakes, to the international boundary. Any State admitted subsequent to the formation of the Union which has not already done so may extend its seaward boundaries to a line three geographical miles distant from its coast line, or to the international boundaries of the United States in the Great Lakes or any other body of water traversed by such boundaries. Any claim heretofore or hereafter asserted either by constitutional provision, statute, or otherwise, indicating the intent of a State so to extend its boundaries is approved and confirmed, without prejudice to its claim, if any it has, that its boundaries extend beyond that line. Nothing in this section is to be construed as questioning or in any manner prejudicing the existence of any State's seaward boundary beyond three geographical miles if it was so provided by its constitution or laws prior to or at the time such State became a member of the Union, or if it has been heretofore approved by Congress.

(May 22, 1953, ch. 65, title II, § 4, 67 Stat. 31.)

## § 1313. Exceptions from operation of section 1311 of this title

There is excepted from the operation of section 1311 of this title—

(a) all tracts or parcels of land together with all accretions thereto, resources therein, or improvements thereon, title to which has been lawfully and expressly acquired by the United States from any State or from any person in whom title had vested under the law of the State or of the United States, and all lands which the United States lawfully holds under the law of the State; all lands expressly retained by or ceded to the United States when the State entered the Union (otherwise than by a general retention or cession of lands underlying the marginal sea); all lands acquired by the United States by eminent domain proceedings, purchase, cession, gift, or otherwise in a proprietary capacity; all lands filled in, built up, or otherwise reclaimed by the United States for its own use; and any rights the United States has in lands presently and actually occupied by the United States under claim of right;

(b) such lands beneath navigable waters held, or any interest in which is held by the United States for the benefit of any tribe, band, or group of Indians or for individual Indians; and

(c) all structures and improvements constructed by the United States in the exercise of its navigational servitude.

(May 22, 1953, ch. 65, title II, § 5, 67 Stat. 32.)

## § 1314. Rights and powers retained by United States; purchase of natural resources; condemnation of lands

(a) The United States retains all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs, all of which shall be paramount to, but shall not be deemed to include, proprietary rights of ownership, or the rights of management, administration, leasing, use, and development of the lands and natural resources which are specifically recognized, confirmed, established, and vested in and assigned to the respective States and others by section 1311 of this title.

(b) In time of war or when necessary for national defense, and the Congress or the President shall so prescribe, the United States shall have the right of first refusal to purchase at the prevailing market price, all or any portion of the said natural resources, or to acquire and use any portion of said lands by proceeding in accordance with due process of law and paying just compensation therefor.

(May 22, 1953, ch. 65, title II, § 6, 67 Stat. 32.)

## § 1315. Rights acquired under laws of United States unaffected

Nothing contained in this subchapter or subchapter I shall affect such rights, if any, as may have been acquired under any law of the United States by any person in lands subject to this subchapter or subchapter I and such rights, if any, shall be governed by the law in effect at the time they may have been acquired: *Provided, however*, That nothing contained in this subchapter or subchapter I is intended or shall be construed as a finding, interpretation, or construction by the Congress that the law under which such rights may be claimed in fact or in law applies to the lands subject to this subchapter or subchapter I, or authorizes or compels the granting of such rights in such lands, and that the determination of the applicability or effect of such law shall be unaffected by anything contained in this subchapter or subchapter I.

(May 22, 1953, ch. 65, title II, § 8, 67 Stat. 32.)

## SUBCHAPTER III—OUTER CONTINENTAL SHELF LANDS

## § 1331. Definitions

When used in this subchapter—

(a) The term "outer Continental Shelf" means all submerged lands lying seaward and outside of the area of lands beneath navigable waters as defined in section 1301 of this title, and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control;

(b) The term "Secretary" means the Secretary of the Interior, except that with respect to functions under this subchapter transferred to, or vested in, the Secretary of Energy or the Federal Energy Regulatory Commission by or pursuant to the Department of Energy Organization Act (42 U.S.C. 7101 et seq.), the term "Secretary" means the Secretary of Energy, or the Federal Energy Regulatory Commission, as the case may be;

(c) The term "lease" means any form of authorization which is issued under section 1337 of this title or maintained under section 1335 of

this title and which authorizes exploration for, and development and production of, minerals;

(d) The term "person" includes, in addition to a natural person, an association, a State, a political subdivision of a State, or a private, public, or municipal corporation;

(e) The term "coastal zone" means the coastal waters (including the lands therein and thereunder) and the adjacent shorelands (including the waters therein and thereunder), strongly influenced by each other and in proximity to the shorelines of the several coastal States, and includes islands, transition and intertidal areas, salt marshes, wetlands, and beaches, which zone extends seaward to the outer limit of the United States territorial sea and extends inland from the shorelines to the extent necessary to control shorelands, the uses of which have a direct and significant impact on the coastal waters, and the inward boundaries of which may be identified by the several coastal States, pursuant to the authority of section 1454(b)(1)[1] of title 16;

(f) The term "affected State" means, with respect to any program, plan, lease sale, or other activity, proposed, conducted, or approved pursuant to the provisions of this subchapter, any State—

(1) the laws of which are declared, pursuant to section 1333(a)(2) of this title, to be the law of the United States for the portion of the outer Continental Shelf on which such activity is, or is proposed to be, conducted;

(2) which is, or is proposed to be, directly connected by transportation facilities to any artificial island or structure referred to in section 1333(a)(1) of this title;

(3) which is receiving, or in accordnace[2] with the proposed activity will receive, oil for processing, refining, or transshipment which was extracted from the outer Continental Shelf and transported directly to such State by means of vessels or by a combination of means including vessels;

(4) which is designated by the Secretary as a State in which there is a substantial probability of significant impact on or damage to the coastal, marine, or human environment, or a State in which there will be significant changes in the social, governmental, or economic infrastructure, resulting from the exploration, development, and production of oil and gas anywhere on the outer Continental Shelf; or

(5) in which the Secretary finds that because of such activity there is, or will be, a significant risk of serious damage, due to factors such as prevailing winds and currents, to the marine or coastal environment in the event of any oilspill, blowout, or release of oil or gas from vessels, pipelines, or other transshipment facilities;

(g) The term "marine environment" means the physical, atmospheric, and biological components, conditions, and factors which interactively determine the productivity, state, condition, and quality of the marine ecosystem, including the waters of the high seas, the contiguous zone, transitional and intertidal areas, salt marshes, and wetlands within the coastal zone and on the outer Continental Shelf;

(h) The term "coastal environment" means the physical atmospheric, and biological components, conditions, and factors which interactively determine the productivity, state, condition, and quality of the terrestrial ecosystem from the shoreline inward to the boundaries of the coastal zone;

(i) The term "human environment" means the physical, social, and economic components, conditions, and factors which interactively determine the state, condition, and quality of living conditions, employment, and health of those affected, directly or indirectly, by activities occurring on the outer Continental Shelf;

(j) The term "Governor" means the Governor of a State, or the person or entity designated by, or pursuant to, State law to exercise the powers granted to such Governor pursuant to this subchapter;

(k) The term "exploration" means the process of searching for minerals, including (1) geophysical surveys where magnetic, gravity, seismic, or other systems are used to detect or imply the presence of such minerals, and (2) any drilling, whether on or off known geological structures, including the drilling of a well in which a discovery of oil or natural gas in paying quantities is made and the drilling of any additional delineation well after such discovery which is needed to delineate any reservoir and to enable the lessee to determine whether to proceed with development and production;

(l) The term "development" means those activities which take place following discovery of minerals in paying quantities, including geophysical activity, drilling, platform construction, and operation of all onshore support facilities, and which are for the purpose of ultimately producing the minerals discovered;

(m) The term "production" means those activities which take place after the successful completion of any means for the removal of minerals, including such removal, field operations, transfer of minerals to shore, operation monitoring, maintenance, and work-over drilling;

(n) The term "antitrust law" means—

(1) the Sherman Act (15 U.S.C. 1 et seq.);
(2) the Clayton Act (15 U.S.C. 12 et seq.);
(3) the Federal Trade Commission Act (15 U.S.C. 41 et seq.);
(4) the Wilson Tariff Act (15 U.S.C. 8 et seq.); or
(5) the Act of June 19, 1936, chapter 592 (15 U.S.C. 13, 13a, 13b, and 21a);

(o) The term "fair market value" means the value of any mineral (1) computed at a unit price equivalent to the average unit price at which such mineral was sold pursuant to a lease during the period for which any royalty or net profit share is accrued or reserved to the United States pursuant to such lease, or (2) if there were no such sales, or if the Secretary finds that there were an insufficient number of such sales to equitably determine such value, computed at the average unit price at which such mineral was sold pursuant to other leases in the same region of the outer Continental Shelf during such period, or (3) if there were no sales of such min-

---

[1] See References in Text note below.
[2] So in original. Probably should be "accordance".

eral from such region during such period, or if the Secretary finds that there are an insufficient number of such sales to equitably determine such value, at an appropriate price determined by the Secretary;

(p) The term "major Federal action" means any action or proposal by the Secretary which is subject to the provisions of section 4332(2)(C) of title 42; and

(q) The term "minerals" includes oil, gas, sulphur, geopressured-geothermal and associated resources, and all other minerals which are authorized by an Act of Congress to be produced from "public lands" as defined in section 1702 of this title.

(Aug. 7, 1953, ch. 345, §2, 67 Stat. 462; Pub. L. 95–372, title II, §201, Sept. 18, 1978, 92 Stat. 632.)

### Editorial Notes

#### References in Text

The Department of Energy Organization Act, referred to in subsec. (b), is Pub. L. 95–91, Aug. 4, 1977, 91 Stat. 565, as amended, which is classified principally to chapter 84 (§7101 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 7101 of Title 42 and Tables.

Section 1454(b) of title 16, referred to in subsec. (e), was amended generally by Pub. L. 101–508, title VI, §6205, Nov. 5, 1990, 104 Stat. 1388–302, and, as so amended, does not contain a par. (1).

The Sherman Act, referred to in subsec. (n)(1), is act July 2, 1890, ch. 647, 26 Stat. 209, as amended, which enacted sections 1 to 7 of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 1 of Title 15 and Tables.

The Clayton Act, referred to in subsec. (n)(2), is act Oct. 15, 1914, ch. 323, 38 Stat. 730, as amended, which is classified generally to sections 12, 13, 14 to 19, 21, and 22 to 27 of Title 15, and sections 52 and 53 of Title 29, Labor. For further details and complete classification of this Act to the Code, see References in Text note set out under section 12 of Title 15 and Tables.

The Federal Trade Commission Act, referred to in subsec. (n)(3), is act Sept. 26, 1914, ch. 311, 38 Stat. 717, as amended, which is classified generally to subchapter I (§41 et seq.) of chapter 2 of Title 15. For complete classification of this Act to the Code, see section 58 of Title 15 and Tables.

The Wilson Tariff Act, referred to in subsec. (n)(4), is act Aug. 27, 1894, ch. 349, §§73 to 77, 28 Stat. 570, as amended. Sections 73 to 76 enacted sections 8 to 11 of Title 15. Section 77 is not classified to the Code. For complete classification of this Act to the Code, see Short Title note set out under section 8 of Title 15 and Tables.

Act of June 19, 1936, referred to in subsec. (n)(5) is act June 19, 1936, ch. 592, 49 Stat. 1526, popularly known as the Robinson-Patman Act, the Robinson-Patman Anti-Discrimination Act, and the Robinson-Patman Price Discrimination Act, which enacted sections 13a, 13b, and 21a of Title 15, Commerce and Trade, and amended section 13 of Title 15. For complete classification of this Act to the Code, see Short Title note set out under section 13 of Title 15 and Tables.

#### Amendments

1978—Subsec. (b). Pub. L. 95–372, §201(a), inserted provision that, with respect to functions under this subchapter transferred to, or vested in, the Secretary of Energy or the Federal Energy Regulatory Commission by or pursuant to the Department of Energy Organization Act, "Secretary" means the Secretary of Energy or the Federal Energy Regulatory Commission, as the case may be.

Subsec. (c). Pub. L. 95–372, §201(a), substituted "lease" for "mineral lease" as term defined and in definition of that term substituted "any form of authorization which is issued under section 1337 of this title or maintained under section 1335 of this title and which authorizes exploration for, and development and production of, minerals;" for "any form of authorization for the exploration for, or development or removal of deposits of, oil, gas, or other minerals; and".

Subsec. (d). Pub. L. 95–372, §201(b)(1), substituted semicolon for period at end.

Subsecs. (e) to (q). Pub. L. 95–372, §201(b)(2), added subsecs. (e) to (q).

### Statutory Notes and Related Subsidiaries

#### Short Title of 1978 Amendment

For short title of Pub. L. 95–372 as the "Outer Continental Shelf Lands Act Amendments of 1978", see section 1 of Pub. L. 95–372, set out as a Short Title note under section 1801 of this title.

#### Short Title

For short title of act Aug. 7, 1953, which enacted this subchapter, as the "Outer Continental Shelf Lands Act", see section 1 of act Aug. 7, 1953, set out as a note under section 1301 of this chapter.

#### Separability

Act Aug. 7, 1953, ch. 345, §17, 67 Stat. 471, provided that: "If any provision of this Act [enacting this subchapter], or any section, subsection, sentence, clause, phrase or individual word, or the application thereof to any person or circumstance is held invalid, the validity of the remainder of the Act and of the application of any such provision, section, subsection, sentence, clause, phrase or individual word to other persons and circumstances shall not be affected thereby."

#### Transfer of Functions

Functions of Secretary of the Interior to promulgate regulations under this subchapter which relate to fostering of competition for Federal leases, implementation of alternative bidding systems authorized for award of Federal leases, establishment of diligence requirements for operations conducted on Federal leases, setting of rates for production of Federal leases, and specifying of procedures, terms, and conditions for acquisition and disposition of Federal royalty interests taken in kind, transferred to Secretary of Energy by section 7152(b) of Title 42, The Public Health and Welfare. Section 7152(b) of Title 42 was repealed by Pub. L. 97–100, title II, §201, Dec. 23, 1981, 95 Stat. 1407, and functions of Secretary of Energy returned to Secretary of the Interior. See House Report No. 97–315, pp. 25, 26, Nov. 5, 1981.

#### Gulf of Mexico Energy Security

Pub. L. 109–432, div. C, title I, Dec. 20, 2006, 120 Stat. 3000, as amended by Pub. L. 113–287, §5(l)(2), Dec. 19, 2014, 128 Stat. 3270; Pub. L. 115–97, title II, §20002, Dec. 22, 2017, 131 Stat. 2237, provided that:

"SEC. 101. SHORT TITLE.

"This title may be cited as the 'Gulf of Mexico Energy Security Act of 2006'.

"SEC. 102. DEFINITIONS.

"In this title:

"(1) 181 Area.—The term '181 Area' means the area identified in map 15, page 58, of the Proposed Final Outer Continental Shelf Oil and Gas Leasing Program for 1997–2002, dated August 1996, of the Minerals Management Service, available in the Office of the Director of the Minerals Management Service, excluding the area offered in OCS Lease Sale 181, held on December 5, 2001.

"(2) 181 South Area.—The term '181 South Area' means any area—

the production of fissionable material, contained, in whatever concentration, in deposits in the subsoil or seabed of the outer Continental Shelf are reserved for the use of the United States.

**(f) Helium ownership; rules and regulations governing extraction**

The United States reserves and retains the ownership of and the right to extract all helium, under such rules and regulations as shall be prescribed by the Secretary, contained in gas produced from any portion of the outer Continental Shelf which may be subject to any lease maintained or granted pursuant to this subchapter, but the helium shall be extracted from such gas so as to cause no substantial delay in the delivery of gas produced to the purchaser of such gas.

(Aug. 7, 1953, ch. 345, § 12, 67 Stat. 469.)

### Editorial Notes

#### REFERENCES IN TEXT

Paragraph (1) of subsection (b) of section 5 of the Atomic Energy Act of 1946, as amended, referred to in subsec. (e), is par. (1) of section 5(b) of act Aug. 1, 1946, ch. 724, 60 Stat. 755, which was classified to section 1805 of Title 42, The Public Health and Welfare, prior to the general amendment of the Atomic Energy Act of 1946 by act Aug. 30, 1954, ch. 1073, § 1, 68 Stat. 919. See section 2014(z) of Title 42.

### Executive Documents

#### KEY LARGO CORAL REEF PRESERVE

Withdrawal of area designated Key Largo Coral Reef Preserve from disposition, see Proc. No. 3339, Mar. 15, 1960, 25 F.R. 2352, set out as a note under section 320101 of Title 54, National Park Service and Related Programs.

### § 1342. Prior claims as unaffected

Nothing herein contained shall affect such rights, if any, as may have been acquired under any law of the United States by any person in lands subject to this subchapter and such rights, if any, shall be governed by the law in effect at the time they may have been acquired: *Provided, however,* That nothing herein contained is intended or shall be construed as a finding, interpretation, or construction by the Congress that the law under which such rights may be claimed in fact applies to the lands subject to this subchapter or authorizes or compels the granting of such rights in such lands, and that the determination of the applicability or effect of such law shall be unaffected by anything herein contained.

(Aug. 7, 1953, ch. 345, § 14, 67 Stat. 470.)

### § 1343. Repealed. Pub. L. 105–362, title IX, § 901(*l*)(1), Nov. 10, 1998, 112 Stat. 3290

Section, acts Aug. 7, 1953, ch. 345, § 15, 67 Stat. 470; Pub. L. 95–372, title II, § 207, Sept. 18, 1978, 92 Stat. 648; Pub. L. 99–367, § 2(a), July 31, 1986, 100 Stat. 774, related to Secretary's annual report to Congress concerning outer Continental Shelf leasing and production program and promotion of competition in leasing.

### § 1344. Outer Continental Shelf leasing program

#### (a) Schedule of proposed oil and gas lease sales

The Secretary, pursuant to procedures set forth in subsections (c) and (d) of this section, shall prepare and periodically revise, and maintain an oil and gas leasing program to implement the policies of this subchapter. The leasing program shall consist of a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity which he determines will best meet national energy needs for the five-year period following its approval or reapproval. Such leasing program shall be prepared and maintained in a manner consistent with the following principles:

(1) Management of the outer Continental Shelf shall be conducted in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf, and the potential impact of oil and gas exploration on other resource values of the outer Continental Shelf and the marine, coastal, and human environments.

(2) Timing and location of exploration, development, and production of oil and gas among the oil- and gas-bearing physiographic regions of the outer Continental Shelf shall be based on a consideration of—

(A) existing information concerning the geographical, geological, and ecological characteristics of such regions;

(B) an equitable sharing of developmental benefits and environmental risks among the various regions;

(C) the location of such regions with respect to, and the relative needs of, regional and national energy markets;

(D) the location of such regions with respect to other uses of the sea and seabed, including fisheries, navigation, existing or proposed sealanes, potential sites of deepwater ports, and other anticipated uses of the resources and space of the outer Continental Shelf;

(E) the interest of potential oil and gas producers in the development of oil and gas resources as indicated by exploration or nomination;

(F) laws, goals, and policies of affected States which have been specifically identified by the Governors of such States as relevant matters for the Secretary's consideration;

(G) the relative environmental sensitivity and marine productivity of different areas of the outer Continental Shelf; and

(H) relevant environmental and predictive information for different areas of the outer Continental Shelf.

(3) The Secretary shall select the timing and location of leasing, to the maximum extent practicable, so as to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone.

(4) Leasing activities shall be conducted to assure receipt of fair market value for the lands leased and the rights conveyed by the Federal Government.

#### (b) Estimates of appropriations and staff required for management of leasing program

The leasing program shall include estimates of the appropriations and staff required to—

(1) obtain resource information and any other information needed to prepare the leasing program required by this section;

(2) analyze and interpret the exploratory data and any other information which may be compiled under the authority of this subchapter;

(3) conduct environmental studies and prepare any environmental impact statement required in accordance with this subchapter and with section 4332(2)(C) of title 42; and

(4) supervise operations conducted pursuant to each lease in the manner necessary to assure due diligence in the exploration and development of the lease area and compliance with the requirements of applicable law and regulations, and with the terms of the lease.

**(c) Suggestions from Federal agencies and affected State and local governments; submission of proposed program to Governors of affected States and Congress; publication in Federal Register**

(1) During the preparation of any proposed leasing program under this section, the Secretary shall invite and consider suggestions for such program from any interested Federal agency, including the Attorney General, in consultation with the Federal Trade Commission, and from the Governor of any State which may become an affected State under such proposed program. The Secretary may also invite or consider any suggestions from the executive of any affected local government in such an affected State, which have been previously submitted to the Governor of such State, and from any other person.

(2) After such preparation and at least sixty days prior to publication of a proposed leasing program in the Federal Register pursuant to paragraph (3) of this subsection, the Secretary shall submit a copy of such proposed program to the Governor of each affected State for review and comment. The Governor may solicit comments from those executives of local governments in his State who he, in his discretion, determines will be affected by the proposed program. If any comment by such Governor is received by the Secretary at least fifteen days prior to submission to the Congress pursuant to such paragraph (3) and includes a request for any modification of such proposed program, the Secretary shall reply in writing, granting or denying such request in whole or in part, or granting such request in such modified form as the Secretary considers appropriate, and stating his reasons therefor. All such correspondence between the Secretary and the Governor of any affected State, together with any additional information and data relating thereto, shall accompany such proposed program when it is submitted to the Congress.

(3) Within nine months after September 18, 1978, the Secretary shall submit a proposed leasing program to the Congress, the Attorney General, and the Governors of affected States, and shall publish such proposed program in the Federal Register. Each Governor shall, upon request, submit a copy of the proposed leasing program to the executive of any local government affected by the proposed program.

**(d) Comments by Attorney General on anticipated effect on competition; comments by State or local governments; submission of program to President and Congress; issuance of leases in accordance with program**

(1) Within ninety days after the date of publication of a proposed leasing program, the Attorney General may, after consultation with the Federal Trade Commission, submit comments on the anticipated effects of such proposed program upon competition. Any State, local government, or other person may submit comments and recommendations as to any aspect of such proposed program.

(2) At least sixty days prior to approving a proposed leasing program, the Secretary shall submit it to the President and the Congress, together with any comments received. Such submission shall indicate why any specific recommendation of the Attorney General or a State or local government was not accepted.

(3) After the leasing program has been approved by the Secretary, or after eighteen months following September 18, 1978, whichever first occurs, no lease shall be issued unless it is for an area included in the approved leasing program and unless it contains provisions consistent with the approved leasing program, except that leasing shall be permitted to continue until such program is approved and for so long thereafter as such program is under judicial or administrative review pursuant to the provisions of this subchapter.

**(e) Review, revision, and reapproval of program**

The Secretary shall review the leasing program approved under this section at least once each year. He may revise and reapprove such program, at any time, and such revision and reapproval, except in the case of a revision which is not significant, shall be in the same manner as originally developed.

**(f) Procedural regulations for management of program**

The Secretary shall, by regulation, establish procedures for—

(1) receipt and consideration of nominations for any area to be offered for lease or to be excluded from leasing;

(2) public notice of and participation in development of the leasing program;

(3) review by State and local governments which may be impacted by the proposed leasing;

(4) periodic consultation with State and local governments, oil and gas lessees and permittees, and representatives of other individuals or organizations engaged in activity in or on the outer Continental Shelf, including those involved in fish and shellfish recovery, and recreational activities; and

(5) consideration of the coastal zone management program being developed or administered by an affected coastal State pursuant to section 1454 or section 1455 of title 16.

Such procedures shall be applicable to any significant revision or reapproval of the leasing program.

**(g) Information from public and private sources; confidentiality of classified or privileged data**

The Secretary may obtain from public sources, or purchase from private sources, any survey, data, report, or other information (including interpretations of such data, survey, report, or other information) which may be necessary to assist him in preparing any environmental impact statement and in making other evaluations required by this subchapter. Data of a classified nature provided to the Secretary under the provisions of this subsection shall remain confidential for such period of time as agreed to by the head of the department or agency from whom the information is requested. The Secretary shall maintain the confidentiality of all privileged or proprietary data or information for such period of time as is provided for in this subchapter, established by regulation, or agreed to by the parties.

**(h) Information from all Federal departments and agencies; confidentiality of privileged or proprietary information**

The heads of all Federal departments and agencies shall provide the Secretary with any nonprivileged [1] or nonproprietary information he requests to assist him in preparing the leasing program and may provide the Secretary with any privileged or proprietary information he requests to assist him in preparing the leasing program. Privileged or proprietary information provided to the Secretary under the provisions of this subsection shall remain confidential for such period of time as agreed to by the head of the department or agency from whom the information is requested. In addition, the Secretary shall utilize the existing capabilities and resources of such Federal departments and agencies by appropriate agreement.

(Aug. 7, 1953, ch. 345, § 18, as added Pub. L. 95–372, title II, § 208, Sept. 18, 1978, 92 Stat. 649.)

STATUTORY NOTES AND RELATED SUBSIDIARIES

TRANSFER OF FUNCTIONS

Functions of Secretary of the Interior to promulgate regulations under this subchapter which relate to fostering of competition for Federal leases, implementation of alternative bidding systems authorized for award of Federal leases, establishment of diligence requirements for operations conducted on Federal leases, and specifying of procedures, terms, and conditions for acquisition and disposition of Federal royalty interests taken in kind, transferred to Secretary of Energy by section 7152(b) of Title 42, The Public Health and Welfare. Section 7152(b) of Title 42 was repealed by Pub. L. 97–100, title II, § 201, Dec. 23, 1981, 95 Stat. 1407, and functions of Secretary of Energy returned to Secretary of the Interior. See House Report No. 97–315, pp. 25, 26, Nov. 5, 1981.

**§ 1345. Coordination and consultation with affected State and local governments**

**(a) Recommendations regarding size, time, or location of proposed lease sales**

Any Governor of any affected State or the executive of any affected local government in such State may submit recommendations to the Secretary regarding the size, timing, or location of a proposed lease sale or with respect to a proposed development and production plan. Prior to submitting recommendations to the Secretary, the executive of any affected local government in any affected State must forward his recommendations to the Governor of such State.

**(b) Time for submission of recommendations**

Such recommendations shall be submitted within sixty days after notice of such proposed lease sale or after receipt of such development and production plan.

**(c) Acceptance or rejection of recommendations**

The Secretary shall accept recommendations of the Governor and may accept recommendations of the executive of any affected local government if he determines, after having provided the opportunity for consultation, that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State. For purposes of this subsection, a determination of the national interest shall be based on the desirability of obtaining oil and gas supplies in a balanced manner and on the findings, purposes, and policies of this subchapter. The Secretary shall communicate to the Governor, in writing, the reasons for his determination to accept or reject such Governor's recommendations, or to implement any alternative means identified in consultation with the Governor to provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State.

**(d) Finality of acceptance or rejection of recommendations**

The Secretary's determination that recommendations provide, or do not provide, for a reasonable balance between the national interest and the well-being of the citizens of the affected State shall be final and shall not, alone, be a basis for invalidation of a proposed lease sale or a proposed development and production plan in any suit or judicial review pursuant to section 1349 of this title, unless found to be arbitrary or capricious.

**(e) Cooperative agreements**

The Secretary is authorized to enter into cooperative agreements with affected States for purposes which are consistent with this subchapter and other applicable Federal law. Such agreements may include, but need not be limited to, the sharing of information (in accordance with the provisions of section 1352 of this title), the joint utilization of available expertise, the facilitating of permitting procedures, joint planning and review, and the formation of joint surveillance and monitoring arrangements to carry out applicable Federal and State laws, regulations, and stipulations relevant to outer Continental Shelf operations both onshore and offshore.

(Aug. 7, 1953, ch. 345, § 19, as added Pub. L. 95–372, title II, § 208, Sept. 18, 1978, 92 Stat. 652.)

---

[1] So in original. Probably should be ''nonprivileged''.

source Management Plan (including any updates or amendments to the Jupiter Inlet Coordinated Resource Management Plan) precludes, prohibits, or otherwise affects—

(A) any maritime security, maritime safety, or environmental protection mission or activity of the Coast Guard;

(B) any border security operation or law enforcement activity by the Department of Homeland Security or the Department of Justice; or

(C) any law enforcement activity of any Federal, State, or local law enforcement agency in the Outstanding Natural Area.

**(7) Future disposition of Coast Guard facilities**

If the Commandant determines, after May 8, 2008, that Coast Guard facilities within the Outstanding Natural Area exceed the needs of the Coast Guard, the Commandant may relinquish the facilities to the Secretary without removal, subject only to any environmental remediation that may be required by law.

**(e) Effect on ongoing and future Coast Guard operations**

Nothing in this section, the management plan, or the Jupiter Inlet Coordinated Resource Management Plan (including updates or amendments to the Jupiter Inlet Coordinated Resource Management Plan) precludes, prohibits, or otherwise affects ongoing or future Coast Guard operations or activities in the Outstanding Natural Area, including—

(1) the continued and future operation of, access to, maintenance of, and, as may be necessitated for Coast Guard missions, the expansion, enhancement, or replacement of, the Coast Guard High Frequency antenna site on lot 16;

(2) the continued and future operation of, access to, maintenance of, and, as may be necessitated for Coast Guard missions, the expansion, enhancement, or replacement of, the military family housing area on lot 18;

(3) the continued and future use of, access to, maintenance of, and, as may be necessitated for Coast Guard missions, the expansion, enhancement, or replacement of, the pier on lot 18;

(4) the existing lease of the Jupiter Inlet Lighthouse on lot 18 from the Coast Guard to the Loxahatchee River Historical Society; or

(5) any easements or other less-than-fee interests in property appurtenant to existing Coast Guard facilities on lots 16 and 18.

**(f) Authorization of appropriations**

There are authorized to be appropriated such sums as are necessary to carry out this section.

(Pub. L. 110–229, title II, §202, May 8, 2008, 122 Stat. 763.)

**Editorial Notes**

References in Text

The Executive Order dated October 22, 1854, and Executive Order No. 4254 (June 12, 1925), referred to in subsec. (b)(4)(B)(i), (ii), were not classified to the Code.

The Federal Land Policy and Management Act of 1976, referred to in subsec. (d)(1)(A)(iii), is Pub. L. 94–579, Oct. 21, 1976, 90 Stat. 2743, which is classified

principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1701 of this title and Tables.

Codification

Section was enacted as part of the Consolidated Natural Resources Act of 2008, and not as part of the Federal Land Policy and Management Act of 1976 which comprises this chapter.

## CHAPTER 36—OUTER CONTINENTAL SHELF RESOURCE MANAGEMENT

Sec.
1801.    Congressional findings.
1802.    Congressional declaration of purposes.

SUBCHAPTER I—OFFSHORE OIL SPILL POLLUTION FUND

1811 to 1824. Repealed.

SUBCHAPTER II—FISHERMEN'S CONTINGENCY FUND

1841.    Definitions.
1842.    Fishermen's Contingency Fund.
1843.    Duties and powers of Secretary.
1844.    Burden of proof.
1845.    Claims procedure.
1846, 1847. Repealed.

SUBCHAPTER III—MISCELLANEOUS PROVISIONS

1861.    Repealed.
1862.    Natural gas distribution.
1863.    Unlawful employment practices; regulations.
1864.    Disclosure of financial interests by officers and employees of Department of the Interior.
1865.    Investigation of reserves of oil and gas in Outer Continental Shelf.
1866.    Relationship to existing law.

## § 1801. Congressional findings

The Congress finds and declares that—

(1) the demand for energy in the United States is increasing and will continue to increase for the foreseeable future;

(2) domestic production of oil and gas has declined in recent years;

(3) the United States has become increasingly dependent upon imports of oil from foreign nations to meet domestic energy demand;

(4) increasing reliance on imported oil is not inevitable, but is rather subject to significant reduction by increasing the development of domestic sources of energy supply;

(5) consumption of natural gas in the United States has greatly exceeded additions to domestic reserves in recent years;

(6) technology is or can be made available which will allow significantly increased domestic production of oil and gas without undue harm or damage to the environment;

(7) the Outer Continental Shelf contains significant quantities of oil and natural gas and is a vital national resource reserve which must be carefully managed so as to realize fair value, to preserve and maintain competition, and to reflect the public interest;

(8) there presently exists a variety of technological, economic, environmental, administrative, and legal problems which tend to retard the development of the oil and natural gas reserves of the Outer Continental Shelf;

(9) environmental and safety regulations relating to activities on the Outer Continental

Shelf should be reviewed in light of current technology and information;

(10) the development, processing, and distribution of the oil and gas resources of the Outer Continental Shelf, and the siting of related energy facilities, may cause adverse impacts on various States and local governments;

(11) policies, plans, and programs developed by States and local governments in response to activities on the Outer Continental Shelf cannot anticipate and ameliorate such adverse impacts unless such States, working in close cooperation with affected local governments, are provided with timely access to information regarding activities on the Outer Continental Shelf and an opportunity to review and comment on decisions relating to such activities;

(12) funds must be made available to pay for the prompt removal of any oil spilled or discharged as a result of activities on the Outer Continental Shelf and for any damages to public or private interests caused by such spills or discharges;

(13) because of the possible conflicts between exploitation of the oil and gas resources in the Outer Continental Shelf and other uses of the marine environment, including fish and shellfish growth and recovery, and recreational activity, the Federal Government must assume responsibility for the minimization or elimination of any conflict associated with such exploitation;

(14) the oil and gas resources of the Outer Continental Shelf are limited, nonrenewable resources which must be developed in a manner which takes into consideration the Nation's long-range energy needs and also assures adequate protection of the renewable resources of the Outer Continental Shelf which are a continuing and increasingly important source of food and protein to the Nation and the world; and

(15) funds must be made available to pay for damage to commercial fishing vessels and gear resulting from activities involving oil and gas exploration, development, and production on the Outer Continental Shelf.

(Pub. L. 95–372, title I, § 101, Sept. 18, 1978, 92 Stat. 630.)

### Statutory Notes and Related Subsidiaries

#### Short Title of 1988 Amendment

Pub. L. 100–610, title I, § 1, Nov. 5, 1988, 102 Stat. 3176, provided that: "This Act [probably should be 'This title', which amended section 1815 of this title] may be cited as the 'Outer Continental Shelf Operations Indemnification Clarification Act of 1988'."

#### Short Title

Pub. L. 95–372, § 1, Sept. 18, 1978, 92 Stat. 629, provided: "That this Act [enacting this chapter, sections 1344 to 1356 of this title, and section 237 of Title 30, Mineral Lands and Mining, amending sections 1331 to 1334, 1337, 1340, and 1343 of this title, sections 1456, 1456a, and 1464 of Title 16, Conservation, and section 6213 of Title 42, The Public Health and Welfare, and enacting provisions set out as notes under sections 1348 and 1811 of this title] may be cited as the 'Outer Continental Shelf Lands Act Amendments of 1978'."

## § 1802. Congressional declaration of purposes

The purposes of this chapter are to—

(1) establish policies and procedures for managing the oil and natural gas resources of the Outer Continental Shelf which are intended to result in expedited exploration and development of the Outer Continental Shelf in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade;

(2) preserve, protect, and develop oil and natural gas resources in the Outer Continental Shelf in a manner which is consistent with the need (A) to make such resources available to meet the Nation's energy needs as rapidly as possible, (B) to balance orderly energy resource development with protection of the human, marine, and coastal environments, (C) to insure the public a fair and equitable return on the resources of the Outer Continental Shelf, and (D) to preserve and maintain free enterprise competition;

(3) encourage development of new and improved technology for energy resource production which will eliminate or minimize risk of damage to the human, marine, and coastal environments;

(4) provide States, and through States, local governments, which are impacted by Outer Continental Shelf oil and gas exploration, development, and production with comprehensive assistance in order to anticipate and plan for such impact, and thereby to assure adequate protection of the human environment;

(5) assure that States, and through States, local governments, have timely access to information regarding activities on the Outer Continental Shelf, and opportunity to review and comment on decisions relating to such activities, in order to anticipate, ameliorate, and plan for the impacts of such activities;

(6) assure that States, and through States, local governments, which are directly affected by exploration, development, and production of oil and natural gas are provided an opportunity to participate in policy and planning decisions relating to management of the resources of the Outer Continental Shelf;

(7) minimize or eliminate conflicts between the exploration, development, and production of oil and natural gas, and the recovery of other resources such as fish and shellfish;

(8) establish an oilspill liability fund to pay for the prompt removal of any oil spilled or discharged as a result of activities on the Outer Continental Shelf and for any damages to public or private interests caused by such spills or discharges;

(9) insure that the extent of oil and natural gas resources of the Outer Continental Shelf is assessed at the earliest practicable time; and

(10) establish a fishermen's contingency fund to pay for damages to commercial fishing vessels and gear due to Outer Continental Shelf activities.

(Pub. L. 95–372, title I, § 102, Sept. 18, 1978, 92 Stat. 631.)

Shelf should be reviewed in light of current technology and information;

(10) the development, processing, and distribution of the oil and gas resources of the Outer Continental Shelf, and the siting of related energy facilities, may cause adverse impacts on various States and local governments;

(11) policies, plans, and programs developed by States and local governments in response to activities on the Outer Continental Shelf cannot anticipate and ameliorate such adverse impacts unless such States, working in close cooperation with affected local governments, are provided with timely access to information regarding activities on the Outer Continental Shelf and an opportunity to review and comment on decisions relating to such activities;

(12) funds must be made available to pay for the prompt removal of any oil spilled or discharged as a result of activities on the Outer Continental Shelf and for any damages to public or private interests caused by such spills or discharges;

(13) because of the possible conflicts between exploitation of the oil and gas resources in the Outer Continental Shelf and other uses of the marine environment, including fish and shellfish growth and recovery, and recreational activity, the Federal Government must assume responsibility for the minimization or elimination of any conflict associated with such exploitation;

(14) the oil and gas resources of the Outer Continental Shelf are limited, nonrenewable resources which must be developed in a manner which takes into consideration the Nation's long-range energy needs and also assures adequate protection of the renewable resources of the Outer Continental Shelf which are a continuing and increasingly important source of food and protein to the Nation and the world; and

(15) funds must be made available to pay for damage to commercial fishing vessels and gear resulting from activities involving oil and gas exploration, development, and production on the Outer Continental Shelf.

(Pub. L. 95–372, title I, §101, Sept. 18, 1978, 92 Stat. 630.)

### Statutory Notes and Related Subsidiaries

#### Short Title of 1988 Amendment

Pub. L. 100–610, title I, §1, Nov. 5, 1988, 102 Stat. 3176, provided that: "This Act [probably should be 'This title', which amended section 1815 of this title] may be cited as the 'Outer Continental Shelf Operations Indemnification Clarification Act of 1988'."

#### Short Title

Pub. L. 95–372, §1, Sept. 18, 1978, 92 Stat. 629, provided: "That this Act [enacting this chapter, sections 1344 to 1356 of this title, and section 237 of Title 30, Mineral Lands and Mining, amending sections 1331 to 1334, 1337, 1340, and 1343 of this title, sections 1456, 1456a, and 1464 of Title 16, Conservation, and section 6213 of Title 42, The Public Health and Welfare, and enacting provisions set out as notes under sections 1348 and 1811 of this title] may be cited as the 'Outer Continental Shelf Lands Act Amendments of 1978'."

## § 1802. Congressional declaration of purposes

The purposes of this chapter are to—

(1) establish policies and procedures for managing the oil and natural gas resources of the Outer Continental Shelf which are intended to result in expedited exploration and development of the Outer Continental Shelf in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade;

(2) preserve, protect, and develop oil and natural gas resources in the Outer Continental Shelf in a manner which is consistent with the need (A) to make such resources available to meet the Nation's energy needs as rapidly as possible, (B) to balance orderly energy resource development with protection of the human, marine, and coastal environments, (C) to insure the public a fair and equitable return on the resources of the Outer Continental Shelf, and (D) to preserve and maintain free enterprise competition;

(3) encourage development of new and improved technology for energy resource production which will eliminate or minimize risk of damage to the human, marine, and coastal environments;

(4) provide States, and through States, local governments, which are impacted by Outer Continental Shelf oil and gas exploration, development, and production with comprehensive assistance in order to anticipate and plan for such impact, and thereby to assure adequate protection of the human environment;

(5) assure that States, and through States, local governments, have timely access to information regarding activities on the Outer Continental Shelf, and opportunity to review and comment on decisions relating to such activities, in order to anticipate, ameliorate, and plan for the impacts of such activities;

(6) assure that States, and through States, local governments, which are directly affected by exploration, development, and production of oil and natural gas are provided an opportunity to participate in policy and planning decisions relating to management of the resources of the Outer Continental Shelf;

(7) minimize or eliminate conflicts between the exploration, development, and production of oil and natural gas, and the recovery of other resources such as fish and shellfish;

(8) establish an oilspill liability fund to pay for the prompt removal of any oil spilled or discharged as a result of activities on the Outer Continental Shelf and for any damages to public or private interests caused by such spills or discharges;

(9) insure that the extent of oil and natural gas resources of the Outer Continental Shelf is assessed at the earliest practicable time; and

(10) establish a fishermen's contingency fund to pay for damages to commercial fishing vessels and gear due to Outer Continental Shelf activities.

(Pub. L. 95–372, title I, §102, Sept. 18, 1978, 92 Stat. 631.)

## § 1501.2  Apply NEPA early in the process.

Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts. Each agency shall:

(a) Comply with the mandate of section 102(2)(A) to "utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment," as specified by § 1507.2.

(b) Identify environmental effects and values in adequate detail so they can be compared to economic and technical analyses. Environmental documents and appropriate analyses shall be circulated and reviewed at the same time as other planning documents.

(c) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources as provided by section 102(2)(E) of the Act.

(d) Provide for cases where actions are planned by private applicants or other non-Federal entities before Federal involvement so that:

(1) Policies or designated staff are available to advise potential applicants of studies or other information foreseeably required for later Federal action.

(2) The Federal agency consults early with appropriate State and local agencies and Indian tribes and with interested private persons and organizations when its own involvement is reasonably foreseeable.

(3) The Federal agency commences its NEPA process at the earliest possible time.

## § 1501.3  When to prepare an environmental assessment.

(a) Agencies shall prepare an environmental assessment (§ 1508.9) when necessary under the procedures adopted by individual agencies to supplement these regulations as described in § 1507.3. An assessment is not necessary if the agency has decided to prepare an environmental impact statement.

(b) Agencies may prepare an environmental assessment on any action at any time in order to assist agency planning and decisionmaking.

## § 1501.4  Whether to prepare an environmental impact statement.

In determining whether to prepare an environmental impact statement the Federal agency shall:

(a) Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which:

(1) Normally requires an environmental impact statement, or

(2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§ 1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1).

(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

(d) Commence the scoping process (§ 1501.7), if the agency will prepare an environmental impact statement.

(e) Prepare a finding of no significant impact (§ 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

(1) The agency shall make the finding of no significant impact available to the affected public as specified in § 1506.6.

(2) In certain limited circumstances, which the agency may cover in its procedures under § 1507.3, the agency shall make the finding of no significant impact available for public review (including State and areawide clearinghouses) for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin. The circumstances are:

apply the regulations in this subchapter to ongoing activities and environmental documents begun before September 14, 2020.

## PART 1507—AGENCY COMPLIANCE

Sec.
1507.1   Compliance.
1507.2   Agency capability to comply.
1507.3   Agency NEPA procedures.
1507.4   Agency NEPA program information.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

SOURCE: 85 FR 43373, July 16, 2020, unless otherwise noted.

### § 1507.1   Compliance.

All agencies of the Federal Government shall comply with the regulations in this subchapter.

### § 1507.2   Agency capability to comply.

Each agency shall be capable (in terms of personnel and other resources) of complying with the requirements of NEPA and the regulations in this subchapter. Such compliance may include use of the resources of other agencies, applicants, and other participants in the NEPA process, but the agency using the resources shall itself have sufficient capability to evaluate what others do for it and account for the contributions of others. Agencies shall:

(a) Fulfill the requirements of section 102(2)(A) of NEPA to utilize a systematic, interdisciplinary approach that will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making that may have an impact on the human environment. Agencies shall designate a senior agency official to be responsible for overall review of agency NEPA compliance, including resolving implementation issues.

(b) Identify methods and procedures required by section 102(2)(B) of NEPA to ensure that presently unquantified environmental amenities and values may be given appropriate consideration.

(c) Prepare adequate environmental impact statements pursuant to section 102(2)(C) of NEPA and cooperate on the development of statements in the areas where the agency has jurisdiction by law or special expertise or is authorized to develop and enforce environmental standards.

(d) Study, develop, and describe alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources, consistent with section 102(2)(E) of NEPA.

(e) Comply with the requirements of section 102(2)(H) of NEPA that the agency initiate and utilize ecological information in the planning and development of resource-oriented projects.

(f) Fulfill the requirements of sections 102(2)(F), 102(2)(G), and 102(2)(I), of NEPA, Executive Order 11514, Protection and Enhancement of Environmental Quality, section 2, as amended by Executive Order 11991, Relating to Protection and Enhancement of Environmental Quality, and Executive Order 13807, Establishing Discipline and Accountability in the Environmental Review and Permitting for Infrastructure Projects.

### § 1507.3   Agency NEPA procedures.

(a) Where existing agency NEPA procedures are inconsistent with the regulations in this subchapter, the regulations in this subchapter shall apply, consistent with § 1506.13 of this chapter, unless there is a clear and fundamental conflict with the requirements of another statute. The Council has determined that the categorical exclusions contained in agency NEPA procedures as of September 14, 2020 are consistent with this subchapter.

(b) No more than 36 months after September 14, 2020, or 9 months after the establishment of an agency, whichever comes later, each agency shall develop or revise, as necessary, proposed procedures to implement the regulations in this subchapter, including to eliminate any inconsistencies with the regulations in this subchapter.When the agency is a department, it may be efficient for major subunits (with the consent of the department) to adopt their own procedures. Except for agency efficiency (see paragraph (c) of this

section) or as otherwise required by law, agency NEPA procedures shall not impose additional procedures or requirements beyond those set forth in the regulations in this subchapter.

(1) Each agency shall consult with the Council while developing or revising its proposed procedures and before publishing them in the FEDERAL REGISTER for comment. Agencies with similar programs should consult with each other and the Council to coordinate their procedures, especially for programs requesting similar information from applicants.

(2) Agencies shall provide an opportunity for public review and review by the Council for conformity with the Act and the regulations in this subchapter before adopting their final procedures. The Council shall complete its review within 30 days of the receipt of the proposed final procedures. Once in effect, the agency shall publish its NEPA procedures and ensure that they are readily available to the public.

(c) Agencies shall adopt, as necessary, agency NEPA procedures to improve agency efficiency and ensure that agencies make decisions in accordance with the Act's procedural requirements. Such procedures shall include:

(1) Designating the major decision points for the agency's principal programs likely to have a significant effect on the human environment and assuring that the NEPA process begins at the earliest reasonable time, consistent with §1501.2 of this chapter, and aligns with the corresponding decision points.

(2) Requiring that relevant environmental documents, comments, and responses be part of the record in formal rulemaking or adjudicatory proceedings.

(3) Requiring that relevant environmental documents, comments, and responses accompany the proposal through existing agency review processes so that decision makers use the statement in making decisions.

(4) Requiring that the alternatives considered by the decision maker are encompassed by the range of alternatives discussed in the relevant environmental documents and that the decision maker consider the alternatives described in the environmental docu-

ments. If another decision document accompanies the relevant environmental documents to the decision maker, agencies are encouraged to make available to the public before the decision is made any part of that document that relates to the comparison of alternatives.

(5) Requiring the combination of environmental documents with other agency documents. Agencies may designate and rely on one or more procedures or documents under other statutes or Executive orders as satisfying some or all of the requirements in this subchapter, and substitute such procedures and documentation to reduce duplication. When an agency substitutes one or more procedures or documents for the requirements in this subchapter, the agency shall identify the respective requirements that are satisfied.

(d) Agency procedures should identify those activities or decisions that are not subject to NEPA, including:

(1) Activities or decisions expressly exempt from NEPA under another statute;

(2) Activities or decisions where compliance with NEPA would clearly and fundamentally conflict with the requirements of another statute;

(3) Activities or decisions where compliance with NEPA would be inconsistent with Congressional intent expressed in another statute;

(4) Activities or decisions that are non-major Federal actions;

(5) Activities or decisions that are non-discretionary actions, in whole or in part, for which the agency lacks authority to consider environmental effects as part of its decision-making process; and

(6) Actions where the agency has determined that another statute's requirements serve the function of agency compliance with the Act.

(e) Agency procedures shall comply with the regulations in this subchapter except where compliance would be inconsistent with statutory requirements and shall include:

(1) Those procedures required by §§1501.2(b)(4) (assistance to applicants) and 1506.6(e) of this chapter (status information).

(2) Specific criteria for and identification of those typical classes of action:

(i) Which normally do require environmental impact statements.

(ii) Which normally do not require either an environmental impact statement or an environmental assessment and do not have a significant effect on the human environment (categorical exclusions (§ 1501.4 of this chapter)). Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect. Agency NEPA procedures shall identify when documentation of a categorical exclusion determination is required.

(iii) Which normally require environmental assessments but not necessarily environmental impact statements.

(3) Procedures for introducing a supplement to an environmental assessment or environmental impact statement into its formal administrative record, if such a record exists.

(f) Agency procedures may:

(1) Include specific criteria for providing limited exceptions to the provisions of the regulations in this subchapter for classified proposals. These are proposed actions that are specifically authorized under criteria established by an Executive order or statute to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive order or statute. Agencies may safeguard and restrict from public dissemination environmental assessments and environmental impact statements that address classified proposals in accordance with agencies' own regulations applicable to classified information. Agencies should organize these documents so that classified portions are included as annexes, so that the agencies can make the unclassified portions available to the public.

(2) Provide for periods of time other than those presented in § 1506.11 of this chapter when necessary to comply with other specific statutory requirements, including requirements of lead or co-operating agencies.

(3) Provide that, where there is a lengthy period between the agency's decision to prepare an environmental impact statement and the time of actual preparation, the agency may publish the notice of intent required by § 1501.9(d) of this chapter at a reasonable time in advance of preparation of the draft statement. Agency procedures shall provide for publication of supplemental notices to inform the public of a pause in its preparation of an environmental impact statement and for any agency decision to withdraw its notice of intent to prepare an environmental impact statement.

(4) Adopt procedures to combine its environmental assessment process with its scoping process.

(5) Establish a process that allows the agency to use a categorical exclusion listed in another agency's NEPA procedures after consulting with that agency to ensure the use of the categorical exclusion is appropriate. The process should ensure documentation of the consultation and identify to the public those categorical exclusions the agency may use for its proposed actions. Then, the agency may apply the categorical exclusion to its proposed actions.

[85 FR 43373, July 16, 2020, as amended at 86 FR 34158, June 29, 2021]

§ 1507.4 Agency NEPA program information.

(a) To allow agencies and the public to efficiently and effectively access information about NEPA reviews, agencies shall provide for agency websites or other means to make available environmental documents, relevant notices, and other relevant information for use by agencies, applicants, and interested persons. Such means of publication may include:

(1) Agency planning and environmental documents that guide agency management and provide for public involvement in agency planning processes;

(2) A directory of pending and final environmental documents;

(3) Agency policy documents, orders, terminology, and explanatory materials regarding agency decision-making processes;

(4) Agency planning program information, plans, and planning tools; and

**§ 1508.6  Council.**

*Council* means the Council on Environmental Quality established by title II of the Act.

**§ 1508.7  Cumulative impact.**

*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

**§ 1508.8  Effects.**

*Effects* include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

**§ 1508.9  Environmental assessment.**

*Environmental assessment:*

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

**§ 1508.10  Environmental document.**

*Environmental document* includes the documents specified in § 1508.9 (environmental assessment), § 1508.11 (environmental impact statement), § 1508.13 (finding of no significant impact), and § 1508.22 (notice of intent).

**§ 1508.11  Environmental impact statement.**

*Environmental impact statement* means a detailed written statement as required by section 102(2)(C) of the Act.

**§ 1508.12  Federal agency.**

*Federal agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. It also includes for purposes of these regulations States and units of general local government and Indian tribes assuming NEPA responsibilities under section 104(h) of the Housing and Community Development Act of 1974.

**§ 1508.13  Finding of no significant impact.**

*Finding of no significant impact* means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§ 1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§ 1501.7(a)(5)). If the assessment is included, the finding need not

492

USCA Case #22-5036    Document #1969190    Filed: 01/25/2023    Page 60 of 61

## DEPARTMENT OF THE INTERIOR

### Geological Survey

### 30 CFR Part 250

### Oil and Gas and Sulphur Operations in the Outer Continental Shelf

**AGENCY:** Department of the Interior, U.S. Geological Survey.

**ACTION:** Final rule.

**SUMMARY:** This rule incorporates the modifications of 30 CFR 250.34 required to conform to the Outer Continental Shelf (OCS) Lands Act Amendments of 1978, 92 stat. 629 (herein referred to as the "Act"). A proposed rule was published on January 17, 1979, in the Federal Register (44 FR 3513). The proposed rule described modifications in existing practices and procedures related to (1) exploration activities on OCS oil and gas leases, (2) coordination and consultation with the Governors of affected States and the executives of affected local governments, and (3) development and production activities on OCS oil and gas leases. Issuance of this rule implements the changes that are needed to make the provisions of section 250.34 consistent with the Act.

**DATES:** This rule becomes effective December 13, 1979.

**ADDRESSES:** A copy of 30 CFR 250.34 may be obtained from the following offices of the Geological Survey:

Director, U.S. Geological Survey; National Center—Mail Stop 620, Reston, Virginia 22092.

Conservation Manager—Eastern Region, U.S. Geological Survey, 1725 K Street, N.W., Suite 204, Washington, D.C. 20244.

Conservation Manager—Gulf of Mexico Region, U.S. Geological Survey, 336 Imperial Office Building, P.O. Box 7944, Metairie, Louisiana 70010.

Conservation Manager—Western Region, U.S. Geological Survey, 345 Middlefield Road, Menlo Park, California 94205.

Area Oil and Gas Supervisor—Pacific Area, U.S. Geological Survey, 1340 West Sixth Street, Room 160, Los Angeles, California 90017.

Area Oil and Gas Supervisor—Alaska Area, U.S. Geological Survey, 800 "A" Street, Suite 109, Anchorage, Alaska 99501.

**FOR FURTHER INFORMATION CONTACT:** Gerald D. Rhodes, Branch of Marine Oil and Gas Operations, Conservation Division, Mail Stop 620, U.S. Geological Survey, National Center, Reston, Virginia 22092, (703) 860–7531.

**Supplementary Information**

Background: Rules establishing practices and procedures under which the U.S. Geological Survey (herein referred to as the "Survey") makes information contained in exploration plans and development and production plans available to affected States, executives of affected local governments, and other interested parties were published January 27, 1978 (43 FR 3880). Those practices and procedures were set out in a revise § 250.34 of Title 30 of the Code of Federal Regulations. On September 18, 1978, the OCS Lands Act Amendments of 1978 were enacted (Public Law 95–372). Certain provisions of the Act required revision of the regulations published January 27, 1978. By notice of November 1, 1978 (43 FR 50903), the Department of the Interior temporarily suspended certain provisions of 30 CFR 250.34 pending full implementation of the Act. A proposed rule incorporating the modifications of § 250.34 was published January 17, 1979 (44 FR 3513). In addition, on May 10, 1979, proposed modifications to 30 CFR 250.34 were published to implement the requirement of section 5(a)(8) of the Act that the Secretary of the Interior issue regulations which provide for compliance with the national ambient air quality standards pursuant to the Clean Air Act (42 U.S.C. 7401, et seq.) to the extent that activities authorized under the Act significantly affect the air quality of any State. Those modifications are being developed under a separate rulemaking activity.

Comments: A total of 50 sets of comments and recommendations were timely submitted in response to the invitation contained in the notice of proposed rule published January 17, 1979. Comments and recommendations were received from 2 private citizens, 5 public interest groups, 12 State and local government agencies, and 31 oil and gas companies and trade organizations.

Public Hearings: Oral testimony relating to the proposed revisions of 30 CFR 250.34 was also taken at public hearings held in Los Angeles, California; New Orleans, Louisiana; and Washington, D.C.

Differences Between Proposed Rule and Final Rule: The differences between the provisions of the final rule and the provisions of the proposed rule are the result of the Department's efforts to incorporate the comments of the public, to make the provisions of the final rule more clear, and to assure conformance with the Act. In this regard, special attention has been given to the specific provisions of sections 5, 11, 19, 21, and 25 of the Act (43 U.S.C. 1334; 1340; 1345; 1333; and 1351 respectively).

Discussion of Major Comments

General Comments: (1) *Duplication of efforts.* Several respondents suggested that implementation of the proposed regulations would result in unnecessary duplication of effort by lessees. In keeping with Departmental policy, every effort was made to eliminate duplicative paperwork, reduce the volume of material submitted, and simplify the review procedures as fully as possible. Our review of the proposed rule identified no instance of significant duplication. When a lessee is required to submit information or data already in the possession of the Survey office that is to review the plan and accompanying Environmental Report, the lessee shall incorporate that information or data into the plan or report by appropriate reference identifying the documents and page numbers where the specific information or data will be found in the records of the Survey.

(2) *Need for regulatory analysis.* Several respondents suggested that implementation of the proposed regulations would have a significant impact on the Nation's economy and the oil and gas industry. They recommended the preparation of a regulatory analysis pursuant to Executive Order 12044. Prior to the publication of the modifications of 30 CFR 250.34 the Survey prepared a Negative Declaration and Regulatory Analysis. The "negative declaration" was based upon examination of the criteria established by the Department of the Interior (43 CFR Part 14) to determine whether the proposed regulations constituted a significant regulatory action requiring preparation of a regulatory analysis under Executive Order 12044. The examination indicated that an analysis was unnecessary based upon the following considerations: (1) The proposed changes were being made to existing regulations and did not mark a fundamental departure from established practices and procedures; (2) the proposed changes were in response to specific statutory requirements; and (3) the proposed changes should decrease the financial burden borne by lessees operating in the western Gulf of Mexico by eliminating the requirement that Environmental Reports be submitted with exploration plans or development and production plans, unless information contained in an Environmental Report is needed by a State to make a coastal zone consistency determination.

A review of that determination and the comments submitted by respondents failed to develop any basis or criteria which demonstrated any error in the

USCA Case #22-5038    Document #1983158    Filed: 01/25/2023    Page 61 of 61

previous negative determination or to justify a change in that determination.

(3) *Need for Environmental Impact Statement.* Several respondents indicated that implementation of the revised regulations would constitute a major Federal action significantly affecting the quality of the human environment, and that preparation of a detailed environmental impact statement (EIS) is required for compliance with section 102(2)(C) of the National Environmental Policy Act. Prior to the publication of the proposed modifications of 30 CFR 250.34, the Survey prepared a Negative Declaration and Environmental Assessment. The "negative declaration" was based upon the fact that the proposed regulations are specifically designed to, among other things, assure the protection of the marine, coastal, and human environments. The proposed regulations recognize that exploration activities and development and production activities may significantly affect the environment and provide for the evaluation of the effects of those activities. In those instances where significant impacts adversely affecting the marine, coastal, and human environments are identified, EIS's will be prepared in accordance with section 102(2)(C) of the National Environmental Policy Act.

(4) *Identity of official to administer regulations.* Several respondents expressed concern over the designation of the Director of the Geological Survey as the responsible administering official in 30 CFR 250.34. Current regulations identify the Supervisor as the official responsible for administering the regulations in 30 CFR 250.34. Respondents indicated that the proposed change would tend to create delays and confusion, and would disrupt the present system which has worked well for many years. We have not adopted the suggestion to designate the Supervisor as the USGS official administering these regulations. However, the change incorporated into these regulations will not appreciably alter present practices and procedures under which the Area Oil and Gas Supervisors and District Supervisors administer the provisions of 30 CFR Part 250, including § 250.34. Most of the authorities previously delegated to the Supervisor through the regulations will be delegated to the Supervisor or comparable officer through a Delegation of Authority from the Director. This approach anticipates a pending reorganization of the Conservation Division which will modify the organizational structure of offices at the Area and District levels.

(5) *Effective date of rule.* One respondent recommended that it be made clear that exploration plans and development and production plans submitted after the effective date of these regulations will be subject to the requirements of these regulations. This respondent also questioned when the revised regulations will become effective. The review and processing of exploration plans and development and production plans submitted after the effective date of these regulations will be governed by the applicable provisions of these regulations. The effective date of these regulations will be the 91st day following their publication in the Federal Register as final rule.

(6) *Environmental reports.* Several respondents took exception to the decision to continue requiring the submission of Environmental Reports in support of exploration plans and development and production plans. Some questioned the Department's legal authority to require the reports, and many complained that the information contained in a lease sale EIS is sufficient to determine the environmental impact of activities covered in plans. Finally, some pointed out that the information required is so detailed, particularly for development and production plans, that the preparation of Environmental Reports is tantamount to preparing an EIS. The Department believes that it has ample authority to require the submission of Environmental Reports and that this authority predates enactment of the OCS Lands Act Amendments of 1978. The specific requirement that a lessee submit an Environmental Report in support of proposed exploration plans and development and production plans has been a part of the regulations governing oil and gas operations in the OCS since January 27, 1978. Similar information has been required of lessees on a case-by-case basis since the earliest oil and gas operations were regulated on the OCS. The information contained in Environmental Reports is needed to carry out the purposes of the Act and the specific requirements of sections 11(c)(1), 25(a)(2), and 25(h)(1) of the Act. Although impacts of exploration activities may be covered, to a degree, in the corresponding lease sale EIS, the information and data contained in the corresponding lease sale EIS are not generally sufficiently site-specific to provide adequate environmental information and data for the review of exploration or development and production plans. To the extent that the information and data in the

corresponding lease sale EIS are sufficient, the governing provisions of the regulations make it clear that the lessee is to incorporate that information and data in the Environmental Report by appropriate reference and to avoid unnecessary detail and length. The intention is that information be sufficiently detailed to permit the evaluation of the impacts of the proposed activities, considering operating conditions in the lease area as well as past experience. It also recognizes the Department's agreement with the Office of Coastal Zone Management to require specific information in order that coastal States with approved coastal zone management programs will have access to sufficient information for the coastal zone consistency reviews required under the Coastal Zone Management Act.

(7) *Gulf of Mexico exemption.* Treatment in the proposed regulations of the exemption for certain Gulf of Mexico leases created in section 25(a)(1) of the Act has raised several questions.

First, some respondents requested clarification of those parts of the Gulf subject to the exemption. A number of commenters accurately pointed out that the proposed regulations are not precise in identifying those parts of the OCS that are adjacent to Florida. One respondent recommended limiting this area to the tracts which are contiguous with the seaward boundary of Florida, while most urged the adoption of the area identified in the June 7, 1978, Federal Register (43 FR 24711). In order to correct the ambiguity of the proposed regulatory language, the regulations have been modified to indicate that the Director will determine which OCS areas of the Gulf of Mexico are adjacent to the State of Florida. In making these determinations the Director will use, if they are available, the projected boundaries of each State established by the National Oceanic and Atmospheric Administration.

The terms "eastern Gulf of Mexico" and "western Gulf of Mexico" will be used to differentiate between the portions of the Gulf subject to the exemption. Definitions will be added to 30 CFR 250.2 which indicate that, as used in § 250.34, "western Gulf of Mexico" means all OCS areas of the Gulf of Mexico except those deemed by the Director to be adjacent to the State of Florida and "eastern Gulf of Mexico" means all OCS areas of the Gulf of Mexico deemed by the Director to be adjacent to the State of Florida.

A second issue which arose concerned the extent of the exemption created for western Gulf of Mexico