**ORAL ARGUMENT SCHEDULED FOR MARCH 3, 2023**

**Nos. 22-5036; 22-5037**

_____

**UNITED STATES COURT OF APPEALS
FOR THE D.C. CIRCUIT**

_____

FRIENDS OF THE EARTH, *ET AL.*,

*Plaintiffs-Appellees*,

v.

DEBRA A. HAALAND, in her official capacity as Secretary of the Interior, *et al.*,

*Defendants*,

STATE OF LOUISIANA AND AMERICAN PETROLEUM INSTITUTE,

*Intervenors-Defendants-Appellants*.

_____

On Appeal from the U.S. District Court for the
District of Columbia, No. 1:21-cv-2317-RC

_____

**BRIEF FOR THE STATE OF LOUISIANA**

_____

JEFF LANDRY
Attorney General
ELIZABETH B. MURRILL*
  Solicitor General
  *Counsel of Record
JOSEPH S. ST. JOHN
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUS-
TICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

TYLER R. GREEN
JEFFREY S. HETZEL
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423

*Counsel for the State of Louisiana*

## CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES

**Parties and Amici**. All parties, intervenors, and amici appearing before the district court and this Court are listed in appellants' and defendant-appellee's briefs.

**Ruling Under Review**. References to the ruling at issue appear in appellants' brief.

**Related Cases**. This case has not been before this Court or any other (besides the district court). Counsel is aware of no related cases, as defined by Circuit Rule 28(a)(1)(C), currently pending in this Court or any other.

## TABLE OF CONTENTS

Certificate as to Parties, Rulings & Related Cases ............................................. i

Table of Authorities ................................................................................ iii

Jurisdictional Statement & Statement of Issues .................................................1

Introduction ............................................................................................1

Statutes & Constitutional Provisions ...............................................................1

Statement of the Case .................................................................................1

    I.    The Statutory Framework for Oil-and-Gas Leasing on the Outer Continental Shelf. ....................................................................1

    II.   The 2017-2022 OCSLA Five-Year Program...................................5

    III.  Lease Sale 257. ...............................................................7

    IV.  The District Court Vacates the Lease Sale 257 ROD. .......................9

Summary of Argument .............................................................................10

Argument .............................................................................................10

    I.    Lease Sale 257 Complies with NEPA's Requirements....................10

        A.   BOEM was not required to consider downstream climate effects at the lease-sale stage....................................................11

        B.   Even if BOEM were required to consider downstream climate effects, it did so. .............................................................19

    II.   This Case Is a Paradigmatic Occasion for Remand Without Vacatur. .......................................................................21

Conclusion............................................................................................25

Certificate of Compliance ..........................................................................27

Certificate of Service ...............................................................................28

# TABLE OF AUTHORITIES*

## Cases

*Am. Great Lakes Ports Ass'n v. Schultz,
  962 F.3d 510 (D.C. Cir. 2020).................................................. 21, 23, 24

Black Oak Energy, LLC v. FERC,
  725 F.3d 230 (D.C. Cir. 2013)..................................................24

Ctr. for Biological Diversity v. Bernhardt,
  982 F.3d 723 (9th Cir. 2020) ...................................................17

*Defs. of Wildlife v. BOEM,
  871 F. Supp. 2d 1312 (S.D. Ala. 2012) .........................................15

Ensco Offshore Co. v. Salazar,
  781 F. Supp. 2d 332 (E.D. La. 2011) ...........................................2

Fisheries Survival Fund v. Haaland,
  858 F. App'x 371 (D.C. Cir. 2021) .............................................18

Fisheries Survival Fund v. Jewell,
  2018 WL 4705795 (D.D.C. Sept. 30)............................................18

Friends of the Earth v. Haaland,
  No. 1:21-cv-2317-RC (January 27, 2022) ........................................9

Louisiana v. Biden,
  No. 2:21-cv-778 (W.D. La. Mar. 31, 2021).......................................22

Nat'l Comm. for the New River v. FERC,
  373 F.3d 1323 (D.C. Cir. 2004) ...............................................10

*North Slope Borough v. Andrus,
  642 F.2d 589 (D.C. Cir. 1980).................................... 11, 13, 15, 16, 17

Oceana v. BOEM,
  37 F. Supp. 3d 147 (D.D.C. 2014) ...............................................4

*Sec'y of the Interior v. California,
  464 U.S. 312 (1984) ........................................... 2, 3, 4, 5, 11

---

* Our chief authorities are marked with asterisks.

*Sierra Club v. Morton,*
  510 F.2d 813 (5th Cir. 1975) ...............................................................11

*Sierra Club v. FERC*
  867 F.3d 1357 (D.C. Cir. 2017) ...........................................................17

*Sovereign Iñupiat for a Living Arctic v. BLM,*
  2021 WL 3667986 (D. Alaska Aug. 18) ...............................................17

*State of Cal. ex rel. Brown v. Watt,*
  668 F.2d 1290 (D.C. Cir. 1981) .............................................................3

*Suffolk v. Sec'y of the Interior,*
  562 F.2d 1368 (2d Cir. 1977) ...............................................................11

*Sugar Cane Growers Co-op. of Fla. v. Veneman,*
  289 F.3d 89 (D.C. Cir. 2002) ...............................................................24

*\*Tribal Vill. of Akutan v. Hodel,*
  869 F.2d 1185 (9th Cir. 1988) ............................................... 11, 14, 21

*Vill. of False Pass v. Clark,*
  733 F.2d 605 (9th Cir. 1984) ...............................................................15

*WildEarth Guardians v. Zinke,*
  368 F. Supp. 3d 41 (D.D.C. 2019) .......................................... 17, 19, 20, 22

*Wilderness Soc. v. Salazar,*
  603 F. Supp. 2d 52 (D.D.C. 2009) ........................................................13

**Statutes**

43 U.S.C. §1331 ....................................................................................23

43 U.S.C. §1332(3) ..............................................................................1, 2

43 U.S.C. §1334(a)(2)(A)(i) .................................................................4, 5

43 U.S.C. §1344(a) ..................................................................................3

43 U.S.C. §1344(c)(1) ..............................................................................3

43 U.S.C. §1344(c)(2) ..............................................................................3

**Other Authorities**

40 C.F.R. §1502.22 (2019 ed.) .............................................................20

81 Fed. Reg. 14881 (Mar. 18, 2016) ........................................................5

86 Fed. Reg. 6365 (Jan. 21, 2021)............................................................7

86 Fed. Reg. 54728 (Oct. 4, 2021) ...........................................................9

Bernhardt, Record of Decision for Gulf of Mexico Outer Continental Shelf
    Oil and Gas Lease Sale 257 (Jan. 21, 2021) ......................................7

BOEM, 2017-2022 Outer Continental Shelf Oil and Gas Leasing Proposed
    Final Program 3-1 (Nov. 18, 2016) ...............................................5, 6

Daniel-Davis, Record of Decision for Gulf of Mexico Outer Continental
    Shelf Oil and Gas Lease Sale 257 (Aug. 31, 2021) ...........................9

Jewell, Record of Decision and Approval of the 2017-2022 Outer
    Continental Shelf Oil and Gas Leasing Program 3 (Jan. 17, 2017)..............6

Pub. L. 83-212 (1953) ..............................................................................1

## JURISDICTIONAL STATEMENT & STATEMENT OF ISSUES

Louisiana adopts the jurisdictional statement and statement of issues of Appellant American Petroleum Institute. API Br. (Doc. 1983034) at 1-5.

## INTRODUCTION

The district court vacated Gulf of Mexico Lease Sale 257 for inadequately quantifying its effects on climate change. In doing so, the district court upended longstanding precedent holding that the National Environmental Policy Act does not require such speculative assessments at the lease-sale stage. It compounded this error by refusing to remand without vacatur. Its holding should be reversed.

## STATUTES & CONSTITUTIONAL PROVISIONS

All applicable statutes and constitutional provisions are in Appellants' brief.

## STATEMENT OF THE CASE

**I.    The Statutory Framework for Oil-and-Gas Leasing on the Outer Continental Shelf.**

Congress enacted the Outer Continental Shelf Lands Act in 1953 "to meet the urgent need for further exploration and development of oil and gas deposits." Pub. L. 83-212 (1953). OCSLA declares "the outer Continental Shelf" to be "a vital national resource reserve held by the Federal Govern-

ment for the public." 43 U.S.C. §1332(3). After the shock of the OPEC oil embargo, years of declining domestic production, and dissatisfaction with the Secretary's management of the leasing program, Congress stepped in and amended OCSLA in 1978 to "establish policies and procedures for managing the oil and natural gas resources of the Outer Continental Shelf." *Id.* §1802(1). Those updated policies and procedures "are intended to result in expedited exploration and development of the Outer Continental Shelf in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade." *Id.* To those ends, OCSLA directs the Secretary of the Interior to make the Shelf "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." *Id.* §1332(3); *see also Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 339 (E.D. La. 2011) (noting "OCSLA's overriding policy of expeditious development").

OCSLA facilitates the expeditious development of the Shelf's oil-and-gas resources by directing the Secretary to administer a competitive-leasing

program. That program consists of four stages and includes "specific requirements for consultation with Congress, between federal agencies, or with the States." *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984) .

The first stage of the OCSLA leasing process requires the Secretary to formulate a five-year leasing plan. *See* 43 U.S.C. §1344(a). The five-year plan "achieves important practical and legal significance" because it serves as "the basis for future planning by all affected entities, from federal, state and local governments to the oil industry itself." *State of Cal. ex rel. Brown v. Watt*, 668 F.2d 1290, 1299 (D.C. Cir. 1981). Creating a five-year plan is a massive undertaking consisting of mandatory consultation requirements, environmental assessments, and multiple comment periods. *See California*, 464 U.S. at 337-38. Among other things, OCSLA requires the Secretary to invite and consider suggestions from the governors of all affected States, 43 U.S.C. §1344(c)(1), submit copies of the proposed program to those governors for review and comment, *id.* §1344(c)(2), and reply in writing to any governor's request for modification, *id.* "The proposed leasing program is then submitted to the President and Congress, together with comments received by the Secretary from the governor of the affected state." *California*, 464 U.S. at 338 (citing 43 U.S.C. §1344(d)).

The second stage of the OCSLA leasing process consists of holding lease sales and includes another round of mandatory State consultation. OCSLA grants "[a]ny Governor of any affected State or the executive of any affected local government" the right to "submit recommendations to the Secretary regarding the size, timing, or location of a proposed lease sale." 43 U.S.C. §1345(a). The Secretary "shall accept" these recommendations if the Secretary "determines, after having provided the opportunity for consultation, that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State." *Id.* §1345(c).

The third stage of the OCSLA leasing process "is known as the exploration stage; during this stage, the Secretary reviews the lessee's exploration plan." *Oceana v. BOEM*, 37 F. Supp. 3d 147, 150 (D.D.C. 2014) (citing 43 U.S.C. §1340). This stage involves robust environmental review, and an environmental "plan must ... be disapproved if it would 'probably cause serious harm or damage ... to the marine, coastal, or human environment.'" *California*, 464 U.S. at 339 (quoting 43 U.S.C. §1334(a)(2)(A)(i)).

The fourth stage of the OCSLA leasing process is "development and production." *Id.* at 340. This stage also includes robust environmental re-

quirements, including that "the Secretary reviews the development and pro-

duction plan of the lessee for the purposes of actually producing oil and gas

from the leaseholds." *Oceana*, 37 F. Supp. 3d at 150. At the fourth stage, any

production "plan may ... be disapproved if it would 'probably cause serious

harm or damage ... to the marine, coastal or human environments.'" *Califor-

nia*, 464 U.S. at 340 (quoting 43 U.S.C. §1334(a)(2)(A)(i)).

## II.    The 2017-2022 OCSLA Five-Year Program.

Until June 30, 2022, lease sales in the Outer Continental Shelf are gov-

erned by the 2017-2022 Five Year Oil and Gas Leasing Program, or the "Five-

Year Program." *See* BOEM, 2017-2022 Outer Continental Shelf Oil and Gas

Leasing Proposed Final Program 3-1 (Nov. 18, 2016). The process of creating

the current Five-Year Program began in 2014 during the Obama Administra-

tion. In 2016, President Obama's Bureau of Ocean Energy Management pub-

lished a Proposed Five-Year Program. 81 Fed. Reg. 14881 (Mar. 18, 2016). In

formulating this Program, BOEM received over one million comments, held

public meetings, and created environmental impact statements in compli-

ance with the National Environmental Policy Act. *Id.*

After an extensive comment period, President Obama's BOEM pub-

lished the Proposed Final Program in November 2016. In recognition of the

"significant oil and gas resources" and "world-class, well-developed infrastructure, including established spill response capability" in the Gulf of Mexico, the Proposed Final Program scheduled "10 region-wide lease sales in the areas of the Gulf of Mexico that are not under Congressional moratorium or otherwise unavailable for leasing." BOEM, 2017-2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program S-2 (Nov. 18, 2016). The Proposed Final Program observed that "[i]n the Gulf of Mexico, infrastructure is mature" and "industry interest and support from affected states and communities is strong." *Id.* Thus, "[t]o take advantage of these incentives to OCS activity, the region-wide sale approach makes the entire leasable Gulf of Mexico OCS area available in each lease sale." *Id.*

On January 17, 2017—60 days after the Final Program was transmitted to President Obama and Congress—the Secretary approved the Final Program, "which schedule[d] 11 potential oil and gas lease sales, one sale in the Cook Inlet (Alaska) Program Area and 10 sales in the GOM Program Areas," with "one sale in 2017, two each in 2018-2021, and one in 2022." Jewell, Record of Decision and Approval of the 2017-2022 Outer Continental Shelf Oil and Gas Leasing Program 3 (Jan. 17, 2017). The Secretary's approval further specifically affirmed the specification that the sales "would be region-wide

and include unleased acreage not subject to moratorium or otherwise una-
vailable ... to provide greater flexibility to industry, including more frequent
opportunities to bid on rejected, relinquished, or expired OCS lease blocks."
*Id.* Until the halt of Lease Sale 257, all lease sales in the Five-Year Program
occurred on schedule.

### III.    Lease Sale 257.

The Final Program approved and scheduled the lease sale at issue
here—GOM OCS Oil and Gas Lease Sale 257, or "LS257." LS257 covers the
Western and Central Planning Areas of the Gulf of Mexico, together with a
portion of the Eastern Planning Area not subject to congressional morato-
rium. *Id.* The Secretary approved the LS257 Notice of Sale in a Record of De-
cision. *See* 86 Fed. Reg. 6365 (Jan. 21, 2021). In the ROD, the Secretary ana-
lyzed five separate alternatives, including a no-action option, and deter-
mined that Alternative A—a regionwide lease sale with minor exclusions—
would be "in the best interest of the Nation" and "meets the purposes of the
OCS Lands Act." Bernhardt, Record of Decision for Gulf of Mexico Outer
Continental Shelf Oil and Gas Lease Sale 257, at 5 (Jan. 21, 2021). The Secre-
tary also determined that LS257 "promotes domestic energy production,

which can reduce the need for oil imports," and promotes other national interests including "continued employment, labor income, [and] tax revenues." *Id.* at 8. Additionally, the Secretary found that "[c]ontinued oil and gas leasing on the OCS may also reduce the risk of spills from the transportation of imported energy resources," and that "revenue sharing with applicable coastal states and political subdivisions ... can help mitigate the risks and costs assumed by the States and communities in the area of the lease sale." *Id.* at 8.

The Secretary rejected the no-action alternative because "the needed domestic energy sources and the subsequent positive economic impacts from exploration and production, including employment, would not be realized" and "revenue would not be collected by the Federal Government nor subsequently disbursed to the States." *Id.* at 10. Additionally, the Secretary found that alternative sources of energy "may have different but comparable levels of negative environmental impacts, such as the risk of spills from the transportation of alternative oil supplies over long distances." *Id.* That meant the no-action alternative "would not avoid the incremental contribution of the energy substitutes' impacts to those same cumulative effects." *Id.* Finally,

the Secretary's approval noted that the LS257 stipulations included "all prac-

ticable means to avoid or minimize environmental harm from the selected

alternative." *Id.* at 11. LS257 was formally scheduled for March 17, 2021. *Id.*

at 1.

After rescinding the LS257 ROD in February, Interior reissued the

ROD on August 31, 2021. The new ROD readopts the Bernhardt ROD's se-

lection of Alternative A, which is a Gulf of Mexico regionwide lease sale of

all available blocks subject to limited exceptions. *See* Daniel-Davis, Record of

Decision for Gulf of Mexico Outer Continental Shelf Oil and Gas Lease Sale

257 (Aug. 31, 2021). BOEM published a Final Notice of Sale on October 4,

2021. 86 Fed. Reg. 54728 (Oct. 4, 2021). LS257 occurred on Wednesday, No-

vember 17, 2021. *Id.*

## IV.   The District Court Vacates the Lease Sale 257 ROD.

Immediately after Interior reissued the LS257 ROD, Appellees brought

suit challenging it in the United States District Court for the District of Co-

lumbia. As relevant to this appeal, the district court held that Appellees'

claims were ripe, that LS257's ROD violated NEPA, and that remand with-

out vacatur was not warranted. *See* Doc. 78, *Friends of the Earth v. Haaland*,

No. 1:21-cv-2317-RC (January 27, 2022). Intervenor-Defendants timely appealed.

## SUMMARY OF ARGUMENT

The district court erred in vacating Lease Sale 257 for multiple independently sufficient reasons. *First*, Appellees' suit is not ripe. *Second*, BOEM did not violate NEPA, and, even if it did, it remedied any defect. *Third*, the district court erred in refusing to remand the ROD without vacatur. Louisiana addresses the second and third points in this brief.

## ARGUMENT

## I.    Lease Sale 257 Complies with NEPA's Requirements.

When reviewing compliance with NEPA, "the court's role is 'simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004). And "[w]hen an agency 'is evaluating scientific data within its technical expertise,' an 'extreme degree of deference to the agency' is warranted." *Id.*

### A.     BOEM was not required to consider downstream climate effects at the lease-sale stage.

The district court made the unpreceded holding that downstream climate effects must be analyzed before even the lease-sale stage of an Outer Continental Shelf oil-and-gas lease sale. In so holding, the district court upends the fundamental principle of NEPA review that different levels of analysis are required at different stages of tiered-development programs. And it ignores this Court's directly-on-point holding in *North Slope Borough v. Andrus* that downstream effects do *not* need to be considered at the OCSLA lease-sale stage. 642 F.2d 589, 606 (D.C. Cir. 1980).

A fundamental principle of NEPA review of OCSLA programs holds that "the amount and specificity of information necessary to meet NEPA requirements varies at each of OCSLA's stages." *Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1185, 1191-92 (9th Cir. 1988) (citing *California*, 464 U.S. 312 (1984); *Suffolk v. Sec'y of the Interior*, 562 F.2d 1368, 1378 (2d Cir. 1977); *Sierra Club v. Morton*, 510 F.2d 813, 828 (5th Cir. 1975)); *accord N. Slope Borough*, 642 F.2d at 606. By requiring before *the lease-sale stage* a full analysis of the downstream effects of greenhouse gas emissions occurring after *the final stage* of the OCSLA process, the district court collapses OCSLA's tiered structure into

11

one stage, thereby requiring consideration of *all* emissions effects in *one* EIS. That is error. The proper focus of review at the lease-sale stage is "the limited preliminary activities permitted to the lessees during the lease sale phase." *N. Slope Borough v. Andrus*, 642 F.2d at 606.

In *North Slope*, this Court rejected a challenge alleging that an EIS prepared for an OCSLA lease sale violated NEPA because it failed to consider the environmental harms from a potential future oil spill. The Court held that Interior was not required to consider such effects at the lease-sale stage because "[d]rilling for commercial quantities of oil is in all likelihood at least two years away, even under a turn of events most favorable to the government and the oil companies." *Id.* at 605-06. OCSLA's tiered structure ensured that "[u]ncertainty over remote hazards can be rectified as more information is collected." *Id.* at 606. Considering the effects of future drilling at the lease-sale stage is not "logical and efficient" because "[i]t may eventuate that exploratory drilling is disappointing, or that severe environmental hazards become more clearly perceived." *Id.*

"[T]he multistage approach mandated by Congress" in OCSLA means that a lease-sale-stage EIS must focus on "those hazards associated with the limited preliminary activities permitted to the lessees during the lease sale

phase" rather than the alleged downstream effects from exploration and drilling. *Id.* Thus, this Court held that the EIS need only "cover[] imminent and prospective environmental difficulties" arising from the lease sale *itself* and upheld Interior's decision not to consider "remote hazards" at the lease-sale stage. *Id.*

*North Slope* decides this case. The district court's sole finding of fault with the adequacy of BOEM's environmental analysis is that it failed to analyze climate-change effects that *might* occur because of the lease. But those effects would manifest only after leases were issued; exploration occurred; oil or gas were discovered; an as-yet unascertainable amount is extracted, transported, refined, and used; and—then—emissions would follow. By contrast, the oil-spill scenario that the *North Slope* Court held was too speculative for NEPA analysis at the lease-sale stage would have occurred at the extraction or transport phase, long before the emissions phase. The emissions forming the basis of Appellees' claims are even further "removed from categorical relevance at th[e lease] stage" than the hazards in *North Slope*. *Id.* at 605. Accordingly, "[a]t this stage, with prodigious proposing and reviewing to follow," there is "no doubt that this EIS, useful and reasonably foresighted as it is, is valid under NEPA." *North Slope*, <u>642 F.2d at 606</u>.

Courts in this Circuit and around the country have applied *North Slope* to reject arguments that NEPA requires Interior to consider the effects of drilling and emissions at the lease-sale stage. *See Wilderness Soc. v. Salazar*, 603 F. Supp. 2d 52, 60 (D.D.C. 2009) ("[I]n the context of [OCSLA] leasing, courts have acknowledged that the limited information available at the leasing stage necessarily limits the scope of the environmental analysis."). The Ninth Circuit, for example, was "the least troubled by what may seem to be incomplete or speculative data at the lease sale stage" because before "exploration, it is difficult to make so much as an educated guess as to the volume of oil likely to be produced or the probable location of oil wells." *Hodel*, 869 F.2d at 1192. And "[w]ithout this information, an [environmental] analysis can never be more than speculative, regardless of what methodology is used. More accurate information will be available at later stages of the exploration process, and the Secretary can make appropriate alterations in the oil development plan at that time." *Id.* Because Interior "may refine [its] analysis based on information learned during later stages of exploration," the Ninth Circuit concluded that "[u]nder the standard applicable to the lease

sale stage" the "Secretary's environmental impact statement for Lease Sale 92 was adequate to meet the requirements of NEPA." *Id.*[1]

More recently, the Southern District of Alabama applied the *North Slope* rule to reject a NEPA challenge to the holding of Gulf of Mexico Lease Sale 213 of the 2007-2012 Five-Year Plan. *See Defs. of Wildlife v. BOEM*, <u>871 F. Supp. 2d 1312, 1338-39</u> (S.D. Ala. 2012) ("The particular stage that is relevant to this proceeding is the lease sale stage. Not the exploration stage. Not the production stage. Not any other drilling stage. 'If the distinction between a sale of a lease and the issuance of a permit to explore for, produce, or develop oil or gas seems excessively fine, it is a distinction that Congress has codified with great care.'").

The district court's response to this long-established rule is that past cases involved "the risk from oil spills or to specific animals." Op. 28. But

---

[1] Similarly, the Ninth Circuit has held that a lease-sale stage EIS passed NEPA muster even though it didn't "consider a worst case scenario of a 100,000–barrel oil spill" because "such an analysis was unnecessary at the lease sale stage." *Hodel*, <u>869 F.2d at 1191-92</u> (9th Cir. 1988) (citing <u>*Vill. of False Pass v. Clark*</u>, <u>733 F.2d 605</u> (9th Cir. 1984)). The Ninth Circuit rejected the plaintiffs' NEPA challenge based on the same "general principle" from *North Slope*—"the amount and specificity of information necessary to meet NEPA requirements varies at each of OCSLA's stages." *Id.*

*North Slope* spoke generally of "remote hazards," 642 F.2d at 606, not only oil spills, and in any event, the downstream effects of climate change are multiple steps *more* speculative than the possibility of oil spills. And just as the risk of an oil spill cannot be accurately judged at the lease-sale stage (because production is speculative), the risks of climate change from projects can only be analyzed once oil is discovered in particular wells and permits are set for approval.

The district court's alternative distinction based on "site-specific" information, Op. 28, does not withstand scrutiny. If the district court is correct that there is a "cumulative" programmatic increase in risk to the climate from the mere possibility of oil-and-gas production, there is also the same cumulative programmatic increase in risk to the environment from the mere possibility of an oil spill. But it was precisely this type of cumulative programmatic-risk assessment that *North Slope* rejected at the lease-sale stage because "[i]t may eventuate that exploratory drilling is disappointing, or that severe environmental hazards become more clearly perceived." 642 F.2d at 606.

Simply put, BOEM was not required to consider the effects of LS257 on carbon emissions. It is dubious whether NEPA requires speculative predictions about climate change at all, but existing caselaw makes clear that the appropriate time for any such assessments is not at stage two of a four-stage process. The district court cited no contrary case authorizing its novel holding. The cases it does cite fall into two categories: those that involved non-OCSLA programs, *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019); *Sovereign Iñupiat for a Living Arctic v. BLM*, 2021 WL 3667986 (D. Alaska Aug. 18), and a case involving the later drilling stage rather than the lease-sale stage, *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020).

Indeed, the district court accords nearly dispositive weight to the Ninth Circuit's holding in *Center for Biological Diversity* (which it terms "*Liberty*") and the District of Alaska's holding in *Sovereign Iñupiat* (which it terms "*Willow*"). But both *Liberty* and *Willow* involved final-stage agency actions. *Liberty* involved Interior's approval of a specific offshore-drilling facility *at the fourth stage of the OCSLA proce*ss. *Id.* at 731. If anything, *Liberty* shows that Interior will have the opportunity to consider climate effects down the line. But it should do so after the second stage so that "[u]ncertainty over remote

17

hazards can be rectified as more information is collected." *N. Slope Borough*, 642 F.2d at 606.

Willow involved a sale under the Mineral Leasing Act. MLA leases grant immediate rights to drill upon issuance of a lease, meaning that the lease sale was the last stage at which downstream environmental review could occur. By contrast, OCSLA is a multi-stage process with environmental review at each stage, so the lease-sale stage is neither the last nor best opportunity to assess climate-change impact. *Cf. Fisheries Survival Fund v. Jewell*, 2018 WL 4705795, at *8 (D.D.C. Sept. 30), *aff'd sub nom. Fisheries Survival Fund v. Haaland*, 858 F. App'x 371 (D.C. Cir. 2021) (noting difference for NEPA purposes between OCSLA and programs where the government "relinquished the authority to prevent all development" upon issuing a lease). Read in harmony with this Court's holdings, *Liberty* and *Willow*—cases involving the final stages in the drilling process—show that the lease-sale stage is not the time for considering downstream climate effects under OCSLA.

### B. Even if BOEM were required to consider downstream climate effects, it did so.

Though NEPA does not require Interior to consider carbon emissions resulting from production and transportation, Interior did prepare an extensive analysis considering LS257's effect on foreign and domestic carbon emissions. In three comprehensive environmental impact statements and a supplemental Determination of NEPA Adequacy, BOEM thoroughly addressed LS257's domestic and global climate effects. BOEM extensively discussed the effects of GHG emissions in the Programmatic EIS, JA 534-540 [AR0014377-AR0014383]; the Multisale EIS, JA 354-441 [AR0008116-AR0008483]; and Lease Sale EIS, JA 620-622 [AR0015678-AR0015680].

The primary flaw the district court finds in BOEM's analysis is that it did not apply the same level of analysis that the Ninth Circuit required in *Liberty*. But again, that ignores that *Liberty* occurred at the drilling stage and that different sale stages require different levels of analysis. Because the stage of the multi-stage process dictates the vigor of the NEPA review required, courts in this Circuit have correctly held that "NEPA does not require an agency to issue ... wholly speculative assessments at the leasing

19

stage." *WildEarth Guardians*, 368 F. Supp. 3d at 66. Instead, BOEM will "'continue to assess impacts as more information becomes available," and doing so "does not indicate that [it] failed to take a 'hard look' at the environmental consequences of the proposed action here." *Id.* at 67.

And as for the district court's finding of a purported flaw in BOEM's failure to "quantify the change in foreign emissions," Op. 37, courts have explicitly rejected the argument that an agency must "identify any past, present, or reasonably foreseeable GHG-emitting projects *worldwide*," and instead specifically held that an agency "would satisfy NEPA's hard look requirement" by quantitatively and qualitatively analyzing "local, regional, and national climate change." *Wildearth Guardians*, 368 F. Supp. 3d at 77.

BOEM also went above and beyond its NEPA requirements by issuing a Determination of NEPA Adequacy Supplement[2] that addresses *precisely* the concerns the district court raised. JA 727 [AR0029963]. In the Supplement, BOEM extensively discusses the Ninth Circuit's holding in *Center for*

---

[2] Contrary to the district court's observation, the January 5, 2021, Supplement, which is in the administrative record without objection, is appropriate to consider because it was part of the decisionmaking record before the agency when the Lease Sale 257 ROD was initially issued in January 2021 and when it was reissued in August 2021.

*Biological Diversity* and reaffirms BOEM's conclusion that it is "simply not possible at this time to calculate quantitative estimates [of global GHG impact] with the necessary credibility or scientific rigor." JA 729 [AR0029965]. And contrary to the district court's repeated assertions, BOEM does specifically recognize that it is "likely that foreign consumption would increase as a result of lower oil prices." *Id.* In compliance with the Council on Environmental Quality's binding NEPA regulations, BOEM also explicitly "identifie[s] that there is incomplete and unavailable information under 40 C.F.R. §1502.22 (2019 ed.) regarding the degree to which different countries would be impacted by a small drop in oil prices resulting from OCS production" and thus relies on a qualitative analysis. JA 730 [AR0029966].

## II.  This Case Is a Paradigmatic Occasion for Remand Without Vacatur.

If this Court holds that any portion of BOEM's actions violated NEPA, the appropriate remedy here is a remand to the agency without vacatur. "To determine whether to remand without vacatur, this court considers first, 'the seriousness of the [action's] deficiencies,' and, second, the 'likely disruptive consequences of vacatur.'" *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020).

21

The district court erred by holding that any flaw in BOEM's analysis is so serious as to warrant vacatur. As explained extensively above, the level of NEPA analysis varies with the stage of the OCSLA process. Because the analysis necessary at the lease-sale stage is comparatively minimal, to the extant an error exists, it is also minimal—especially since BOEM retains authority to require environmental review at each step of the process. Courts have thus been clear that "any technical deficiencies at the lease sale stage are unlikely to result in environmental damage." *Hodel*, 869 F.2d at 1192. The seriousness of any deficiency is thus small and easily remedied on remand. *See WildEarth Guardians*, 368 F. Supp. 3d at 84 ("BLM's NEPA violation consists merely of a failure to fully discuss the environmental effects of those lease sales; nothing in the record indicates that on remand the agency will necessarily fail to justify its decisions to issue EAs and FONSIs.").

Even if the flaw in BOEM's analysis were serious, the disruptive consequences of vacatur justify remand without vacatur. Coastal States like Louisiana rely on the orderly functioning of the OCSLA oil-and-gas lease-sale process. Louisiana structures its budgets with an eye to revenue from lease sales, particularly a sale as important as Sale 257. *See* Doc. 3-6, *Louisiana v. Biden*, No. 2:21-cv-778 (W.D. La. Mar. 31, 2021) (Declaration of Jerome

Zeringue, Chairman of Louisiana State Legislature Appropriations Committee). Take Louisiana's Coastal Restoration Plan. The Restoration Plan is the "largest climate-adaption plan in the country"; it seeks to protect and restore all 20 Louisiana coastal parishes. *Id.* ¶¶7-8. The Plan has resulted in over 315 miles of levees, 60 miles of barrier islands, and 46,000 acres of new land. *Id.* ¶8. The Restoration Plan's "only annual recurring source of revenue from the federal government comes from the Gulf of Mexico Energy Security Act." *Id.* ¶11. GOMESA has two primary sources of revenue: bonus bids from Gulf of Mexico lease sales and oil-and-gas production royalties from the Gulf. *Id.* ¶13. Chevron has already paid nearly $9.5 million in bonus bids to the federal government and is slated to pay nearly $38 million more. Doc. 71-1 at ¶7. Louisiana and other coastal States are entitled to 37.5 percent of these funds. *See* P.L. 109-432, 120 Stat. 3000, 43 U.S.C. §1331 note. Louisiana plans coastal restoration budgets in reliance on receiving these funds. By undoing LS257 through vacatur, the Court would seriously disrupt Louisiana's Coastal Restoration Plan and the ability of all Gulf States to rely on a steady stream of GOMESA revenues. *See* Zeringue Decl. ¶14 ("The cancellation of Lease 257, which was originally scheduled for March 2021, causes the State an immediate short-term loss in revenue from the bonus bids on the sale, as

well as longer term revenue losses in rents and royalties."). In short, the practical result of the district court's vacatur is to impede real-world action to address climate-change action based on speculative concern with a climate-change analysis.

Abrogating the bids for the November lease sale would also present the archetypical disruptive consequence—disrupting settled transactions. *Am. Great Lakes Ports Ass'n*, <u>962 F.3d at 519</u> ("[A] quintessential disruptive consequence arises when an agency cannot easily unravel a past transaction in order to impose a new outcome."); *see also Black Oak Energy, LLC v. FERC*, <u>725 F.3d 230, 244</u> (D.C. Cir<u>. 2013</u>). Money has already changed hands as a result of LS257. And, as the bidding entities document, LS257 cannot be redone with anything resembling a level playing field because bidding strategies are now public. *See, e.g.*, <u>Doc. 71 at 2-3</u> ("Equally, if not more, damaging is that the bids Chevron submitted for the leases are in the public domain, meaning that BOEM cannot simply restart the bidding process down the road."); <u>Doc. 73-1</u> (attesting to disruptive consequences for Exxon, BP, and Shell); *see Am. Great Lakes Ports Ass'n*, <u>962 F.3d at 519</u> ("[R]emand without vacatur remains an exceptional remedy, we have held that it is appropriate when vacatur would disrupt settled transactions."). Because money has

changed hands—and it is impossible to re-hold LS257 in a fair manner—
"[t]he egg has been scrambled and there is no apparent way to restore the
status quo ante." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97
(D.C. Cir. 2002).[3]

## CONCLUSION

The district court's judgment should be reversed.

---

[3] The district court minimizes Louisiana's reliance on GOMESA revenue by
asserting that Louisiana has no reasonable reliance in such revenue. But the
Five-Year Plan set out a lease-sale schedule and every lease sale in the Plan
has occurred on schedule. Thus, it was reasonable for Louisiana to rely upon
its *statutorily-entitled* bonus bids received from Lease Sale 257, which it
would receive regardless of whether the wells produced.

Respectfully submitted,

JEFF LANDRY
Attorney General
s/ *Elizabeth B. Murrill*
ELIZABETH B. MURRILL*
  Solicitor General
*Counsel of Record
JOSEPH S. ST. JOHN
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF
JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

TYLER R. GREEN
JEFFREY S. HETZEL
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423

## CERTIFICATE OF COMPLIANCE

This brief complies with this Court's briefing order because it contains 4988 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Palatino font.

Dated: January 25, 2023                    _s/ Elizabeth Murrill_

## CERTIFICATE OF SERVICE

I e-filed the original brief on June 6, 2022. I am e-filing this final brief on January 25, 2023, which will cause all counsel of record to be served through the courts ECF system.

Dated: January 25, 2023                    *s/ Elizabeth Murrill*